the Company's prior historical financial reporting, plaintiffs do not challenge the third quarter 2002 actual results. Looking forward, the Company announced that it expected fourth quarter 2002 revenues of approximately $29 million and EPS of $.08 and revised its projections for the year 2003, indicating that it now estimated revenues of $124 million to $130 million and EPS of $.32 to $.39. See id.

After VitalWorks' announcement, analysts covering the Company concurred that the Company had met or exceeded their expectations with respect to net income and EPS for the third quarter 2002, but fell slightly below their expectations -- by only about $1 million -- with respect to revenue. See Wells Fargo Report, dated October 24, 2002, attached as Exhibit 16 to Gallagher Aff.; William Blair Report dated October 24, 2002 attached as Exhibit 17 to Gallagher Aff. In light of the Company's reduced guidance for 2002 and reduced revenue and EPS guidance for 2003, these analysts lowered their projections for the remainder of 2002 and for 2003. Significantly, however, one analyst remained "impressed by management's ability to deliver profit and cash flow improvements." See Gallagher Aff. Ex. 17. In fact, when the Company reported its results for the fourth quarter 2002 and, thus, its annual 2002 results, the Company met its revised guidance for revenue and exceeded by $.01 its guidance (and analysts expectations) for EPS. See January 22, 2003 Press Release attached as Exhibit 18 to Gallagher Aff. Indeed, the Company reported $24.2 million in annual net income for 2002, or $.49 EPS, which exceeded the increased guidance that the Company announced in its April 23, 2002 press release. See id.; Gallagher Aff. Ex. 11. Following the announcement of these results, the analysts confirmed their confidence in Company management and noted that fourth quarter results demonstrated "that the Company's new products are being well received in the market place" (William Blair Report, dated January 23, 2003, attached as Exhibit 19 to Gallagher Aff.), in particular, as a result of experience with RadConnect RIS. See id.; Wells Fargo Report, dated

January 23, 2003 attached as Exhibit 20 to Gallagher Aff. Again, nowhere do plaintiffs challenge the Company's reported results for the fourth quarter 2002.

## ARGUMENT

### POINT I: THE COMPLAINT FAILS TO STATE A CLAIM UNDER SECTION 10(B)

To state a cause of action under Section 10(b), a plaintiff must plead that, in connection with the purchase or sale of a security, the defendant made a materially false statement of fact or omitted a material fact, with scienter, causing damage to the plaintiff. See Kalnit v. Eichler, 264 F.3d 131, 138 (2d Cir. 2001); Ganino, 228 F.3d at 161; In re Nortel Networks Corp. Sec. Litig., 238 F. Supp. 2d 613, 621 (S.D.N.Y. 2003). Plaintiffs' claims under Section 10(b) are deficient for three independent reasons. First, Defendants did not make any false or misleading statements of fact. Second, the challenged statements are protected by the statutory safe harbor for forward-looking statements enacted as part of the Reform Act. Third, plaintiffs have not alleged sufficient facts to raise a strong inference that Defendants acted with an intent to deceive, manipulate or defraud, as required by the Reform Act.

**A.    The Complaint Fails To Allege, With The Requisite Particularity, That Defendants Made False And Misleading Statements Of Fact**

Congress enacted the Reform Act to "establish uniform and more stringent pleading requirements to curtail the filing of meritless lawsuits." H.R. Conf. Rep. No. 104-369, at 41 (1995), reprinted in 1995 U.S.C.C.A.N. 730, 740. As such, the Reform Act sets forth heightened requirements for pleading falsity and scienter. See Spielman v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 332 F.3d 116, 122 & n.4 (2d Cir. 2003); Levitt v. Bear Stearns & Co., 340 F.3d 94, 104 (2d Cir. 2003); Silva Run Worldwide Ltd. v. Bear Stearns & Co., No. 96 Civ. 5102, 2000 WL 1672324, at *3 (S.D.N.Y. Nov. 6, 2000). Accordingly, to survive a motion to dismiss, a plaintiff must set forth each statement alleged to have been misleading, the reason

or reasons why the statement is misleading and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed. See 15 U.S.C. § 78u-4(b)(1); Rothman v. Gregor, 220 F.3d 81, 89 (2d Cir. 2000); Novak v. Kasaks, 216 F.3d 300, 306-07 (2d Cir.), cert. denied, 531 U.S. 1012 (2000). To the extent a complaint relies on anonymous sources to support its allegations of fraud, these sources must be "described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." Novak, 216 F.3d at 314.

