doing, the Company was able to timely provide accurate forecasts to the market and, once guidance was reduced, met or exceeded the revised guidance in the fourth quarter of 2002. In light of its barren factual allegations, the Complaint cannot withstand a motion to dismiss.

### B. The Statements In The Complaint Are Protected By The Reform Act's Safe Harbor For Forward-Looking Statements

Until the late 1970s, SEC policy forbade companies from making forward-looking statements in mandatory disclosure documents. See Statement by the Commission on the Disclosure of Projections of Future Economic Performance, SEC Rel. Nos. 33-5362, 34-9984, 1973 WL 149309 (Feb. 2, 1973). In 1978, the SEC reversed itself and adopted a policy that encouraged disclosure of management forecasts. See Stransky v. Cummins Engine Co., 51 F.3d 1329 (7th Cir. 1995). A main reason for the change in policy was that the SEC "realized that . . . 'projections are currently widespread in the securities markets and are relied upon in the investment process. Persons invest with the future in mind and the market value of a security reflects the judgments of investors about the future economic performance of the issuer. Thus, projections are sought by all investors, whether institutional or individual.'" See id. at 1333.

Consistent with the SEC's longstanding policy to encourage disclosure of forward-looking information, the Reform Act created a statutory safe harbor for statements that qualified as "forward-looking." The purpose of the safe harbor is to encourage companies to give predictive information to the market without the imposition of securities fraud liability if the predictive information turns out to be wrong. In other words, the safe harbor eliminates liability on the basis of "fraud by hindsight." In re Penn Treaty Am. Corp. Sec. Litig., 202 F. Supp. 2d 383, 392-93 (E.D. Pa. 2002). Thus, under the Reform Act, a forward-looking statement is defined to include a projection of financial items, a description of management's plans and objectives for future operations or economic performance, or the stated assumptions underlying

-25-

those projections. 15 U.S.C. § 78-u5(i)(1). Forward-looking statements, whether written or oral, cannot give rise to Section 10(b) liability if they are identified as forward-looking statements and are (1) made without actual knowledge that they are materially false or misleading or (2) accompanied by "meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u-5(c); In re Xerox Corp. Sec. Litig., 165 F. Supp. 2d 208, 218-19 (D. Conn. 2001). Cautionary statements are considered meaningful if they convey substantive information about factors that realistically could cause results to differ materially from those projected in the forward-looking statement. See id. However, "[f]ailure to include the particular factor that ultimately causes the . . . statement not to come true will not mean that the statement is not protected by the safe harbor." H.R. Conf. Rep. 104-369, at 44, 1995 U.S.C.C.A.N. at 743; see Harris v. Ivax Corp., 182 F.3d 799, 806-07 (11th Cir. 1999); Asher v. Baxter Int'l, Inc., Nos. 02 C 5608, 5742, 5807, 6085, 6175, 6267, 2003 WL 21825498, at **10-11 & n.5 (N.D. Ill. July 24, 2003).

All of the statements alleged in the Complaint to be materially false and misleading are eligible for protection of the safe harbor because they are forward-looking statements as defined in the Reform Act. For instance, VitalWorks' financial projections announced in its quarterly press releases and analyst conference calls all qualify as forward-looking statements because they are statements of future economic performance:

- "For the year 2002, the company estimates revenues of approximately $120 million and net income of approximately $12 million, or $.24 per diluted share." Gallagher Aff. Ex. 8.

- "For 2003, VitalWorks estimates revenues of $132 million to $138 million." Gallagher Aff. Ex. 3.

-26-

- "Looking forward, VitalWorks expects to have third quarter revenues of approximately $30 million... For the year 2002, the company estimates net income of approximately $23 million to $24.5 million... For 2003, VitalWorks estimates revenues of $132 million to $138 million and net income of $20 million to $24 million, to $.37 to $.45 per share." Gallagher Aff. Ex. 12.

- "I believe that 2002 will be another exciting year for VitalWorks; we're already off to a good start." Gallagher Aff. Ex. 2.

- "We are very pleased with our second-quarter results. Our team continues to perform in a tough environment, producing another quarter of double-digit revenue growth, a net income margin of 29% and strong cash flow. We continue to win in the markets we serve by bringing great software and service solutions to both new and existing clients. The remainder of the year looks promising for us." Gallagher Aff. Ex. 12.

