UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

---

FRAZIER, et al.,             X

        Plaintiffs,           Civil Action No.
                                3:03cv358 (JBA)

     vs.                    December 5, 2003

VITALWORKS, INC., et al.,

        Defendants.       X

---

## LEAD PLAINTIFF'S MEMORANDUM OF LAW
## IN OPPOSITION TO DEFENDANTS' MOTION TO
## <u>DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT</u>

Andrew M. Schatz (ct00603)
Patrick A. Klingman (ct17813)
SCHATZ & NOBEL, P.C.
330 Main Street
Hartford, CT 06106
(860) 493-6292

Keith M. Fleischman
Mark T. Millkey
Michael S. Bigin
BERNSTEIN LIEBHARD & LIFSHITZ, LLP
10 East 40th Street
New York, NY 10016
(212) 779-1414

*Attorneys for Lead Plaintiff Fuller & Thaler
Asset Management, Inc.*

**ORAL ARGUMENT REQUESTED**

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................... iii

INTRODUCTION ..................................................................................................................... 1

STATEMENT OF FACTS ........................................................................................................ 4

    Material Problems with the Company's Core Products ..................................................... 4

    The Company's Classic Products Were Not Producing Expected Revenue ...................... 6

    Defendants Misrepresented the Effect of HIPAA ............................................................... 7

    Defendants' Revenue Guidance .......................................................................................... 8

    Insider Trading .................................................................................................................... 8

    The Truth is Revealed ........................................................................................................ 9

ARGUMENT ........................................................................................................................... 10

    I.    THE COMPLAINT SPECIFICALLY
         ALLEGES DEFENDANTS' FRAUD IN
         ACCORDANCE WITH RULE 9(B) AND THE PSLRA .................................... 10

         A.    Defendants' Statements Concerning Marketability of
             Its Core Products Were Materially False and Misleading
             ............................................................................................................. 12

         B.    Defendants' Statements Concerning the Effect of HIPAA
             Were Materially False and Misleading ................................................... 16

         C.    Defendants' Baseless Financial Guidance was Materially
             False and Misleading ............................................................................... 18

    II.   DEFENDANTS' FALSE STATEMENTS
         ARE NOT SHIELDED FROM LIABILITY
         BY THE SAFE HARBOR PROVISION ............................................................ 22

         A.    The Complaint Alleges False Statements of Present Fact ....................... 23

         B.    Defendants Do Not Provide Any Meaningful
             Cautionary Language .............................................................................. 24

Case 3:03-cv-00358-JBA    Document 33    Filed 12/05/2003    Page 3 of 19

|      | C.   | Defendants Knew Their Statements Were Materially False and Misleading When Made ........................................... 25 |
| ---- | ---- | --- |
| III. | THE COMPLAINT'S DETAILED ALLEGATIONS DEMONSTRATE A STRONG INFERENCE OF SCIENTER ......................... 26 | |
|      | A.   | VitalWorks' Alleged Rule 10b5-1 Plans Are Not a Proper Basis for a Motion to Dismiss, and in Any Event Create Numerous Questions of Fact Inappropriate for Resolution on this Motion ........................................... 28 |
|      | B.   | Defendant Walsh, Not His Spouse, Filed a Form 4 with the SEC for the Sale of 58,736 shares on May 31, 2002 ................. 30 |
|      | C.   | The Alleged Insider Sales Were Suspicious ........................................... 32 |
| IV.  | CONTROL PERSON LIABILITY IS ADEQUATELY ALLEGED .................. 37 | |

ii

# TABLE OF AUTHORITIES

## CASES

Acito v. IMCERA Group, Inc.,
    47 F.3d 47 (2d Cir. 1995) .................................................................................. 27, 28, 33

Basic Inc. v. Levinson,
    485 U.S. 224 (1988) ..................................................................................................... 21

Baxter v. A.R. Baron,
    No. 94 Civ. 3913, 1996 WL 586338
    (S.D.N.Y. Oct.11, 1996) ........................................................................................ 11, 21

Boguslavsky v. Kaplan,
    159 F.3d 715 (2d Cir. 1998) ................................................................................... 38, 39

Cosmas v. Hassett,
    886 F.2d 8 (2d Cir. 1989) .................................................................................. 11, 15, 26

Craftmatic Sec. Litig. v. Kraftsow,
    890 F.2d 628 (3d Cir.1989) ........................................................................................... 11

