- "Today, I am pleased to report that we have commercially released two next-generation radiology products . . . RadConnect RIS and RadConnect Results. . . . We believe that these products will be very attractive to our considerable radiology customer base as well as to the entire ambulatory radiology market. . . ." ¶ 88.

- "I believe that 2002 will be another very exciting year for VitalWorks; we're already off to a good start." ¶ 88.

- "We continue to win in the markets we serve by bringing great software and service solutions to both new and existing clients. The remainder of the year looks promising for us . . . ." ¶ 91.

- "And I also, I think, said that on the other hand, our software licenses we were seeing greater sales than we anticipated and because of that, as you know, we raised guidance in the last quarter, mainly because when you mix in more software sales on recurring side, the margins on the software are much higher. So that would, hopefully, explain those numbers." ¶ 93.

- "Again, radiology, I think we got pretty good visibility over the upgrades and the business that we're doing." ¶ 94.

- "In our conversations with the company, management stated that their latest product, RadConnect RIS, has been very well received."[11] ¶ 97.

Each of these statements was particularly pleaded in accordance with Rule 9(b) and the PSLRA: the Complaint specifically identifies each statement, who made the statement, when and where the statement was made, and why the statement was false and misleading. ¶¶ 81, 82, 83, 84, 88, 89, 91, 92, 93, 94, 95, 97, 98.

Contrary to defendants' assertion that Lead Plaintiff fails to allege facts establishing the falsity of these statements (Def. Mem. at 14), Lead Plaintiff cites detailed information provided by numerous former employees and customers concerning the failure of VitalWorks' Core products. ¶¶ 45, 48-53. These sources – whom the Complaint describes "with sufficient particularity to support the probability that the person in the position occupied by the source would possess the information alleged" (Novak, 216 F.3d at 314) – set forth with particularity "sufficient facts to support the belief"

---

[11]This statement, from an analyst report by A. Draper of Sun Trust Robinson Humphrey Capital Markets, is actionable. Defendants misled the market through analysts by intentionally fostering the mistaken belief that RadConnect was well received. See Novak, 216 F.3d at 314; Elkind v Liggett & Myers, Inc., 635 F.2d 156, 163-64 (2d Cir. 1980) (intentionally fostering a false belief among analysts of a material fact is actionable).

13

that the Company's Core products did not function acceptably and were not well received by customers. See Novak, 216 F.3d at 312. For example, the Complaint cites a former Senior Software Specialist who worked for VitalWorks throughout the Class Period, and who was personally involved in the development of RadConnect (¶ 45), who stated that, "contrary to VitalWorks's April 11, 2002 announcement, RadConnect was not ready for commercial release"; that RadConnect had software problems; that the code was not "solid"; and that VitalWorks had been relying, for development of the product, on a third party that was not delivering a usable product in a timely manner. ¶ 48.

According to the same source, beta testing of RadConnect, which continued at least through May 2002 – nearly half the Class Period (and well after the product release announcement on April 11, 2002) – revealed problems with RadConnect. ¶ 49. Beta testing confirmed the existence of software problems or bugs that prevented the product from performing as advertised when it was commercially released in April and sold in May 2002. ¶ 49. See also ¶ 50 (problems with RadConnect beta testing corroborated by former VitalWorks sales executive and account manager). Because of these bugs, RadConnect could not "redefin[e] the standards of speed, productivity, and workflow," as VitalWorks had represented. ¶ 83.

In addition to the problems with RadConnect, sources stated that VitalWorks had material problems with another Core product, ChartStation. A former Client Services Manager in VitalWorks' Enterprise Division, who oversaw software for large medical practices, informed defendant Kahane that ChartStation was at least two years behind the competition, based on an analysis of competitors' products. ¶ 52. Similarly, a programmer employed at VitalWorks until April 2002, who was charged with troubleshooting problems with ChartStation, stated that ChartStation did not work correctly, always had something wrong with it, and was plagued with bugs. ¶ 53. This information was corroborated by other sources, including a former Senior Manager, who stated that ChartStation did not properly interface with third parties, and was not ready for commercial release. ¶ 53.