Similarly, Rule 9(b) states that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge and other condition of mind of a person may be averred generally." Fed. R. Civ. P. 9(b). In this Circuit, Rule 9(b) requires that a complaint specify, with particularized factual allegations, the statements plaintiff contends were fraudulent, identify the speaker, state where and when the statements were made and explain why the statements were fraudulent. See Truncellito v. Scholastic Corp. (In re Scholastic Corp. Sec. Litig.), 252 F.3d 63, 69-70 (2d Cir.), cert. denied, 534 U.S. 1071 (2001); Anatian v. Coutts Bank (Switz.) Ltd., 193 F.3d 85, 88 (2d Cir. 1999), cert. denied, 528 U.S. 188 (2000); Mills v. Polar Molecular Corp., 12 F.3d 1170, 1175 (2d Cir. 1993). Plaintiffs "do not . . . enjoy a 'license to base claims of fraud on speculation and conclusory allegations.'" San Leandro Emer. Med. Grp. Profit Sharing Plan v. Philip Morris Cos., 75 F.3d 801, 813 (2d Cir. 1996) (citation omitted). Instead, "[p]laintiffs must accompany their legal theory with factual allegations that make their theoretically viable claim plausible." In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1418 (3d Cir. 1997). These requirements are "designed to provide a defendant with fair notice of a plaintiff's claim in order to enable defendant to prepare a defense, protect defendant's reputation or goodwill from harm,

and reduce the number of strike suits." Eickhorst v. American Completion & Dev. Corp., 706 F. Supp. 1087, 1091 (S.D.N.Y. 1989).

The Complaint consists of two categories of allegedly false or misleading statements made by Defendants: (1) that Defendants made false or misleading statements about its future business prospects regarding the Company's products, its new contract with Fuji and revenues anticipated to be generated as a result of the implementation of regulations mandated by HIPAA; and (2) that the Company's forecasts for future financial performance were false and misleading. Plaintiffs' allegations, however, are deficient, as a matter of law, in that the Complaint fails to satisfy the heightened pleading standards set forth in the Reform Act and Rule 9(b).

1. **VitalWorks' Products**

Plaintiffs assert that the Company had acknowledged in its public disclosures the risk that its financial and operating results depended on the success of its new Core products, and, in particular, RadConnect RIS. Compl. ¶ 41. In wholly conclusory terms, plaintiffs claim that Defendants knew or recklessly disregarded that "substantial problems" then existing with its software would prevent these products from gaining the necessary market acceptance, but publicly disclosed otherwise. Id. Incredibly, plaintiffs attempt to convert what is clearly identified as a risk disclosure into the basis for a fraud claim by asserting that Defendants were aware of information that manifested the possibility that the identified risk could actually occur! This rhetorical sleight of hand can hardly form the basis for a securities fraud claim.

In any event, the Complaint struggles desperately to identify specific statements by Defendants that plaintiffs contend were false and misleading with respect to the supposed disregard of the alleged "substantial problems" with the Company's software that prevented market acceptance of its Core products. Specifically, plaintiffs point to the following statements:

-13-

- In the Company's April 11, 2002 press release, the Company announced the introduction of its new Core product, RadConnect RIS, stating that "RadConnect RIS is one of the most significant product offerings in recent years, not just for VitalWorks but for the specialty as a whole, redefining the standards of speed, productivity and workflow." In the same release, Defendant Walsh characterized RadConnect RIS as an important part of the Company's product line and business plan. Compl. ¶ 44. See Gallagher Aff. Ex. 6.