All of VitalWorks' statements regarding its relationship with Fuji qualify as forward-looking statements because they are descriptions of management's plans and objectives and projections of financial items:

- "We are extremely pleased to be working with Fuji, and we're excited to co-market an integrated solution to a market which is estimated to reach nearly $3 billion by 2010." Gallagher Aff. Ex. 5.

- "VitalWorks' agreement with Fuji exemplifies its commitment to radiology by bringing to market the finest products and technologies available, in this case to a largely unserved segment of the market. As VitalWorks continues to add world-leading technology corporations to its list of business partners, it continues to demonstrate its strength and leadership in the industry and the unfaltering execution of its business plan." Id.

- "I expect that our recent strategic partnerships will provide us with expanded reach into key markets as well as new competitive advantages strengthening the value position we offer and advancing the market leadership position of our company." Gallagher Aff., Ex. 2.

Likewise, VitalWorks' statements about its Core and Classic Products and HIPAA are forward-looking statements because they are descriptions of management's objectives for future operations. For example,

- "After a two-year, multi-million dollar development effort, we are extremely excited to offer the industry's next generation of RIS. RadConnect RIS is one of the most significant product offerings in recent years, not just for Vital Works but for the specialty as a whole, redefining the standards of speed, productivity and workflow." Gallagher Aff. Ex. 2.

- "RadConnect RIS is an important part of our product line, as well as our business plan . . . VitalWorks is presently the leading provider of RIS systems in the country. RadConnect RIS underlines our commitment to radiology and our role as the industry leader, and helps secure our leadership for the years to come." Id.

- "VitalWorks believes that there is a significant opportunity to provide system upgrades to those clients using classic and other non-core products by providing a migration path to VitalWorks' core products." Gallagher Aff. Ex. 2.

- "We are continuing to achieve growth in our software license sales across every division of the company, as a result of both core product upgrades revolving around HIPAA compliance as well as an increased rate of competitive wins." Gallagher Aff. Ex. 11.

- "Today I am pleased to report that we have commercially released two next-generation radiology products . . . RadConnect RIS and RadConnect Results . . . . We believe that these products will be very attractive to our considerable radiology customer base as well as to the entire ambulatory radiology market . . . ." Gallagher Aff. Ex. 2.

Defendants are shielded from any liability on the basis of these forward-looking statements under either prong of the safe harbor. First, plaintiffs have not alleged any facts that could establish that any Defendant actually knew that any of the challenged statements were false or misleading at the time they were made or what adverse facts were actually known to the Defendants at the time the statements were made. 15 U.S.C. § 78u-5(c); In re Keyspan Corp. Sec. Litig., No. 01 CV 5852, 2003 WL 21981806, at *18 (E.D.N.Y July 30, 2003) (under the safe-harbor provision of the Reform Act, a statement concerning projections or future plans cannot give rise to a securities fraud claim if the plaintiff fails to prove the statement was made with actual knowledge that it was false or misleading). This pleading deficiency alone requires dismissal of the Section 10(b) claim.

-28-

Second, Defendants are immune from liability based on the challenged statements because each statement was accompanied by meaningful cautionary language. 15 U.S.C. § 78u-5(c); In re Keyspan, 2003 WL 21981806, at *18 (under the safe-harbor provision of the Reform Act a statement concerning projections or future plans cannot give rise to a securities fraud claim if it is accompanied by meaningful cautionary language). The Company's SEC filings contained extensive risk disclosures and cautionary statements. Likewise, the Company's press releases contained meaningful safe-harbor statements and advised investors to consider the risks in light of factors detailed in the press release, as well as other risks described in extensive detail in the Company's filings with the SEC. All of the risk disclosures address the Complaint's conclusory allegations concerning the alleged basis for the falsity of the challenged statements. For example, the Company made the following risk disclosures:[6]

- With respect to the Fuji agreement, VitalWorks' press release warned that "among the important factors that could cause actual results to differ materially from those indicated by these forward-looking statements are possible deferral, delay or cancellation by customers of computer system purchase decisions; variations in the volume and timing of systems sales and installations; possible delays in product development. . . ." Gallagher Aff. Ex. 5.