Credit Suisse First Boston Corp. v. ARM Fin. Group, Inc.,
    No. 99 CIV 12046 WHP, 2001 WL 300733
    (S.D.N.Y. Mar. 28, 2001) ............................................................................................. 24

Elkind v Liggett & Myers, Inc.,
    635 F.2d 156 (2d Cir. 1980) .......................................................................................... 13

Endo v. Albertine,
    812 F. Supp. 1479 (N.D. Ill. 1993) ............................................................................... 21

Epstein v. Itron, Inc.,
    993 F. Supp. 1314 (E.D. Wash. 1998) .......................................................................... 26

Friedberg v. Discreet Logic Inc.,
    959 F. Supp. 42 (D. Mass. 1997) ............................................................................ 34, 36

Ganino v. Citizens Utils. Co.,
    228 F.3d 154 (2d Cir. 2000) ..................................................................................... 18, 26

Goldman v. Belden,
    754 F.2d 1059 (2d Cir. 1985) ........................................................................................ 37

In re Ancor Communs.,
    22 F. Supp. 2d 999 (D. Minn. 1998) ........................................................................ 21, 26

In re Ann Taylor Stores Sec. Litig.,
   807 F. Supp. 990 (S.D.N.Y. 1992) .................................................................................. 11

In re Complete Mgmt. Inc. Sec. Litig.,
   153 F. Supp. 2d 314 (S.D.N.Y. 2001) ............................................................................. 11

In re Indep. Energy Holdings Sec. Litig.,
   154 F. Supp. 2d 741 (S.D.N.Y. 2001) ....................................................................... 22, 25

In re Int'l Bus. Machines Corp. Sec. Litig.,
   163 F.3d 102 (2d Cir. 1998) ........................................................................................ 16, 21

In re Initial Public Offering Sec. Litig.,
   241 F. Supp. 2d 281 (S.D.N.Y. 2003) ....................................................................... *passim*

In re KeySpan Corp. Sec. Litig.,
   No. 01 CV 5852(ARR), 2003 WL 21981806
   (E.D.N.Y. Jul. 30, 2003) ................................................................................................. 23

In re Nortel Networks Corp. Sec. Litig.,
   238 F. Supp. 2d 613 (S.D.N.Y. 2003) ....................................................................... *passim*

In re Oxford Health Plans Inc., Sec. Litig.,
   187 F.R.D. 133 (S.D.N.Y. 1999) ................................................................. 15, 35, 37, 39

In re Peritus Software Services, Inc.,
   52 F. Supp. 2d 211 (D. Mass. 1999) ............................................................................... 37

In re Prudential Sec. Inc. Ltd. P'ships Litig.,
   930 F. Supp. 68 (S.D.N.Y. 1996) ............................................................................. 22, 25

In re Scholastic Corp. Sec. Litig.,
   252 F.3d 63 (2d Cir. 2001) .................................................................................. 11, 15, 32, 36

In re Sears, Roebuck and Co. Sec. Litig.,
   No. 02 C 7527, 2003 WL 22454021
   (N.D. Ill. Oct. 24, 2003) ................................................................................................. 26

In re Silicon Graphics Inc. Sec. Litig.,
   183 F.3d 970 (9th Cir. 1999) ..................................................................................... 35, 37

In re Vivendi Universal, S.A. Sec. Litig.,
   No. 02 Civ. 5571 (HB), 2003 WL 22489764
   (S.D.N.Y. Nov. 3, 2003) ........................................................................................... *passim*

In re Worlds of Wonder Sec. Litig.,
   35 F.3d 1407 (9th Cir. 1994) .......................................................................................... 37

In re Xerox Corp. Sec. Litig.,
    165 F. Supp. 2d 208 (D. Conn. 2001) ................................................................. *passim*

Irvine v ImClone Sys.,
    No. 02 Civ.109 RO, 02 Civ. 7499 RO
    2003 WL 21297285 (S.D.N.Y. June 4, 2003) ............................................................. 25

Kalnit v. Eichler,
    264 F.3d 131 (2d Cir. 2001) ............................................................................. 26, 27

Marksman Partners L.P. v. Chantal Pharm. Corp.,
    927 F. Supp. 1297 (C.D. Cal. 1996) ........................................................................ 37

Milman v. Box Hill Sys. Corp,
    72 F. Supp. 2d 220 (S.D.N.Y 1999) ......................................................................... 24