14

Indeed, the Company was not off to a "good start" in 2002, as defendant Walsh had represented. ¶ 88. Sources have stated that the Company had no products to which the customers who purchased Classic products could migrate. ¶¶ 62-63. For example, according to a former Client Services Manager in VitalWorks' Enterprise Division, the Company supported a Classic DOS-based product called Prism. Although Prism generated approximately 16% of VitalWorks corporate revenue (¶ 60) – by any standard a material amount – the product was twenty-five years old, difficult to use, and slated to be phased out. ¶¶ 61-62. Yet the Company had no new Enterprise software to which to migrate its Prism customers. ¶¶ 62-63.

Thus, abundant information from reliable sources supports the inference that VitalWorks' Core Products did not function acceptably and had limited marketability. Moreover, this source information is corroborated by documents the Company filed with the SEC. For example, the Company's 2002 Form 10-K admits that VitalWorks' first upgrade of RadConnect was completed in February 2003 – less than a year after the product's initial release. ¶ 51. Additionally, VitalWorks' 2002 Form 10-K reveals that the Company's maintenance and service revenues declined by approximately $1 million in 2002, in stark contrast to fiscal year 2001, in which maintenance and service revenue increased by approximately $5 million. ¶ 56; see Scholastic, 252 F.3d at 73 (considering post-class period revelations as indicative of liability); Novak, 316 F.3d at 312-13 (same). Accordingly, the Complaint sets forth particularized facts supporting the allegation that defendants were aware of substantial problems with their Core products, but nevertheless issued false and misleading statements concerning the marketability of those products. See also Cosmas, 886 F.2d at 13 (management is presumed to be aware of matters critical to its business).[12]

---

[12]The statements alleged to be materially false and misleading are not puffery, as defendants suggest. "It is disingenuous to suggest that factual assertions are puffery and opinion that no reasonable investor could reasonably rely on for their truth simply because [defendant] claims only to have stated that it believes in their truth." In re Oxford Health Plans Inc., Sec. Litig., 187 F.R.D. 133, 141 (S.D.N.Y. 1999). Even "[a]n opinion may . . . be actionable . . . if it is without a basis in fact . . . [or if] the speakers were aware of any facts undermining the

15

B.  **Defendants' Statements Concerning the Effect of HIPAA Were Materially False and Misleading**

Throughout the Class Period, defendants represented to the investing public that HIPAA was generating revenues for VitalWorks and was a driving force for system sales. Contrary to defendants' claims, however, HIPAA did not generate significant revenue for the Company. ¶¶ 74-75, 100-01. Accordingly, the Complaint alleges that defendants issued the following false and misleading statements concerning the effect of HIPAA:

- "We are continuing to achieve growth in our software license sales across every division of the company, a result of both core product upgrades revolving around HIPAA compliance as well as an increased rate of competitive wins." ¶ 85.

- "Bud, I think we spoke earlier that we expect to continue to invest in the Company and especially in the marketing and sales arena related around pushing our DDI (ph) with HIPAA. So we have cost built into our internal models related to those, including building our EDI gateway, which is underway, and some costs associated to that. So, at this point, I think our guidance – we feel comfortable with our guidance for the third quarter, where it is right now." ¶ 94.

- "I think that we'll see expanding revenues related to upgrades, getting people the current versions. But I also believe that that process, we'll be seeing revenues from that [upgrades for HIPAA], certainly through the second quarter, but I also think it will probably go into the third, fourth quarter." ¶ 94.

- "But we're seeing some of those impacts at HIPAA now in our license revenue, I certainly can see where we've built, over the past several quarters, people moving to standardized versions of the software that's HIPAA compliant. I would expect, you know, again, you see our models, you see our revenues that we expected over the next several quarters will continue to grow at the rate we projected in our revenue guidance." ¶ 94.

---

accuracy of these statements." In re Int'l Bus. Machs. Corp. Sec. Litig., 163 F.3d 102, 109 (2d Cir. 1998). Here, the Complaint does "more than just offer rosy predictions"; it alleges that defendants knew through beta testing that RadConnect had material software problems preventing it from working as advertised, that RadConnect was not being purchased by customers, that HIPPA was not driving revenue growth, and that the Company lacked Core products to which to migrate its Classic product customers. Novak, 216 F.3d at 315. These facts are thus distinguishable from those in San Leandro Emergency Med. Group Profit Sharing, 75 F.3d 801, 811 (2d Cir. 1996), cited by defendants, in which the puffery "consisted of relatively subdued general comments, such as the company 'should deliver income growth consistent with its historically superior performance' (emphasis added) and 'we are optimistic about 1993.'" Those statements "lack the sort of definite positive projections that might require later correction." Id.