- In a July 23, 2002 press release, the Company identified RadConnect RIS as a "noteworthy development[ ], highlight[ ] and metric of the second quarter." Compl. ¶ 46. See Gallagher Aff. Ex. 12.

- In an analyst conference call on July 23, 2002, Defendant Walsh responded to a question by estimating that approximately 40% of the software code for RadConnect RIS could be used to form the basis for additional new products. Compl. ¶ 47.

- In its Annual Report for the year ended December 31, 2001 -- filed with the SEC on March 29, 2002 -- the Company stated:

    > VitalWorks believes that there is a significant opportunity to provide system upgrades to those clients using classic and other non-core products by providing a migration path to VitalWorks' core products. . . . The Company is actively promoting the migration of these clients to newer products at the earliest possible opportunity.

    Compl. ¶ 81. See Gallagher Aff. Ex. 2.

- On May 6, 2002, Defendant Walsh sent a letter to shareholders, stating, "I am pleased to report that we have commercially released two next-generation radiology products . . . RadConnect RIS and RadConnect Results. . . . We believe that these products will be very attractive to our considerable radiology customer base as well as to the entire ambulatory radiology market." Compl. ¶ 88. See Gallagher Aff. Ex. 2, Letter to Shareholders, dated May 6, 2002.

The Complaint utterly fails to conform to even the most rudimentary pleading requirements established by the Reform Act and Rule 9(b). There are no allegations of fact that could possibly establish how or why any of these innocuous statements are in any way false or

-14-

misleading.[3] Moreover, because the entire Complaint is premised on plaintiffs' "information and belief" (see Compl. Preamble at p.1), the Complaint fails to state any particularized facts that would form the basis for the contention that these statements are false and misleading. See Wexner v. First Manhattan Co., 902 F.2d 169, 172 (2d Cir. 1990) (Even when a pleading is permitted upon information and belief, the complaint still "must adduce specific facts supporting a strong inference of fraud or it will not satisfy even a relaxed pleading standard"); Meilke v. Constellation Bancorp, No. 90 Civ. 3915, 1992 WL 47342, at **1-2 (S.D.N.Y. Mar. 4, 1992) (same).

Indeed, plaintiffs themselves are guilty of making misleading allegations by presenting certain of the challenged statements entirely out of context. For example, plaintiffs give the misleading impression that Defendants represented specific (and presumably false) financial information concerning RadConnect RIS in the July 23, 2002 press release. Compl. ¶¶ 46-47. According to the Complaint, the Company identified RadConnect RIS as a "noteworthy development[ ], highlight[ ] and metric of the second quarter." Compl. ¶ 46. But the press release itself reveals that no financial metrics were presented with respect to RadConnect RIS and that the only statement made about RadConnect RIS is the truthful observation that RadConnect RIS was commercially released in the second quarter. See Gallagher Aff. Ex. 12. Similarly, the Complaint gives the misleading impression that the Company's 2001 Annual Report falsely represented that the Company was "actively promoting

---

[3] In addition, as a matter of law, statements, such as many of those challenged in the Complaint, of corporate goals and general statements of optimism, or "puffery," are not actionable under the securities laws. See San Leandro, 75 F.3d at 811 (Cigarette manufacturer did not commit securities fraud by making public announcements that it was "optimistic" about its earnings and "expected" its leading brand to perform well because such statements constituted puffery, even though it had under consideration at time marketing plan involving reduction in price of leading brand likely to produce lower short-term earnings); Lasker v. New York State Elec. & Gas Corp., 85 F.3d 55, 59 (2d Cir. 1996) ("Soft, puffing statements . . . generally lack materiality . . .") (citation and internal quotations omitted).

the migration" of all of its Classic product customers to Core products. Compl. ¶¶ 81-82. Disingenuously, the Complaint deliberately omits two key sentences in the quoted paragraph in the Annual Report, which make clear that (1) the Company will only continue to provide customer support for Classic products where it is cost-effective and practical to do so and (2) the Company would be actively supporting migration to newer products for only 15% of its customers presently using the obsolete software in products that the Company intended to abandon at the earliest possible opportunity. See Gallagher Aff. Ex.2 at p. 4.