- [T]he company operates with a minimal amount of software licensing and systems backlog. Therefore quarterly revenues and operating results are quite dependent on the volume and timing of the signing of the licensing agreements and product deliveries during the quarter, which are difficult to forecast. . . . Due to the relatively fixed nature of certain costs, . . . a decline or shortfall in quarterly and/or annual revenues typically results in losses or lower profitability. Gallagher Aff. Exs. 8, 11, 12 and 15.

- Safe-harbor statements contained in press releases, conference calls and SEC filings that cautioned, among other things, that quarterly revenues and operating results are dependent on the volume and timing of the signing of licensing agreements and product deliveries during the quarter, which are difficult to forecast, the company's future operating results may

---

[6] A complete set of VitalWorks' risk disclosures is attached to the Gallagher Aff. at Exhibit 23.

fluctuate due to factors such as customer buying patterns, the timing of new product introductions and product upgrade releases, new product development by the company or its competitors, and changing economic, political and regulatory influences, generally, and specifically, on the healthcare industry. See id.

- HIPAA regulations may require VitalWorks to expend significant resources to comply with applicable requirements. Because these regulations are new, there is uncertainty as to how they will be interpreted and enforced. In addition, the delay in adopting final security regulations creates uncertainties as to what security requirements ultimately will be imposed, to what extent it will be required to comply with those requirements, and what the deadline for compliance will be. . . . [VitalWorks] may not be able to conform its operations and products to such requirements in a timely manner, or at all. . . . In addition, delay in developing or failure to develop products that would enable HIPAA compliance for its current and prospective customers would put VitalWorks at a significant disadvantage in the marketplace. Accordingly, the sale of its products and its business could be harmed by the implementation of HIPAA regulations. Gallagher Aff. Ex. 2.

- Any [ ] restrictions [to the ability of healthcare providers to submit patient record information] would inevitably decrease the value of [VitalWorks'] applications to its customers, which could materially harm VitalWorks' business. . . . Consequently, the sale of its products and its business could be harmed. Changes in the regulatory and economic environment in the healthcare industry could cause the Company to lose revenue and incur substantial costs to comply with new regulations. . . . Changes in current healthcare financing and reimbursement systems could require VitalWorks to make unplanned enhancements of applications or services, or result in delays or cancellations of orders or in the revocation of endorsement by VitalWorks' services by its strategic partners and others. . . . Larger competitors and consolidation of competitors could cause the Company to lower its prices or to lose customers. See id.

- Even plaintiffs admit that the Company disclosed that if its products, upgrades and services do not achieve sufficient market acceptance, VitalWorks' business will suffer. Compl. ¶ 41; Gallagher Aff. Ex. 2.

In addition, the forward-looking statements that were made orally in analyst conference calls are protected under the safe harbor because they were all accompanied by a statement that additional information concerning factors that could cause actual results to materially differ from those in the forward-looking statement is contained in a readily available

-30-

written documents, or portions thereof. See 15 U.S.C. § 78u-5(c)(2)(B)(i). For example, at the commencement of each conference call, VitalWorks' General Counsel, Stephen Hicks would state that "during this call, we will discuss our business outlook and make many other forward-looking statements. These particular forward-looking statements and all other statements that may be made during this conference call that are not historical facts are subject to a number of risks and uncertainties. Our actual results may differ materially from those suggested by our forward-looking statements." See, e.g., Gallagher Aff. Exs. 21, 22. Investors were then advised to refer to VitalWorks' latest Form 10-K for more information on the risk factors that could cause results to differ. See id.[7]

## C. The Complaint Fails To Allege With Particularity That The Defendants Acted With The Requisite Scienter

The Reform Act created uniform, stringent pleading requirements applicable to claims under Section 10(b), including a rigorous standard for pleading the required state of mind. See 15 U.S.C. § 78u-4(b). Thus, it is no longer sufficient for plaintiffs to allege a defendant's