Mishkin v. Ageloff,
    No. 97 Civ. 2690 LAP,
    1998 WL 651065 (S.D.N.Y. Sept. 23, 1998) ............................................................. 39

Newby v. Enron Corp.,
    258 F. Supp. 2d 576 (S.D. Tex. 2003) ........................................................ 30, 31, 33, 34

Novak v. Kasaks,
    216 F.3d 300 (2d Cir. 2000) ............................................................................ *passim*

Petri v. Gatlin,
    997 F. Supp. 956 (N.D. Ill. 1997) ............................................................................ 21

Rothman v. Gregor,
    220 F.3d 81 (2d Cir. 2000) .............................................................................. 29, 33

San Leandro Emergency Medical Group Profit Sharing,
    75 F.3d 801 (2d Cir. 1996) .............................................................................. 16, 33

S.E.C. v. First Jersey Sec., Inc.,
    101 F.3d 1450 (2d Cir. 1996) ................................................................................. 38

Simon v. American Power Conversion Corp.,
    945 F. Supp. 416 (D.R.I. 1996) ............................................................................... 33

Stavros v. Exelon Corp.,
    266 F. Supp. 2d 833 (N.D. Ill. 2003) ........................................................................ 26

Steinberg v. PRT Group, Inc.,
    88 F. Supp. 2d 294 (S.D.N.Y. 2000) ........................................................................ 25

Suez Equity Investors, L.P. v. Toronto-Dominion Bank,
    250 F.3d 87 (2d Cir. 2001) .............................................................................. 38, 39


TSC Indus. Inc. v. Northway, Inc.,
   426 U.S. 438 (1976) ................................................................................................ 21

Taylor v. Vermont Dep't of Educ.,
   313 F.3d 768 (2d Cir. 2002) .................................................................................... 29

## STATUTES & RULES

15 U.S.C. § 75u-5(c)(1)(A)(i) ............................................................................................ 22

15 U.S.C. § 78p(a) ............................................................................................................. 31

15 U.S.C. § 78t(a) .............................................................................................................. 38

15 U.S.C. § 78u-4(b)(1) ............................................................................................... 10, 27
                (b)(2) ....................................................................................................... 26

17 C.F.R. § 240.10b5-1 ......................................................................................... 28, 29, 30, 31

17 C.F.R. § 240.16a-1 ............................................................................................... *passim*

17 C.F.R. § 240.16a-3(j) ................................................................................................... 32

Fed. R. Civ. P. 9(b) ................................................................................................... *passim*

Fed. R. Civ. P. 12(b)(6) ............................................................................................... 11, 18

Lead plaintiff Fuller & Thaler Asset Management, Inc. ("Lead Plaintiff") submits this memorandum of law in opposition to the motion to dismiss of defendants VitalWorks, Inc. ("VitalWorks"), Joseph M. Walsh, Michael A. Manto, and Stephen N. Kahane (together with defendants Walsh and Manto, the "Individual Defendants").

## INTRODUCTION

This case is about materially false and misleading representations of current fact defendants made about their products and services, and how the Company based its financial projections upon those known, false representations. It is also about the massive, coordinated insider trading the Individual Defendants engaged in, just as VitalWorks' stock was hitting Class Period highs. None of the Individual Defendants had sold VitalWorks' stock before the Class Period, nor have they since.[1]

On April 11, 2002, VitalWorks announced the commercial release of a radiology information system called RadConnect™ RIS ("RadConnect"). ¶ 43.[2] VitalWorks touted RadConnect, on which it had spent millions of dollars in development, as the next generation of radiology information systems. ¶ 44. According to the Company's April 11 press release: "RadConnect RIS is one of the most significant product offerings in recent years, not just for VitalWorks but for the specialty as a whole, redefining the standards of speed, productivity and work flow." Id. Defendant Walsh characterized RadConnect as "an important part of our product line, as well as our business" (id.), and defendants continued to tout RadConnect throughout the Class Period. On July 23, 2002, for example, VitalWorks described the release of RadConnect as a "noteworthy development[], highlight[] and metric[] of the second quarter." ¶ 46.

Former employees of the Company, however, have told a different story. According to a former Senior Software Specialist who worked for VitalWorks throughout the Class Period, and who

___

[1] The Class Period begins on January 24, 2002, and ends on October 23, 2002.