16

Each of these statements was particularly pleaded in accordance with Rule 9(b) and the PSLRA: the Complaint specifically identifies each statement, who made the statement, when and where the statement was made, and why the statement was false and misleading. ¶¶ 85, 86, 94, 95.

Defendants attempt to distort the Complaint by claiming that Lead Plaintiff disputes the Company's characterization of HIPAA (Def. Mem. at 20), which Lead Plaintiff does not, and by citing statements from ¶¶ 71-73 of the Complaint that plaintiffs do not contend are false and misleading. See Def. Mem. at 20 (first two bullets). In fact, the Complaint alleges that the statements quoted above are materially false and misleading because, as confirmed by specific information from numerous sources, as well as the Company's own admissions, HIPAA was not a driving factor to produce revenue.

As defendants were necessarily aware, there was no pressure for current and potential clients to purchase VitalWorks' products to comply with HIPAA by October 16, 2002. Not only did federal law permit entities subject to the law to take advantage of a one-year extension, but there were numerous other software providers that competed with VitalWorks in this area. ¶ 75. According to a former VitalWorks sales executive and account manager who worked at the Company for over a year (until May 2002) selling software for emergency medicine, family practice, cardiology, ob-gyn, and ophthalmology, the market for HIPAA compliance was fully saturated, and VitalWorks did not have a competitive advantage. ¶ 75. VitalWorks held only a small share of the market for "practice management" software. ¶ 75.

Moreover, in an October 23, 2002 conference call, the Company admitted that fewer than 200,000 out of two million entities required to comply with HIPAA had filed for an extension, suggesting that the vast majority had already complied with the requirement. ¶ 100. When asked directly about HIPAA revenues, Walsh admitted that revenue from HIPAA would be less than forecasted. ¶ 76. Although defendants try to characterize this statement as a simple recognition that HIPAA-related revenues would be delayed (Def. Mem. at 22) – a highly debatable point, given the

17

relatively small number of entities applying for an extension, and the competitive nature of the market – even the admission of a delay refutes defendants' Class Period statements that HIPAA was driving <u>current</u> revenue growth. Moreover, Kahane's flippant explanation in the October 23, 2002 conference call that Companies were "annoy[ed]" and simply refused to comply with a federal statute is unbelievable and amounts to an unsupported opinion. Gallagher Aff. Exh. 22 at 5. At most, these arguments raise issues of fact that support sustaining the Complaint and proceeding with discovery. <u>Ganino v. Citizens Utils. Co.</u>, 228 F.3d 154, 165 (2d Cir. 2000) (issues of fact are not appropriate to be resolved through a Rule 12 (b)(6) motion to dismiss).

In essence, defendants viewed HIPAA as a vehicle for taking advantage of their current customers by overcharging them for simple modifications to make their already-installed software HIPAA-compliant. ¶ 74. According to a former Senior Sales Executive who was employed at VitalWorks during the Class Period, and who was responsible for sales to hospitals and large medical practices, many VitalWorks customers became angry at this practice and, as soon as possible, severed their relationship with the Company. ¶ 74.

Accordingly, Lead Plaintiff has alleged sufficient facts supporting its allegation that defendants misrepresented the effect HIPAA was having on the Company's revenue.

### C. Defendants' Baseless Financial Guidance was Materially False and Misleading

In addition to defendants' false and misleading statements concerning its Core Products and HIPAA, defendants also issued baseless guidance to inflate the value of VitalWorks' stock. During the Class Period, for example, defendants stated:

- On January 24, 2002, the first day of the Class Period, the Company reported its fourth-quarter 2001 results over PR Newswire. The press release announced: "[f]or the year 2002, the company estimates revenues of approximately $120 million and net income of approximately $12 million, or $.24 per diluted share." ¶ 77.