In a weak attempt to salvage their allegations concerning the Company's Core and Classic products, plaintiffs contend that Defendants "touted" these products, but disregarded "material facts" that RadConnect RIS contained "software bugs" that made the product unready for commercial release, causing new and existing customers to delay or avoid purchases of VitalWorks' products, which resulted in a negative effect on VitalWorks' sales. See Compl. ¶¶ 45, 48-51, 84, 86. Unfortunately for plaintiffs, however, the Complaint is completely lacking in any specific factual allegations to support their conclusory allegations, based on information and belief, of fraud. The Complaint contains no allegations of fact regarding what these alleged "bugs" consisted of; what impact, if any, these alleged "bugs" had on sales of RadConnect RIS and when; which customers delayed or avoided purchases of which products and in what amounts; which products were adversely affected by the alleged performance problems with RadConnect RIS; what information concerning the alleged software "bugs" was known to which Defendants and how they knew it. Nowhere does the Complaint explain why the Company actually did successfully sell RadConnect RIS units during 2002.

Plaintiffs' only attempt at specificity is the Complaint's reliance on certain anonymous, allegedly former employees of the Company. These sources, however, are entirely insufficient to prop up plaintiffs' deficient allegations of falsity concerning the challenged

-16-

statements about the Company's products. For example, plaintiffs cite to a "former Senior Software Specialist" for the vague and highly subjective conclusions that the software code was not "solid," that a beta test that allegedly continued until May 2002 -- very early in the Class Period -- confirmed that the "bugs" prevented the product from "performing as advertised," and that existing customers were reluctant to purchase newer VitalWorks products. Compl. ¶¶ 45, 48-49. Plaintiffs' anonymous source, however, does not provide them with the requisite specific pleading concerning the nature and significance of the alleged "bugs," the quantification of the alleged "problems" on sales volume and revenue and which customers were delaying purchases of what products and in what amounts. Nor does plaintiffs' description of the "former Senior Software Specialist" provide any basis for the Court to consider him/her as a credible source who would be in a position to know anything about the Company's actual sales of the product, discussions with customers, views of customers or the impact of these alleged "bugs" on sales and revenues, let alone on the Company's business plans and operations.

Similarly, plaintiffs rely on an alleged "former Senior Sales Executive" "who was responsible for sales to hospitals and large medical practices" for the unremarkable statement that the Company allegedly sold and installed 28 RadConnect RIS units between May 2002 and July 2003. Compl. ¶¶ 45, 51. Of course, the Complaint is entirely devoid of factual allegations concerning how the 28 units compared to the Company's sales plans; how many units have been sold but not yet installed; what quantifiable impact, if any, these observations had on the Company's forecasts and results at the time the allegedly false statements were made; and the timing and reasons for the status of these units in July 2003, some 9 months after the end of the Class Period.[4]

---

[4] The Complaint also makes unsupported allegations that unspecified customers of Classic products were not upgrading to Core products because they were having unsatisfactory experiences with their

2.  **The Fuji Strategic Alliance**

Plaintiffs next complain that Defendants touted the integration of the VitalWorks and Fuji systems, but that the strategic alliance allegedly failed to generate significant revenues, earnings or profits since its inception and had materially impeded VitalWorks' ability to meet its revenue and earnings guidance for fiscal years 2002 and 2003 by absorbing Company marketing and product development resources. Compl. ¶¶ 69, 80. In that regard, the Complaint identifies the following statements as being false and misleading:

- In the January 28, 2002 press release announcing the Fuji relationship, Defendant Walsh stated, "[w]e are extremely pleased to be working with Fuji, and we're excited to co-market an integrated solution to a market which is estimated to reach nearly $3 billion by 2010 . . . . VitalWorks' agreement with Fuji exemplifies its commitment to radiology by bringing to market the finest products and technologies available, in this case to a largely unserved segment of the market." Compl. ¶¶ 79-80; Gallagher Aff. Ex. 5.