---

[7] In addition, certain alleged misrepresentations are immaterial as a matter of law because it cannot be said that any reasonable investor could consider them important in light of adequate cautionary language accompanying the alleged misrepresentations. See Halperin v. eBanker USA.com, Inc., 295 F.3d 352, 357 (2d Cir.), aff'd, 40 Fed. Appx. 624 (2d Cir. 2002). This principle is known as the "bespeaks caution" doctrine, which "prevents a plaintiff from basing an action for fraudulent misrepresentation upon a statement that bespeaks caution of the very risk about which plaintiffs complain." Saslaw v. Askari, No. 95 Civ. 7641, 1997 WL 221208, at *7 (S.D.N.Y. Apr. 25, 1997); In re Alliance Pharm. Corp. Sec. Litig., 279 F. Supp. 2d 171, 192-93 (S.D.N.Y. 2003). "[C]ourts in this Circuit consistently have dismissed claims . . . 'if they charge omission of what was in fact disclosed.'" DeMaria v. Andersen, 153 F. Supp. 2d 300, 311 (S.D.N.Y., 2001) (citation omitted), aff'd, 318 F.3d 170 (2d Cir. 2003). When cautionary language is present, the allegedly fraudulent statements are analyzed in their entirety to determine whether a reasonable investor would have been misled. The touchstone of the inquiry is not whether isolated statements within a document were true, but whether defendants' representations or omissions, considered together and in context, would affect the "total mix of information" and thereby mislead a reasonable investor regarding the nature of the securities. See Halperin, 295 F.3d at 357. Defendants are protected from liability under the common law "bespeaks caution" doctrine for the same reasons they are protected from liability on the basis of the Reform Act's safe harbor for forward-looking statements: (1) the challenged statements are all forward-looking and (2) they are all accompanied by meaningful cautionary language addressing the Complaint's alleged basis for asserting that they are fraudulent.

state of mind in general or conclusory terms. Rather, plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind" with respect to each act or omission. See 15 U.S.C. § 78u-4(b)(2). A plaintiff bringing an action under Section 10(b) must allege, with particularity, "facts that give rise to a strong inference of fraudulent intent." Novak, 216 F.3d at 307, 310; Faulkner v. Verizon Communs., Inc., 156 F. Supp. 2d 384, 392-93 (S.D.N.Y. 2001) (citing Wexner, 902 F.2d at 172). Even when a pleading is permitted upon information and belief, under the exception for facts that are peculiarly within the opposing party's knowledge, the complaint still "must adduce specific facts supporting a strong inference of fraud or it will not satisfy even a relaxed pleading standard." Wexner, 902 F.2d at 172.

In this Circuit, a "strong inference" of fraudulent intent can be raised only by alleging, with particularity, (1) a motive and opportunity to commit fraud or (2) facts that constitute "strong circumstantial evidence of conscious misbehavior or recklessness." Novak, 216 F.3d at 307 (internal citations omitted); see also Kalnit, 264 F.3d at 138. Plaintiffs have done neither.

### 1. The Complaint Does Not Adequately Allege Motive And Opportunity To Commit Fraud

To plead scienter by alleging motive, plaintiffs must allege "a concrete and personal benefit to the individual defendants resulting from the fraud." Kalnit, 264 F.3d at 139. Allegations of such a motive must be specific, and "[m]otives that are generally possessed by most corporate directors and officers do not suffice." Id. Thus, for example, it is insufficient to allege merely that a defendant wished to make the corporation "appear profitable" or to "keep stock prices high to increase officer compensation." Id.; Glickman v. Alexander & Alexander Servs., Inc., No. 93 Civ. 7594, 1996 WL 88570, at **6-7 (S.D.N.Y. Feb. 29, 1996) (alleged

motive to "raise much needed capital" for the company and to protect an individual defendant's financial interests were too generalized and commonplace to support inference of scienter); Ferber v. Travelers Corp., 785 F. Supp. 1101, 1107 (D. Conn. 1991) ("[I]ncentive compensation can hardly be the basis on which an allegation of fraud is predicated. On a practical level, were the opposite true, the executives of virtually every corporation in the United States would be subject to fraud allegations"); Grossman v. Texas Commerce Bancshares, Inc., No. 87 Civ. 6295, 1995 WL 552744, at *11 (S.D.N.Y. Sept. 15, 1995) ("Every company's executives likely wish to report positive financial health so that the company can reap the varied benefits that flow from an image of financial stability").

The only allegations in the Complaint concerning the Defendants' motives to make materially false and misleading statements about VitalWorks' forecasts and business prospects consist of claims that the Individual Defendants realized a profit by selling personally-held stock and options at artificially inflated prices resulting from their purported fraudulent scheme. Compl. ¶¶ 106-09. These allegations are insufficient to satisfy the Reform Act's pleading requirements for scienter. See Ressler v. Liz Claiborne, Inc., 75 F. Supp. 2d 43, 57 (E.D.N.Y. 1999) (to create an inference of scienter through the stock sales of insiders, plaintiffs must establish that the stock sales during the class period were "suspicious" or "unusual"); Acito v. IMCERA Grp., Inc., 47 F.3d 47, 54 (2d Cir. 1995) (holding that scienter was insufficiently pleaded because stock sale by single insider was not "unusual").