[2] References to the Consolidated Class Action Complaint (the "Complaint") are designated ¶ ___.

was personally involved in the development of RadConnect, RadConnect had software problems and was not ready for commercial release. ¶¶ 45, 48. The Senior Software Specialist stated that beta testing of RadConnect – which started in September or October of 2001 and continued at least through May 2002, well after the product announcement on April 11 – confirmed the existence of "bugs" that prevented the product from performing as advertised. ¶ 49. Ultimately, VitalWorks sold only 28 units between May 2002 and July 2003; of those 14, only three are still in operation. ¶ 51.

Defendants engaged in similar misrepresentations concerning the effects of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") on VitalWorks' business. Defendants represented that the new HIPAA regulations required its clients and potential clients to make certain transaction-processing changes, and would increase the Company's recurring electronic data interchange revenue streams. ¶¶ 71-73. Defendants knew, however, that HIPAA was having no appreciable impact on its current business, because federal law permitted entities subject to the law to get a one-year extension for compliance. Moreover, according to a former VitalWorks sales executive and account manager who worked at the Company until May 2002, the market for HIPAA compliance was fully saturated, and VitalWorks did not have a competitive advantage. ¶ 75. VitalWorks held only a small share of the market for "practice management" software. Id.

Indeed, in an October 23, 2002 conference call, the Company admitted that fewer than 200,000 out of two million entities required to comply with HIPAA had filed for an extension, suggesting that the vast majority had already complied with the requirement. When asked directly about HIPAA revenues, Walsh admitted that revenue from HIPAA would be less than forecasted. ¶ 76.[3]

At the same time that the defendants were making these and similar misrepresentations – and issuing materially false and misleading financial guidance based upon them – the defendants were

---

[3]Lead Plaintiff has decided not to pursue the allegations of the Complaint relating to FUJIFILM Medical Systems USA, Inc.

2

also engaging in highly suspicious and unusual insider trading. Together, the three Individual Defendants sold 738,926 shares during the Class Period – almost all after the Company announced the commercial release of RadConnect in April 2002: Kahane sold 390,190 shares (¶ 109);[4] Manto sold 200,000 shares (¶ 108); and Walsh sold 148,736 shares. ¶ 107. Because none of the Individual Defendants sold any VitalWorks shares before the Class Period, and have sold none since, the very fact of these sales was unusual, and strongly supports scienter for each of the Individual Defendants. ¶ 111. Moreover, the sales were highly coordinated. Of the 738,926 shares sold, 558,736, or 76%, were sold during the three-day period between May 29 and May 31, 2002 – <u>the very day VitalWorks' shares hit a Class Period high of $9.00 per share</u>.

Based upon these and the other facts alleged, the Complaint satisfies the pleading requirements applicable to claims asserted under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). The Complaint alleges, with particularity, that defendants issued materially false and misleading statements concerning the marketability of the Company's Core products, the revenue produced as a result of HIPAA, and the Company's revenue guidance for 2002. These false and misleading statements are not protected by the Safe Harbor provision of the PSLRA or the common law bespeaks caution doctrine because they were either not forward looking, were not accompanied by meaningful cautionary language, or were otherwise known to be false when made. Additionally, the Complaint alleges that defendants acted with the requisite scienter – that defendants knowingly or recklessly issued their false and misleading statements, and possessed the motive and opportunity to defraud. Finally, the Complaint adequately alleges that the Individual Defendants are liable as control persons pursuant to Section 20(a) of the Exchange Act.

---

[4]Although the Complaint indicates that Kahane sold 355,190 shares during the Class Period, in fact he sold an additional 35,000 shares. See Exhibit A to the Declaration of Patrick A. Klingman in Support of Lead Plaintiff's Opposition to Defendants' Motion to Dismiss, dated December 5, 2003 (the "Klingman Decl.").

## STATEMENT OF FACTS

VitalWorks is a provider of information management technology and services targeted to healthcare practices and organizations. ¶ 38. VitalWorks offers practice management software products that are designed to automate the administrative, financial, and clinical information management functions of office-based physician practices, hospital-based physician practices, and large healthcare enterprises, clinics, and organizations. ¶ 38. In addition to automating record keeping, VitalWorks' software automates billing by providing electronic data interchange services, which are required by HIPAA. ¶ 38.