- On April 23, 2002 and April 24, 2002, the Company issued a press release entitled "Record First Quarter Earnings, Raises Guidance for 2002 . . ." The Company raised its guidance for fiscal year 2002 net income and provided revenue guidance for fiscal year 2003. The press release stated:

18

"Looking forward, VitalWorks expects to have second quarter revenues of approximately $29 million . . . . For the year 2002, the company estimates revenues of approximately $120 million, and has raised its guidance for net income to $18.5 million to $19.5 million . . . and EBITDA, as adjusted, to $21 million to $22 million. For 2003, VitalWorks estimates revenues of $132 million to $138 million. . . ." ¶ 85

- On May 15, 2002, VitalWorks filed its First Quarter Report on Form 10-Q for the quarter ended March 31, 2002. The Form 10-Q repeated the revenue guidance issued in its first-quarter earnings releases dated April 23 and 24, 2002. The Form 10-Q again stated: "[m]anagement believes that these forward-looking statements are reasonable and that the projections contained in this report are based on reasonable assumptions and forecasts . . . ." ¶ 89.

- On July 23, 2002, the Company issued a press release over PR Newswire announcing Second-Quarter Earnings. The Company stated that although it did not meet revenue guidance for the second quarter of $29 million by $.3 million, it was raising its guidance for fiscal year 2002 net income to $24.5 million. The press release stated in pertinent part:

"Looking forward, VitalWorks expects to have third quarter revenues of approximately $30 million . . . . For the year 2002, the company estimates revenues of approximately $120 million, and has raised its guidance for net income to $23 million to $24.5 million . . . . For 2003, VitalWorks estimates revenues of $132 million to $138 million and net income of $20 million to $24 million, or $.37 to $.45 per share." ¶ 91.

- "Bud, I think we spoke earlier that we expect to continue to invest in the Company and especially in the marketing and sales arena related around pushing our DDI (ph) with HIPAA. So we have cost built into our internal models related to those, including building our EDI [electronic data interchange] gateway, which is underway, and some costs associated to that. So, at this point, I think our guidance – we feel comfortable with our guidance for the third quarter, where it is right now." ¶ 94.

The Complaint specifically identifies each of these false and misleading statements in conformity with Rule 9(b) and the PSRLA. ¶¶ 77, 78, 85, 86, 89, 90, 91, 92, 94, 95. Each statement is materially false and misleading because, as discussed above, defendants' Core products did not function as advertised, were not well received by customers, and had software malfunctions (¶¶ 45, 48-53), and because HIPAA did not cause revenue to increase in a material amount. ¶¶ 74, 75, 100. In addition, up to 16% of the Company's revenue was generated by an outdated product, Prism, for which the Company had no substitute (¶¶ 60-66), and the Company's treatment of its Classic customers caused increased customer attrition and thwarted VitalWorks' chances to sell new products. ¶¶ 59-66, 103; see In re Nortel Networks, 238 F. Supp. 2d at 628 (stating that guidance was

19

baseless because it would be nearly impossible for the defendant to achieve forecasted revenue growth).

Indeed, a former Software Support Employee for VitalWorks throughout the Class Period, who was responsible for supporting medical billing software, hardware, network, and server support, stated that he/she provided customer service for VitalWorks' Classic Prism software, and that Prism was DOS-based and not competitive with other Windows and Internet-based practice management software then available. ¶ 58. Another source, a former Client Services Manager in VitalWorks' Enterprise Division who was responsible for customer service relating to Prism, confirmed that Prism was being phased out, and that there was no new Enterprise software to which to migrate its customers. ¶¶ 61, 63. According to this former Client Services Manager, Prism produced approximately 16% of VitalWorks corporate revenue. ¶ 60.

The Complaint also details sources who confirm that the poor performance of the Company's Classic Products, as well as its reputation for poor customer service, harmed the sales of its Core products. ¶ 57, 59, 64. These problems caused existing and prospective customers to delay making decisions to purchase additional VitalWorks software. ¶ 64. As a result, many would-be buyers of the product either postponed their purchases to ensure the problems had been resolved, or purchased products from competitors with superior products. ¶¶ 49, 63. These sources further support the allegation that defendants' revenue guidance was baseless.

Nonetheless, defendants repeatedly assured the market that the Company would meet its guidance. They stated, for example, that their guidance was based on "reasonable assumptions" (¶ 89); that "we think we got pretty good visibility over the upgrades and the business that we're doing" (¶ 94); and that, after increasing their guidance for the third quarter, "we feel comfortable with our guidance for the third quarter, where it is right now." ¶ 94. In light of the many issues negatively affecting VitalWorks' business – including HIPAA compliance and technical problems with

20

RadConnect – these statements were clearly actionable. See In re Nortel Networks, 238 F. Supp. 2d at 627 (quoting In re Int'l Bus. Machs. Corp Sec. Litig., 163 F.3d 102, 107 (2d Cir. 1998)).