- In its April 23, 2002 press release announcing first quarter 2002 earnings results, the Company identified the agreement with Fuji as an "other noteworthy development and highlight of the first quarter . . . ." Compl. ¶ 85; Gallagher Aff. Ex. 11

The Complaint contains absolutely no factual allegations to support the conclusion that these statements are false or misleading. It is difficult to understand how plaintiffs could even do so. The January 28, 2002 statement simply announces the Fuji partnership and expresses the Company's aspiration that the partnership will be successful and that the Company is committed to its radiology business. See Gallagher Aff. Ex. 5. Certainly,

---

Classic products. Compl. ¶¶ 56-65. These allegations are puzzling because, as plaintiffs must concede, the Company at all times disclosed that the Classic products were obsolete and would be receiving only limited support and that the Company only targeted some 15% of these customers for migration to new products. In any event, the Complaint provides no particularized factual allegations sufficient to satisfy the pleading requirements of the Reform Act and Rule 9(b) to link the anecdotes concerning alleged customer dissatisfaction with certain Classic products, on the one hand, and the allegedly false and misleading statements, on the other hand. Indeed, the anecdotal descriptions of customer unhappiness with obsolete Classic products is hardly surprising and is entirely consistent with the Company's public disclosures. See Gallagher Aff. Ex. 2.

plaintiffs do not contend that the Fuji contract was a sham and the Complaint concedes that radiology is a significant area of VitalWorks' business. See, e.g., Compl. ¶¶ 5, 40. The truth of the April 23, 2002 statement is self evident: the Fuji agreement was a "noteworthy development and highlight of the first quarter." Gallagher Aff. Ex. 11.

Plaintiffs contend that the statements were false and misleading because the Fuji partnership failed to contribute significant revenues or profits and materially impeded the Company's ability to meet its revenue and earnings guidance for fiscal years 2002 and 2003 by absorbing marketing and product development resources. Compl. ¶ 80. Again, the Complaint contains no factual allegations to support these contentions, relying solely on the fact that the Company disclosed in October 2002 that the Fuji arrangement had not generated much in the way of sales. Compl. ¶ 102. Yet, plaintiffs nowhere explain how the innocuous statements made in January and April 2002 could have been false at the time if the alleged basis for their falsity is the result of alleged events that necessarily occurred well after the statements were made. The fact that the Fuji partnership did not work out as hoped does not render these general aspirational statements false. See Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co., 32 F.3d 697, 703 (2d Cir. 1994) (refusing to allow plaintiff to plead "fraud by hindsight" where defendant's high-risk investment decision turned out to be unworkable).[5]

### 3. HIPAA Revenues

Plaintiffs allege that the Company's "robust estimates" of increased revenues based on regulatory changes mandated by HIPAA were false and misleading. The Complaint alleges that the Defendants misrepresented and failed to disclose that the Company was experiencing lower than expected system sales and upgrades related to HIPAA compliance and

---

[5] These statements are also immaterial, non-actionable puffery. See n.3, supra.

the slowdown in customer demand for HIPAA-compliant products had materially impacted the Company's ability to realize revenues. Compl. ¶¶ 78, 86. Plaintiffs identify the following HIPAA-related statements as false and misleading:

- The Company's 2001 Annual Report, stated that new regulations mandated by HIPAA require the industry to adopt a single electronic format for all payors, which will "enhance the utilization of electronic claim submission and open the door to many other types of burgeoning EDI services ... offer[ing] extraordinary potential ...." Compl. ¶ 71; Gallagher Aff. Ex. 2.

- The Company allegedly "represented" that the new HIPAA regulations required its clients and potential clients to make changes to their transaction processes during 2002 and 2003, and would increase incremental revenue by up to $30 million over a six-quarter period from the last half of 2002 to the end of 2003. See Compl. ¶¶ 72-73.

- In its April 23, 2002 press release, the Company stated, "[w]e are continuing to achieve growth in our software license sales across every division of the Company, a result of both core product upgrades revolving around HIPAA compliance as well as an increased ratio of competitive wins." Compl. ¶ 85; Gallagher Aff. Ex. 11.