First, the SEC adopted Rule 10b5-1 to provide corporate insiders with a safe harbor against allegations that they traded their company securities on the basis of material non-public information. See Selective Disclosure and Insider Trading, SEC Rel. Nos. 33-7881, 34-43154, 2000 WL 1201556 (Aug. 15, 2000); Newby v. Enron Corp. (In re Enron Corp. Sec., Deriv. & ERISA Litig.), 258 F. Supp. 2d 576, 592-93 (S.D. Tex. 2003). Thus, Rule 10b5-1

provides an affirmative defense against a Section 10(b) claim to insiders who either (1) purchase the securities pursuant to a binding contract to purchase or sell the security, or (2) adopt a written plan for trading securities. 17 C.F.R. § 240.10b5-1(c)(1)(A)(1) and (3); SEC v. Healthsouth Corp., 261 F. Supp. 2d 1298, 1322 (N.D. Ala. 2003) ("it is a defense to an allegation of violation of Section 10(b) and Rule 10b5-1, if the person making the purchase or sale demonstrates that the purchase or sale that occurred was made pursuant to a plan"). Such contract, instruction or plan must specify the amount of securities to be purchased or sold and the price at which, and the date on which, the securities are to be purchased or sold. See 17 C.F.R. § 240.10b5-1(c)(1)(C).

Here, each of the Individual Defendants entered into contracts to implement plans pursuant to Rule 10b5-1, a fact that was publicly disclosed in the Company's Forms 10-Q filed with the SEC throughout the Class Period. See Gallagher Aff., Ex. 3. As reflected in filings made with the SEC, with the exception of one transaction, all of the option exercises and stock sales by the Individual Defendants during the Class Period were undertaken pursuant to their respective Rule 10b5-1 plans. Compl. ¶¶ 107-09. Thus, there can be nothing unusual or suspicious about those option exercises and sales and it is presumed that the Individual Defendants did not sell their stock "on the basis of" public information. 17 C.F.R. § 240.10b5-1(c)(1)(C). Accordingly, the Individual Defendants can have no Section 10(b) liability on the basis of their exercise of options and sale of Company stock during the Class Period that were made pursuant to their Rule 10b5-1 Plans. Healthsouth, 261 F. Supp. 2d at 1322.

The only transaction that plaintiffs identify that was made outside of the Defendants' 10b5-1 plans was the sale of approximately 50,690 shares on or about April 26,

2002 by Defendant Kahane.[8] Compl. ¶ 109. However, plaintiffs have not, because they cannot, plead anything suspicious or unusual about this trade. Significantly, the trade was made three days following the disclosure of the Company's first quarter earnings. Therefore, Mr. Kahane acted completely appropriately by trading after the market had an opportunity to absorb the information that was disclosed in the Company's April 23, 2002 press release and quarterly conference call. Lipton v. PathoGenesis Corp., 284 F.3d 1027, 1037 (9th Cir. 2002) (holding that stockholders failed to adequately plead insider trading to establish scienter because "[o]fficers of publicly traded companies commonly make stock transactions following the public release of quarterly earnings and related financial disclosures"). Plaintiffs allege that Mr. Kahane's April 26, 2002 sale was suspicious because it occurred after VitalWorks commercially released RadConnect RIS, but before the alleged problems with the software purportedly became publicly known. Compl. ¶ 109. Plaintiffs' argument is frivolous. Mr. Kahane's sale occurred only 11 trading days after the RadConnect RIS announcement. According to plaintiffs, Mr. Kahane would have had to know or have information during the 11 trading days after its release that RadConnect RIS would not be successful. Not only does plaintiffs' argument defy logic, plaintiffs also fail to plead any facts that Mr. Kahane had any knowledge that RadConnect RIS contained disabling software "bugs" or that the product was not allegedly selling well, let alone any facts that there were material problems with sales at that time.