VitalWorks' principal products are its practice management software products. These products are classified as either "Core" or "Classic." ¶ 39. VitalWorks' Core products purportedly offer the Company's targeted practice areas advanced functionality and operate with the latest generation of operating systems and hardware product. ¶ 39. Classic products, by contrast, typically lack advanced practice management features, and are not designed for the latest generation of operating systems. ¶ 39. The Company actively markets its Core products only. ¶ 39.

**Material Problems with the Company's Core Products**

In 2001, the Company's research and development efforts focused largely on one core product, RadConnect, which is the Company's next-generation radiology information system. ¶ 40. Imaging centers and radiology practices use radiology information systems such as RadConnect, commonly known as "RISs," to manage patient processing, staff and resource scheduling, and workflow. ¶ 40. RadConnect was the Company's new Core product capable of complying with HIPAA. ¶¶ 41, 42.

On April 11, 2002, the Company announced the commercial release of RadConnect, "the most advanced radiology information system available today." ¶ 43. The Company stated that "RadConnect RIS is one of the most significant product offerings in recent years, not just for VitalWorks but for the specialty as a whole, redefining the standards of speed, productivity, and

4

workflow." ¶¶ 44, 83. On July 23, 2002, VitalWorks again expressed the importance of RadConnect as a "noteworthy development[]" and a "highlight" of the second quarter. ¶ 46.

RadConnect, however, did not perform properly and was not ready for commercial release. ¶ 48. RadConnect had software problems or "bugs," and the code was not "solid." VitalWorks had also been relying on a third party for development of the product, but that third party was not delivering a usable product in a timely manner. ¶ 48

These problems were evident during beta testing by the Company at client facilities, during the late summer and fall of 2001 through May 2002. ¶¶ 49, 50. According to a former Senior Software Specialist, beta testing of RadConnect confirmed the existence of bugs that prevented the product from performing as advertised. ¶¶ 49, 50. As a result, many would-be buyers of the product postponed their purchases to ensure the problems had been resolved, and other potential sales fell through altogether. ¶ 49. According to the former Senior Software Specialist, even VitalWorks' existing customers were reluctant to purchase newer VitalWorks products, further hampering the Company's ability to generate increasing revenues. ¶ 49.

As late as February 2003, VitalWorks had still not rolled out a working, bug-free version of RadConnect, and had expended millions of dollars in developing and re-writing the software for the product. ¶ 51. That month, according to the Company's 2002 Form 10-K (filed with the SEC on March 27, 2003), VitalWorks finally completed its first upgrade of RadConnect. ¶ 51.

RadConnect is not the only Core product with which VitalWorks had problems. According to a former Client Services Manager in VitalWorks' Enterprise Division – which oversaw software for large medical practices – in April 2002 defendant Kahane asked him/her to attend a trade show for the medical software/device industry to get a sense of VitalWorks' place vis-a-vis competitors. ¶ 52. In particular, he/she was asked to see how the VitalWorks practice management software compared with the competition. Id. The former Client Services Manager concluded that two such products, including one called ChartStation, were at least two years behind the competition. Id.

5

He/she prepared a memo to this effect, directed to both defendant Kahane and to Kevin Collins, VitalWorks' Vice President of Development. Id.

Similarly, a programmer employed at VitalWorks until April 2002, who was charged with troubleshooting problems with ChartStation, stated that ChartStation's software did not work correctly. ¶ 53. According to this former programmer, there was always something wrong with the product, which was plagued with bugs. Id. This information was corroborated by a former Senior Manager who was employed by VitalWorks for most of the Class Period, and who was responsible for regional operations relating to software development and customer support. Id. According to this former Senior Manager, ChartStation did not properly interface with third parties and was not ready to be sold. ¶¶ 53, 61, 62, 63.

**The Company's Classic Products Were Not Producing Expected Revenue**

Although VitalWorks depended on its Core products, such as RadConnect, to fuel growth, its Classic products provided maintenance and service revenue comprising seventy percent of the Company's total revenue. ¶ 55.

Beginning in 2002, the Company's maintenance and service revenues were declining. ¶ 56. According to the Company's 2002 Form 10-K, filed with the SEC on March 27, 2003, those revenues declined by approximately $1 million dollars, in stark contrast to fiscal year 2001, when maintenance and service revenue increased by approximately $5 million. ¶ 56. As numerous former employees have stated, VitalWorks' Classic products did not perform acceptably and were inadequately supported by VitalWorks' Customer service. ¶¶ 56, 59.