Defendants argue that because the Company was generally regarded as conservative, and had not missed its projections in the past, its Class Period projections were not false and misleading. Whatever VitalWorks' history, however, it is undisputed that the Company missed certain of its Class Period projections. Moreover, defendants' argument that Lead Plaintiff must quantify the difference in expected revenue compared to actual HIPPA revenue is simply false. Quantification of the amount of revenue lost is not required to sustain the Complaint. In re Vivendi Universal, S.A. Sec. Litig., No. 02 Civ. 5571 (HB), 2003 WL 22489764, at *17 (S.D.N.Y. Nov. 3, 2003) (stating an exact amount of revenue lost is not required to satisfy pleading requirements).[13]

Finally, defendants assert that their revenue guidance, and their failure to meet that guidance, was immaterial. Def. Mem. at 24. The market's reaction to that failure belies this assertion. On October 24, 2002, the first trading day after VitalWorks announced its shortfall, the price of VitalWorks common shares fell more than 56% in value, to close at $3.13 per share, on record trading volume of more than 14 million shares. ¶ 16. In any event, defendants' argument at most presents an issue of fact about whether a reasonable investor would consider the Company's revenue projections to be material. See Basic Inc. v. Levinson, 485 U.S. 224, 234 (1988) (citing TSC Indus. Inc. v. Northway, Inc., 426 U.S. 438, 448-49 (1976)).

---

[13] In addition, Lead Plaintiff is not required to allege facts, such as the extent to which forecasts relied on revenue and profits from HIPAA-compliant products, exclusively within the defendants' knowledge. In re Initial Pub. Offering Sec. Litig., 241 F. Supp. 2d at 386 ("The degree of particularity required for pleading . . . is not as demanding as . . . in other instances of fraud because the facts relating to a manipulation scheme are often known only by the defendants.") (quoting Baxter, 1996 WL 586338, at *8); Petri v. Gatlin, 997 F. Supp. 956, 974 (N.D. Ill. 1997) ("'[p]laintiffs need not allege facts which are in the exclusive knowledge or control of the defendants'") (quoting Endo v. Albertine, 812 F. Supp. 1479, 1497 (N.D. Ill. 1993)).

21

II. **DEFENDANTS' FALSE STATEMENTS ARE NOT SHIELDED FROM LIABILITY BY THE SAFE HARBOR PROVISION**

The securities laws afford certain protections for false and misleading statements under certain circumstances, but for defendants to avail themselves of those protections, they must meet four requirements. First, the statements must be forward-looking. In re Vivendi, 2003 WL 22489764, at *18 (misrepresentations of historical or current fact are not protected). Second, the statements must be identified as forward-looking statements. See 15 U.S.C. § 75u-5(c)(1)(A)(i). Third, the identified forward-looking statements must be accompanied by meaningful cautionary statements, identifying important factors that could cause actual results to differ materially from those in the forward-looking statements. Id. For the cautionary language to be meaningful, it must be more than a mere generic warning that actual results may differ; the warning must specifically identify and precisely address the substance of the specific statement that is challenged. In re Vivendi, 2003 WL 22489764, at *18. Finally, even if each of the three previous requirements is met, a statement is still actionable if made with actual knowledge of its falsity. In re Xerox, 165 F. Supp. 2d at 219; In re Indep. Energy Holdings Sec. Litig., 154 F. Supp. 2d 741, 756 (S.D.N.Y. 2001); In re Prudential Sec. Inc. Ltd. P'ships Litig., 930 F. Supp. 68, 72 (S.D.N.Y. 1996).

The statements alleged in the Complaint are not protected by the Safe Harbor provision of the PSLRA. Many of the statements are current statements of fact; others that are arguably forward-looking and identified as such are not accompanied by meaningful cautionary language; and each of the false statements was known to be materially false and misleading when made. Accordingly, the alleged false and misleading statements are not protected.[14]

---

[14] For these same reasons, defendants' statements are not protected by the bespeaks caution doctrine, which does not protect present statements of fact, forward-looking statements unaccompanied by specific warnings, or statements known to be false when made. In re Nortel Networks, 238 F. Supp.2d at 628; In re Prudential, 930 F. Supp. at 72.