- In a July 23, 2002 analyst conference call, Defendant Walsh stated, "I think that we'll see expanding revenues related to [HIPAA] upgrades, getting people the current versions. But I also believe that we'll be seeing revenues from that, certainly through the second quarter, but I also think it will probably go into the third, fourth quarter." Compl. ¶ 94; Transcript of July 23, 2002 Conference Call attached as Exhibit 21 to Gallagher Aff.

Again, plaintiffs' allegations are deficient. The Complaint contains no factual allegations, nor can it, to establish the falsity of the Company's characterization of the requirements of the new HIPAA regulations or statements that the Company's customer base would have to undertake steps to comply with the new regulations. Nor does the Complaint contain any factual allegations to contradict the Company's April 23, 2002 press release concerning continued growth in software license sales as a result, in part, of HIPAA-related upgrades. The Complaint cites no data and references no internal report or other specific

-20-

information to contradict the Company's statement that it was experiencing such growth at the time of the press release. With respect to the allegation that Defendants stated that the Company would generate $30 million in HIPAA-related revenue over the six-quarter period through the end of 2003, the Complaint fails to identify which Defendant made the statement, and contains no reference to where or when the statement was supposedly made. Assuming, however, that the statement was supposedly made in the Class Period, it is difficult to understand how plaintiffs can claim this statement -- allegedly made sometime in 2002 -- could be false when an entire year of experience lay ahead. Indeed, 2003 is not even over.

The apparent lynch-pin of Plaintiffs' actual claim concerns their contention that HIPAA-related revenue for the third quarter of 2002 did not materialize as anticipated when the Company issued new guidance at the beginning of that quarter. In particular, the Complaint focuses on Defendant Walsh's statement in the July 23, 2002 analyst conference call that VitalWorks would see expanding revenues related to HIPAA upgrades through the second, third and fourth quarters. Compl. ¶ 94. To support the claim that this statement was false and misleading because the Company was experiencing lower than expected sales and upgrades related to HIPAA compliance, the Complaint relies on an October 23, 2002 conference call, in which VitalWorks purportedly "admitted that fewer than 200,000 out of 2 million entities required to comply with HIPAA had filed for an extension, a fact suggesting that the vast majority had already complied with the requirement. When asked directly about HIPAA revenues, Walsh admitted that revenue from HIPAA would be less than forecasted." Compl. ¶¶ 76, 100; Transcript of October 23, 2002 Conference Call attached as Exhibit 22 to Gallagher Aff.

Again, plaintiffs partially quote and mischaracterize Defendant Walsh's explanation in the October 23, 2002 conference call. In that regard, Mr. Walsh indicated that the

-21-

Company had begun to notice a hesitation in the buying patterns of VitalWorks' enterprise and radiology customers: "We believe there are several factors contributing to this pattern. First, HIPAA has created a number of challenges. <u>We have seen a great deal of confusion as well as resistance of practices to adopt its mandates and comply with its deadlines</u>. In fact, it was reported in early September, that fewer than 200,000 covered entities out of more than 2 million entities covered by HIPAA, less than 10% to file for an important extension to October 15th deadline related to transaction processing services." <u>Id.</u>; Compl. ¶ 100 (emphasis supplied). Mr. Kahane expanded on this observation by stating that "clearly there are skeptics out there, people positioned to view the regulation as annoying and a waste of time, and they just don't care to deal with it, and they're going to wait 'til some major threat comes their way." Gallagher Aff. Ex. 22.

In other words, contrary to the Complaint's characterization, Messrs. Walsh and Kahane's statements clearly indicate that expected HIPAA revenues were merely delayed because the HIPAA compliance deadline was <u>pushed back</u> to October 16, 2003, and not only were the overwhelming majority of entities not in compliance with the HIPAA regulations, but they were extremely delinquent in even filing for an extension to comply with the regulation. It is significant to note that the Class Period ends in October 2002, one full year before the deadline for HIPAA compliance. At the very least, plaintiffs prematurely filed this action as it is still too early to tell whether VitalWorks' expectation of HIPAA revenue will be realized.