Second, the Individual Defendants' stock sales are not sufficient to establish scienter as a matter of law because they were not suspicious or dramatically out of line with trading practices. See Acito, 47 F.3d at 54 (rejecting allegations of scienter because stock sales

---

[8] The Complaint mistakenly alleges that Defendant Walsh sold stock on or about May 31, 2002. Compl. ¶ 106. This transaction, however, was undertaken by Defendant Walsh's wife, an employee of the Company, immediately upon her exercise of stock options. The Complaint contains no allegations concerning Mrs. Walsh or any involvement by Mr. Walsh in this transaction.

-35-

alleged were not "unusual"). In that regard, it is well-recognized that, because "[a] large number of today's corporate executives are compensated in terms of stock and stock options . . . [i]t follows . . . that these individuals will trade those securities in the normal course of events." In re Burlington, 114 F.3d at 1424 (citation omitted); In re First Union Corp. Sec. Litig., 128 F. Supp. 2d 871, 897 n.25 (W.D.N.C. 2001) (since "there is nearly always some selling by officers and directors," circumstances of sales must be taken into account to avoid nullifying scienter requirements). Plaintiffs have the burden at the pleading stage to allege facts that show that the Individual Defendants' trading was suspicious or dramatically out of line with prior trading practices. See In re Health Mgmt. Sys., Inc. Sec. Litig., No. 97 Civ. 1865, 1998 WL 283286, at *6 (S.D.N.Y. June 1, 1998); Acito, 47 F.3d at 54. Plaintiffs have not met their burden, as they have not alleged facts showing that the amount of stock that the Individual Defendants sold or the timing of sales was unusual or inconsistent with their prior trading practice. Indeed, none of the sales that plaintiffs attack were made at unusual times, such as immediately prior to a disclosure of earnings or guidance. Moreover, by entering into Rule 10b5-1 plans, the Individual Defendants manifested an intent to periodically sell stock in an orderly and legitimate trading practice.

Further, allegations that stock sales that "generated large proceeds and profits," "alone are not suspicious," and cannot support a scienter pleading. Ressler, 75 F. Supp. 2d at 59. Likewise, stock sales will not support a scienter allegation where the insider retains most of his or her stock position. See Janas v. McCracken (In re Silicon Graphics Inc. Sec. Litig.), 183 F.3d 970, 986-88 (9th Cir. 1999) (holding that sales of 2.6%, 7.7%, 4.1%, 6.9%, 43.6% and 75.3% by the company's officers did not give rise to a strong inference of scienter). Thus in In re Peritus Software Services, Inc., 52 F. Supp. 2d 211 (D. Mass. 1999), the court rejected scienter allegations where a total of nine insiders sold nearly 500,000 shares, for proceeds in excess of $5

million. Id. at 225 n.5. The court stated that the fact that the three "insider" defendants retained 94%, 62% and 75% of their holdings "suggest[ed] that the sales were not unusual or motivated by a desire to capitalize on knowledge of inflated stock values." Id. at 225. In this case, after the sales described in the Complaint, Defendants Walsh, Manto and Kahane retained, respectively 97%, 84% and 84% of their Company stock, properly taking into account their stock options. Accordingly, plaintiffs' allegations concerning stock sales are insufficient to plead scienter.

### 2. The Complaint Does Not Adequately Allege Facts Constituting Strong Circumstantial Evidence Of Conscious Misbehavior Or Recklessness

The Complaint also fails to meet the alternative, but more stringent, scienter pleading requirement of alleging facts constituting "strong circumstantial evidence of conscious misbehavior or recklessness." Novak, 216 F.3d at 308. To satisfy the standard for pleading conscious misbehavior, plaintiffs must allege, with particularity, that defendants engaged in "deliberate illegal conduct." In re Sotheby's Holdings, Inc., No. 00 Civ. 1041, 2000 WL 1234601, at *6 (S.D.N.Y. Aug. 31, 2000). Pleading scienter may not rest on a bare inference that a defendant must have had knowledge of certain material non-public information. See Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1129 (2d Cir. 1994). In that regard, plaintiffs are required to "link the misleading statement with facts that give rise to an inference that the speaker had a basis for knowing it was false." Thacker v. Medaphis Corp., No. 97 Civ. 2849, 1998 WL 684595, at *3 (S.D.N.Y. Sept. 30, 1998); San Leandro, 75 F.3d at 813 (allegations dismissed due in part to failure to plead that defendants knew the statements were false when made). To plead recklessness, a plaintiff must allege particular facts showing conduct that is "'at the least . . . "highly unreasonable" and represents an extreme departure from the standards of ordinary cases . . . to the extent that the danger was either known to the defendant or so obvious

that the defendant must have been aware of it.'" In re Livent, Inc. Sec. Litig., 148 F. Supp. 2d 331, 349 (S.D.N.Y 2001) (emphasis in original; citations omitted); Rothman, 220 F.3d at 90.[9]