According to these same employees, VitalWorks' Classic products were actually harming the sales of its Core products. Customers were not upgrading or buying new VitalWorks' Core products precisely because of their unsatisfactory experience with its Classic products. ¶¶ 57, 64. For example, a former Software Support Employee for VitalWorks throughout the Class Period, who was responsible for supporting medical billing software, hardware, network, and server support,

6

stated that he/she provided customer service for VitalWorks' Classic Prism software. Prism accounted for approximately 16% of VitalWorks' revenue. ¶¶ 58, 60. According to this former employee, the Prism software was DOS-based and not competitive with other Windows and Internet-based practice management software then available. ¶¶ 58, 62. The former employee also stated that the software was difficult to use and that clients, who were continually having problems, "detested" it because it did not meet their needs. ¶59. This source confirmed that as a result of the shoddy support and inferior products, VitalWorks was losing customers. ¶¶ 59, 64, 65.

**Defendants Misrepresented the Effect of HIPAA**

Of particular importance to investors during the Class Period were the Company's robust estimates of increased revenues based on regulatory changes concerning the use of electronic data interchange services. ¶ 71. The Company's 2001 Annual Report stated that "the regulations governing the electronic exchange of information establish a standard format for the most common healthcare transactions, including health claims, enrollment, payment and eligibility. The regulations require compliance by October 16, 2002 unless a covered entity submits a compliance plan by such date requesting an extension for compliance until October 16, 2003." ¶ 73. The Company also noted that many of its customers and potential customers were subject to HIPAA. ¶ 73.

There was no pressure, however, for potential clients to purchase VitalWorks' products to comply with HIPAA by October 16, 2002. Not only could potential customers take advantage of the available extension, but there were numerous other software providers that competed with VitalWorks in this area. ¶ 75. According to a former VitalWorks sales executive and account manager, even as early as May 2002, the market for HIPAA compliance was fully saturated, VitalWorks did not have a competitive advantage, and VitalWorks held only a small share of the market for "practice management" software. ¶ 75.

7

**Defendants' Revenue Guidance**

During the Class Period, defendants issued financial guidance to investors. On January 24, 2002, the Company stated that, "[f]or the year 2002, the company estimates revenues of approximately $120 million. . . ." ¶ 77. On April 23, 2002, the Company raised its guidance for fiscal year 2002 net income and provided revenue guidance for fiscal year 2003. The Company stated that, "[l]ooking forward, VitalWorks expects to have second quarter revenues of approximately $29 million . . . . For the year 2002, the company estimates revenues of approximately $120 million." The Company also stated that, "[f]or 2003, VitalWorks estimates revenues of $132 million to $138 million. . . ." ¶ 85. On July 23, 2002, the Company admitted that it did not meet revenue guidance for the second quarter of $29 million by $.3 million, but decided to raise its guidance for fiscal year 2002 net income to $24.5 million. VitalWorks also stated that third quarter revenues would be approximately $30 million. For 2002, the Company estimated revenues of approximately $120 million and raised its guidance for net income to $23 million to $24.5 million. For 2003, VitalWorks estimated revenues of $132 million to $138 million, and net income of $20 million to $24 million, or $.37 to $.45 per share. ¶ 91.

**Insider Trading**

During the Class Period, the Individual Defendants, as well as other high-level VitalWorks insiders, engaged in substantial insider selling. ¶¶ 106-111. Together, the Individual Defendants realized more than $5 million in proceeds from the sale of personally-held VitalWorks common stock during the Class Period. ¶ 106. Specifically:

- On or about May 31, 2002 – after VitalWorks unveiled RadConnect on April 11, 2002 – defendant Walsh sold approximately 58,736 shares, realizing over $510,000. On or about August 20, 2002, two months before the end of the Class Period, Walsh sold approximately 90,000 shares, realizing over $723,000 (¶ 107);

- On or about May 30, 2002 – after VitalWorks unveiled RadConnect on April 11, 2002 – defendant Manto sold approximately 200,000 shares, realizing over $1,600,000 in proceeds (¶ 108); and

- On or about April 26, 2002 – after VitalWorks unveiled RadConnect on April 11, 2002 – defendant Kahane sold approximately 50,690 shares, realizing over $380,000. ¶ 109. On or about May 30, 2002, Kahane also sold approximately 300,000 shares, realizing over $2,430,000. ¶ 109. On or about September 5, 2002, less than two months before the end of the Class Period, Kahane sold approximately 4,500 shares realizing over $38,000, realizing over $2,800,000 in proceeds. ¶ 109.[5]