22

### A.   The Complaint Alleges False Statements of Present Fact

All the statements concerning RadConnect and HIPAA alleged in the Complaint are actionable because they are false statements of present fact. See ¶¶ 81, 83, 88, 91, 93, 97, and ¶¶ 85, 94, respectively. "By definition, the safe harbor provision applies to protect only 'forward-looking' statements, and not to misrepresentation of historical or current facts." In re Vivendi, 2003 WL 22489764, at *18 (citations omitted).

For example, defendants stated that "RadConnect RIS is one of the most significant product offerings in recent years, not just for VitalWorks but for the specialty as a whole, redefining the standards of speed, productivity and work flow." ¶ 83 (emphasis added); "VitalWorks is presently the leading provider of RIS systems in the country. RadConnect RIS underlines our commitment to radiology and our role as the industry leader." (¶ 83) (emphasis added); "there is a significant opportunity to provide system upgrades . . . ." (¶ 81) (emphasis added); and "We are continuing to achieve growth in . . . as a result of . . . HIPPA compliance . . . ." ¶ 85 (emphasis added). Each of these statements is a statement of current fact. See In re Nortel Networks, 238 F. Supp. 2d at 629 ("it is well recognized that even when an allegedly false statement 'has both a forward-looking aspect and an aspect that encompasses a representation of present fact' the safe harbor provision of the PSLRA does not apply"); In re KeySpan Corp. Sec. Litig., No. 01 CV 5852(ARR), 2003 WL 21981806, at *18 (E.D.N.Y. Jul. 30, 2003).

Defendants attempt to convert these statements of current fact into forward-looking statements by characterizing them as "descriptions of management's objectives for future operations." Def. Mem. at 27. A review of the plain language, however, demonstrates that each of the statements at issue has a significant present-time component. Defendant Walsh stated, for example, that "we're seeing some of those impacts from HIPAA now in our license revenue, I certainly can see where we've built, over the past several quarters, people moving to standardized versions of the software that's HIPAA compliant." ¶ 94 (emphasis added). No amount of distortion can change this statement

23

into a forward-looking statement. See, e.g., In re Vivendi, 2003 WL 22489764, at *18. Because the same is true of each statement alleged to be false and misleading concerning RadConnect and HIPAA, those statements do not qualify for protection under the Safe Harbor.

B.  **Defendants Do Not Provide Any Meaningful Cautionary Language**

Defendants' risk disclosures amount to nothing more than generic statements of risk that failed to warn investors of the specific problems facing the Company when defendants made their materially false and misleading statements. See Credit Suisse First Boston Corp. v. ARM Fin. Group, Inc., No. 99 CIV 12046 WHP, 2001 WL 300733, at *4 (S.D.N.Y. Mar. 28, 2001) (defendants must warn on the exact risk the plaintiffs claim was not disclosed); Milman v. Box Hill Sys. Corp, 72 F. Supp. 2d 220, 230 (S.D.N.Y 1999) ("'cautionary language must be too prominent and specific to be disregarded' and must 'warn investors of exactly the risk that plaintiffs claim was not disclosed.'") (citation omitted).

For example, VitalWorks' risk disclosure concerning HIPAA (Def. Mem. at 30, first complete bullet) fails to warn investors that the demand for the Company's HIPAA products was presently minimal because of the availability of an extension for compliance, because fewer than 200,000 companies (out of 2 million required to comply) were left to comply with the statute (based on filed extensions), because VitalWorks had numerous competitors for the limited business still available, because it had no competitive advantage in this area, and because it held only a small share of the market for "practice management" software. ¶¶ 75-76. Similarly, the Company's warnings that certain restrictions would decrease the value of VitalWorks' products (and other product-related warnings) do not specifically warn that the Company's products, such as RadConnect, might not work as represented. Def. Mem. at 30.