    **4.    Statements Regarding Financial Projections**

Nowhere does the Complaint allege that the actual financial results reported by VitalWorks were false and misleading. The Complaint contains no allegations of accounting fraud or a scheme to "cook the books." Instead, plaintiffs contend that certain of the Company's

projections of future financial performance were false and misleading. In that regard, plaintiffs identify the following forecasts as fraudulent:

- The Company's forecast, in its January 24, 2002 press release, for 2002 total revenue of approximately $120 million, net income of approximately $12 million and EPS of $.24. Compl. ¶¶ 77-78; Gallagher Aff. Ex. 8.

- The Company's forecast, in its April 23, 2002 press release, for second quarter revenues of $29 million; 2002 revenues of approximately $120 million and net income of $19.5 million; and 2003 revenues of between $132 and $138 million. Compl. ¶¶ 85-86; Gallagher Aff. Ex. 11.

- The repetition of the guidance set forth in the April 23, 2002 press release in the Company's Form 10-Q for the first quarter, that was filed with the SEC on May 15, 2002. Compl. ¶¶ 89-90; Gallagher Aff. Ex. 3.

- The Company's revised guidance, in its July 23, 2002 press release, that it was increasing guidance for 2002 to net income of $23 to $24.5 million and for 2003 of $132 to $138 million in revenues, $20 to $24 million in net income, or $.37 to $.45 EPS. Compl. ¶¶ 91-92; Gallagher Aff. Ex. 12.

- Defendant Walsh's confirmation of management's comfort until the revised guidance during the July 23, 2002 analyst conference call. Compl. ¶ 94; Gallagher Aff. Ex. 21.

According to plaintiffs, these forecasts were false and misleading because (1) the Company was experiencing lower than expected sales and upgrades related to HIPAA compliance; (2) there was a slowdown in customer demand for HIPAA-compliant products and services that materially impeded the Company's ability to generate revenues; (3) customers had delayed major systems purchases; (4) RadConnect RIS was not commercially viable; and (5) the Fuji venture did not generate sufficient revenues and profits. Compl. ¶¶ 78, 86, 90, 92 and 95. The Complaint is completely deficient, however, because it contains no factual allegations to support these conclusory assertions and, indeed, contains factual allegations that contradict plaintiffs' claims.

The Complaint contains no factual allegations concerning when the Company was experiencing lower than expected HIPAA-related sales and upgrades or when and how the Company became aware that this problem was inconsistent with its forecasts. The Complaint fails to specify any data concerning the inaccuracy of the forecasts; whether and to what extent the forecasts relied on revenue and profits from HIPAA-compliant products, RadConnect RIS or Fuji; and the difference between the forecasted revenue and profit from these alleged sources, if any, and the actual revenue and profit from these alleged sources. The Complaint fails to identify which customers were delaying purchases and the extent to which the forecasts assumed, if at all, sales to these customers. The Complaint simply assumes, based on sheer speculation, that the forecasts were wrong as a result of these alleged operational concerns, but the Complaint provides no factual support for its speculative assumptions.

Contrary to its conclusory allegations, the Complaint makes clear that, in fact, the forecasts were generally accurate. The Company consistently achieved or exceeded its forecasts for net income and EPS. The analyst reports -- on which the Complaint purports to rely -- make clear that the Defendants had, and have, significant credibility with the investment community and were viewed to be conservative in their forecast. The only projections that turned out to be incorrect were the original revenue forecasts for 2002 and the revised guidance for revenue for the third quarter 2002. But the analyst reports make clear that the analysts viewed revenues to be a soft metric and discounted the Company's guidance. Moreover, there are no factual allegations that would establish that the revenue forecasts were quantifiably unreasonable when made or that there was any quantifiable information that was available to Defendants that would have caused them to reduce the revenue forecasts any earlier than they actually did.

In fact, the allegations really reflect that once Defendants had information that would lead them to reduce revenue guidance, they did so promptly and conservatively. In so