Plaintiffs fail, however, to allege any facts, let alone particularized facts, of Defendants' state of mind. The Complaint is devoid of particularized facts demonstrating that any of the Defendants intentionally or recklessly made false statements to investors or that such statements were false when made. See San Leandro, 75 F.3d at 813 (allegations dismissed due in part to failure to plead that defendants knew the statements were false when made). The Complaint fails to identify what data or information Defendants had access to, or knowledge of, that negated the accuracy of the statements made in the Company's public documents or conference calls or how Defendants could have known that the statements made in the Company's public documents or conference calls were false. Novak, 216 F.3d at 309 (where plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information); San Leandro, 75 F.3d at 812. Rather, the Complaint makes only conclusory allegations that Defendants knew or recklessly disregarded that the public documents and statements issued or disseminated in the name of the Company were materially false or misleading. Compl. ¶ 105. These conclusory allegations are insufficient to satisfy the rigorous requirement for pleading scienter.

### POINT II: PLAINTIFFS FAIL TO ESTABLISH CONTROL PERSON LIABILITY

Plaintiffs allege that the Individual Defendants are liable under Section 20(a) of the Exchange Act, which provides that any person who, either directly or indirectly, controls

---

[9] Section 10(b) is an anti-fraud statute and does not reach mismanagement, negligence or breaches of fiduciary duty. See Field v. Trump, 850 F.2d 938, 948 (2d Cir. 1988), cert. denied, 489 U.S. 1012 (1989). "Rule 10b-5 scienter means intent to defraud and even when plaintiffs rely on the 'recklessness' prong of scienter, they still must show that the defendants acted with fraudulent intent." Hart v. Internet Wire, Inc., 145 F. Supp. 2d 360, 365 (S.D.N.Y. 2001).

another person liable for a securities violation can himself be held jointly and severally liable. 15 U.S.C. § 78t(a). In order to establish a prima facie case of liability under Section 20(a), plaintiffs must show (1) a primary violation by controlled entity; (2) control of primary violator by the controlling person; and (3) that the controlling person was in some meaningful sense a culpable participant in the primary violation. See Ganino, 228 F.3d at 170; Boguslavsky v. Kaplan, 159 F.3d 715, 720 (2d Cir. 1998) (citing SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1472 (2d Cir. 1996), cert. denied, 522 U.S. 812 (1997)); Rubenstein v. Skyteller, Inc., 48 F. Supp. 2d 315, 322 (S.D.N.Y. 1999). Failure to meet any one of these three requirements requires this Court to dismiss plaintiffs' Section 20(a) claim.

Because the Complaint fails to state a claim under Section 10(b), as demonstrated in Point I above, the control person claim must also be dismissed. See Ellison v. American Image Motor Co., 36 F. Supp. 2d 628, 631 (S.D.N.Y. 1999). In addition, the Complaint fails to allege particularized facts demonstrating the Individual Defendants' "culpable participa[tion]" in VitalWorks' alleged illegal conduct. See Boguslavsky, 159 F.3d at 720. Since the required state of mind for liability is "culpable participation," the heightened standards of the Reform Act apply to this claim. See 15 U.S.C. § 78u-4(b)(2) (Reform Act's heightened pleading standard applies to "any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind"); Mishkin v. Ageloff, No. 97 Civ. 2690 LAP, 1998 WL 651065, at **23, 26 (S.D.N.Y. Sept 23, 1998) (dismissing Section 20(a) claim due to the absence of "particularized facts" of defendant's culpable participation). Specific allegations of each defendant's culpable participation in the alleged activity are required. See, e.g., Kersh v. General Council of Assemblies of God, 804 F.2d 546, 549 (9th Cir. 1986); Rosen v. Cascade Int'l, Inc., 21 F.3d 1520, 1525 n.7 (11th Cir. 1994); McLaughlin v. Cendant Corp. (In re Cendant Corp. Sec. Litig.), 76 F. Supp. 2d 539, 548