**The Truth is Revealed**

On October 23, 2002, VitalWorks' problems became public when the Company issued a press release announcing its third-quarter 2002 financial results. VitalWorks reported that it failed to achieve pre-announced third-quarter revenues of $30 million, and had effectively lowered revenue guidance for the fiscal year 2002 to $114.4 million (the sum of Q1-Q3 revenue and Q4 guidance) from $120 million. ¶ 99. Additionally, the Company reported that it had lowered fiscal year 2003 revenue guidance to a range of $124 to $130 million from a range of $132 to $138 million. Defendants admitted that revenues were less than expected, that HIPAA was not going to contribute expected revenues, and that the radiology sector, in which RadConnect was used, was not producing the revenue the Company represented. ¶¶ 99-101, 103.

The Company also disclosed that fewer than 200,000 out of 2 million entities required to comply with HIPAA had filed for an extension, a fact suggesting that the vast majority had already complied with the requirement. When asked directly about HIPAA revenues, Walsh admitted that revenue from HIPAA would be less than forecasted. ¶¶ 77, 100, 101, 103.

On October 24, 2002, the first trading day after VitalWorks' announcements, the price of VitalWorks common shares fell more than 56% in value, to close at $3.13 per share, on record trading volume of more than 14 million shares. As a result of defendants' scheme, Lead Plaintiff and the other members of the Class were damaged.[6]

---

[5]Although the Complaint indicates that Kahane sold 355,190 shares during the Class Period, in fact he sold an additional 35,000 shares. See Klingman Aff. Exh. A.

[6]Lead Plaintiff suffered loses in excess of $4,553,561, as previously submitted to the Court in Fuller & Thaler Asset Management, Inc.'s Motion to Consolidate Related Cases, Appoint Lead Plaintiff and Appoint its Selection of Lead Counsel, filed on May 5, 2003.

**ARGUMENT**

An action filed pursuant to the Rule 10b-5 of the Exchange Act must allege that defendants issued materially false and misleading statements in accordance with Fed. R. Civ. P. Rule 9(b) and the Private Securities Litigation Reform Act of 1995 (the "PSLRA"). A plaintiff must also sufficiently allege that defendants acted with scienter, and that the plaintiff's reliance on defendant's misconduct caused injury to the plaintiff. In re Nortel Networks Corp. Sec. Litig., 238 F. Supp. 2d 613, 621 (S.D.N.Y. 2003). As set out below, Lead Plaintiff satisfies its pleading burden.[7]

## I. THE COMPLAINT SPECIFICALLY ALLEGES DEFENDANTS' FRAUD IN ACCORDANCE WITH RULE 9(B) AND THE PSLRA

Fed. R. Civ. P. 9(b) requires a plaintiff alleging fraud to state "the circumstances constituting fraud . . . with particularity." Thus, to satisfy the particularity requirement of Rule 9(b), the Complaint must specify the statements that Lead Plaintiff contends were fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent. Novak v. Kasaks, 216 F.3d 300, 306 (2d Cir. 2000); In re Xerox Corp. Sec. Litig., 165 F. Supp. 2d 208, 214 (D. Conn. 2001).

The Complaint is also subject to the PSLRA's requirement that sufficient underlying facts be pleaded to support the falsity of each statement. The PSLRA states that "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading and if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). Interpreting this requirement in Novak, the Second Circuit stated: "the PSLRA . . . does not require that plaintiffs plead with particularity every single fact upon which their beliefs concerning false or misleading statements are based. Rather, Plaintiffs need only plead with particularity sufficient facts to support those beliefs." Novak, 216 F.3d at 313-14.

---

[7]Reliance and causation are alleged at ¶¶ 112-15, 120-21, but are conceded by defendants for purposes of this motion.