The remaining risk disclosures are generic boilerplate that courts in this circuit have held to be inadequate to exempt defendants from their fraud. See, e.g., In re Nortel Networks, 238 F. Supp. 2d at 628 ("Defendants' 'generic warnings' were insufficient and failed to warn investors about the

24

'undisclosed adverse conditions' defendants knew existed at the time they made the allegedly false and misleading statements."). Each of the remaining warnings essentially states that sales and forecasts will be lower if customers do not purchase the Company's products. Def. Mem. at 29-30. Importantly, however, the reasons given for that risk, such as customer buying patterns, do not relate to the allegations in the Complaint. The other stated risks, that revenues might fall if costs increase or if products do not achieve increased market experience, are similarly inapplicable.[15]

### C. Defendants Knew Their Statements Were Materially False and Misleading When Made

Even if defendants' cautionary language were meaningful, each of their false and misleading statements would be actionable because defendants knew those statements to be materially false and misleading when made. "No degree of cautionary language will protect material misrepresentations or omissions where defendants knew their statements were false when made." In re Indep. Energy Holdings, 154 F. Supp. 2d at 756; see also In re Prudential, 930 F. Supp. at 72 ("The doctrine of bespeaks caution provides no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away.").

The Complaint specifically alleges that defendants knew RadConnect was experiencing material problems during beta testing; yet defendants continued to tout its technical superiority and speed of product acceptability. ¶¶ 43, 46, 49, 50; see Indep. Energy Holdings, 154 F Supp. 2d at 756 n.11 (source information that software was not corrected was enough to establish knowledge). A

---

[15]See also In re Vivendi, 2003 WL 22489764, at *18 ("The generic warning that 'actual results may differ,' which [the defendants] included with its announcement, does not come close to the 'cautionary language [needed] to render reliance on the misrepresentation unreasonable.'") (quoting Steinberg v. PRT Group, Inc., 88 F. Supp. 2d 294, 301 (S.D.N.Y. 2000)); Irvine v ImClone Sys., Inc., No. 02 Civ. 109 RO, 02 Civ. 7499 RO, 2003 WL 21297285, at *1 (S.D.N.Y. June 4, 2003) ("'that actual results may differ materially' from those predicted, this language is not sufficient to place these statements under the 'safe harbor' provisions of the PSLRA . . . . In considering similar cautionary language to that present here, the court noted that 'individuals commonly ignore such boilerplate warnings . . . .'").

25

VitalWorks employee also expressly informed defendant Kahane that two of the Company's Core products were at least two years behind the competition. ¶ 52. Additionally, defendants are deemed to have knowledge of factors – such as technical flaws in RadConnect and the impact of HIPAA – that affect the sales of their Core products. Cosmas v. Hassett, 886 F.2d 8, 13 (2d Cir.1989) (defendants deemed to have knowledge of factors that affect the sales of core products).[16]

Accordingly, the Complaint sufficiently alleges that defendants knew their statements concerning the technical superiority and marketability of their Core products, including RadConnect, and concerning the effect of HIPAA on Company revenues, were false when made. Because these statements, and the financial guidance based upon them, were known to be false, none of the alleged false and misleading statements can be protected by the Safe Harbor.

## III. THE COMPLAINT'S DETAILED ALLEGATIONS DEMONSTRATE A STRONG INFERENCE OF SCIENTER

The PSLRA requires a complaint to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). According to the Court of Appeals, the requisite state of mind, or scienter, in an action under section 10(b) and Rule 10b-5 is "an intent to deceive, manipulate or defraud." Kalnit v. Eichler, 264 F.3d 131, 138 (2d Cir. 2001) (internal quotation marks omitted; citing Ganino, 228 F.3d at 161). As the

---

[16] See also Xerox, 165 F. Supp. 2d at 223 (problems affecting the company's core operations "jeopardized the success of the company's most significant initiative at that time. Thus, the defendants were aware of those problems by virtue of their responsibilities within the company, and must either intentionally or recklessly have failed to report the company's true condition to the investing public."); In re Ancor Communs., 22 F. Supp. 2d 999, 1005 (D. Minn. 1998) (company insiders are likely to have knowledge of problems associated with their company's "significant" products or transactions, resulting in a strong inference of defendants' conscious behavior); Epstein v. Itron, Inc., 993 F. Supp. 1314, 1326 (E.D. Wash. 1998) ("facts critical to a business's core operations or an important transaction generally are so apparent that their knowledge may be attributed to the company and its key officers"); In re Sears, Roebuck and Co. Sec. Litig., No. 02 C 7527, 2003 WL 22454021, at *4 (N.D. Ill. Oct. 24, 2003) ("Officers of a company can be assumed to know of facts 'critical to a business's core operations or to an important transaction that would affect a company's performance.'") (quoting Stavros v. Exelon Corp., 266 F. Supp. 2d 833, 850 (N.D. Ill. 2003)).