Plaintiffs are not required to plead evidence to meet the requirements of Rule 9(b) and the PSLRA. See In re Scholastic Corp. Sec. Litig., 252 F.3d 63, 72 (2d Cir. 2001). Indeed, the Court of Appeals has held that neither the PSLRA nor Rule 9(b) imposes upon plaintiffs pleading burdens that are impossible to satisfy in the nascent stages of litigation. Id. Moreover, in securities fraud actions, the courts understand that application of the rule before discovery "may permit sophisticated defrauders to successfully conceal the details of their fraud." See In re Ann Taylor Stores Sec. Litig., 807 F. Supp. 990, 1004 (S.D.N.Y. 1992) (quoting Craftmatic Sec. Litig. v. Kraftsow, 890 F.2d 628, 645 (3d Cir.1989)). Accordingly, the normally rigorous particularity rule has been relaxed somewhat when the factual information is particularly within the defendants' knowledge or control. See In re Initial Pub. Offering Sec. Litig., 241 F. Supp. 2d 281, 386 (S.D.N.Y. 2003) ("The degree of particularity required for pleading . . . is not as demanding as . . . in other instances of fraud because the facts relating to a manipulation scheme are often known only by the defendants.") (quoting Baxter v. A.R. Baron, No. 94 Civ. 3913, 1996 WL 586338, at *8 (S.D.N.Y. Oct.11, 1996)).

Here, the Complaint's allegations, which must be taken as true,[8] specifically detail three categories of materially false and misleading statements that were issued by defendants to artificially inflate the value of VitalWorks' stock: i) defendants misled investors regarding the functionality and marketability of the Company's Core products; ii) defendants misrepresented the true effect that HIPAA had on revenues and sales; and iii) defendants issued baseless guidance while in possession of adverse facts concerning their products' marketability and the effect of HIPAA on revenue. Within each of these categories, the Complaint specifically identifies each misstatement and demonstrates why it is materially false and misleading.

---

[8]On a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), the allegations in the complaint must be accepted as true. In re Complete Mgmt. Inc. Sec. Litig.,153 F. Supp. 2d 314, 322 (S.D.N.Y. 2001). In addition, all reasonable inferences must be made in the plaintiff's favor. Cosmas v. Hassett, 886 F.2d 8, 11 (2d Cir. 1989).

11

A.  **Defendants' Statements Concerning Marketability of
    Its Core Products Were Materially False and Misleading**

Throughout the Class Period, defendants falsely represented to the investing public that their core revenue producing products, such as RadConnect and ChartStation, were well received by customers and had no material problems, and that the Company could migrate its customers to these new products. See ¶¶ 81, 83, 88, 91, 94, 97. Specifically, the Complaint alleges that the following statements regarding VitalWorks' products' marketability were materially false and misleading:[9]

- "VitalWorks believes that there is a significant opportunity to provide system upgrades to those clients using classic and other non-core products by providing a migration path to VitalWorks' core products. . . . The Company is actively promoting the migration of these clients to newer products and intends to retire these products at the earliest possible opportunity." ¶ 81.[10]

- "RadConnect RIS is one of the most significant product offerings in recent years, not just for VitalWorks but for the specialty as a whole, redefining the standards of speed, productivity and work flow." ¶ 83.

- "VitalWorks is presently the leading provider of RIS systems in the country. RadConnect RIS underlines our commitment to radiology and our role as the industry leader, and helps secure our leadership for the years to come." ¶ 83.

---

[9]Defendants' list of allegedly false and misleading statements (Def. Mem. at 14) includes one statement that Lead Plaintiff does not contend is false and misleading: the Company's admission in its July 23, 2002 press release that the release of RadConnect was a material event. Far from being false, this admission establishes that representations concerning RadConnect would be important to a reasonable consumer.

[10]Lead Plaintiff omitted text from this quotation (using ellipses) not to mislead the Court, as defendants suggest, but to exclude material not claimed to be false or misleading. The first omitted sentence merely confirms that the Company primarily markets its Core products, and will support its Classic products only until it is no longer cost effective or practical. Because this sentence does not relate to the statement alleged to be materially false and misleading – that VitalWorks could provide a migration path to its Core products – there was no reason to include it. Similarly, the second omitted statement, that "[i]n addition, approximately 15% of VitalWorks's clients are currently using products that were written for operating systems or hardware platforms that are no longer supported by their respective vendors," is not alleged to be materially false and misleading. See Exhibit 2 to the Affidavit of Terence J. Gallagher, sworn to on November 13, 2002 (the "Gallagher Aff."), at 4. The statement that follows, however, concerning the active promotion of certain clients to newer products, is false and misleading: the Company had no migration path to actively promote to any of its Classic products customers. ¶¶ 45, 48, 50, 53.

12