Court wrote in Novak, 216 F.3d at 311, the strong inference that the defendant acted with the required state of mind may arise when the complaint sufficiently alleges that the defendants "(1) benefitted in a concrete and personal way from the purported fraud . . . ; (2) engaged in deliberately illegal behavior . . . ; (3) knew facts or had access to information suggesting that their public statements were not accurate . . . ; or (4) failed to check information they had a duty to monitor . . . ."[17]

Lead Plaintiff has alleged that the Individual Defendants "benefitted in some concrete and personal way" through their insider trading. See id. at 307-08 (requirement of concrete and personal benefit "generally met when corporate insiders . . . alleged to have misrepresented to the public material facts about the corporation's performance or prospects in order to keep the stock price artificially high while they sold their own shares at a profit"). During the Class Period, the Individual Defendants realized over $5 million by selling their personal stock and options in a highly coordinated and suspicious fashion. ¶ 106. On April 26, 2002 – shortly after VitalWorks unveiled RadConnect on April 11, 2002 – defendant Kahane sold 50,690 shares, realizing over $380,000. ¶ 109. One month later, on May 29 and 30, 2002, Kahane sold 300,000 shares, realizing over $2,430,000. Id. Those same two days, defendant Manto sold a total of 200,000 shares, realizing over $1,600,000 in proceeds. ¶ 108. The following day, May 31, 2002, when VitalWorks' stock reached its Class Period high of $9 per share, defendant Walsh sold approximately 58,736 shares, realizing over $510,000. ¶ 107. Thus, during the period between April 26, 2002 and May 31, 2002, the Individual Defendants collectively sold 609,426 shares, for proceeds of approximately $4,920,000.[18]

---

[17]See also Kalnit, 264 F.3d at 138 (expressing the more traditional formulation: plaintiff can establish scienter "either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness") (internal quotation marks omitted; citing Acito v. IMCERA Group, Inc., 47 F.3d 47, 52 (2d Cir.1995)).

[18]During this same period, upper management sold a substantial number of shares. On May 24, 2002, Stephen L. Hicks, VitalWorks' Vice President and General Counsel, sold approximately 51,529 shares, realizing more than $433,000. On May 29, 2002, Kevin M. Silk, VitalWorks' Vice President of Finance & Business Development, sold approximately 3,500

27

The Individual Defendants sold shares later in the Class Period, as well. On or about August 20, 2002, Walsh sold 90,000 shares, realizing over $723,000. ¶ 107. On September 5, 2002, when VitalWorks' stock reached its highest point after June 11, 2002, Kahane sold 4,500 shares, realizing over $38,000. ¶ 109.[19]

Defendants attempt to defend these bouts of insider trading with three arguments: (i) most of the trades were covered by a plan pursuant to SEC Rule 10b5-1; (ii) one of the trades not covered by the alleged 10b5-1 plan was not made by defendant Walsh, as Lead Plaintiff alleges, but by his spouse; and (iii) none of the trades were suspicious. Each of these arguments fails.

### A. VitalWorks' Alleged Rule 10b5-1 Plans Are Not a Proper Basis for a Motion to Dismiss, and in Any Event Create Numerous Questions of Fact Inappropriate for Resolution on this Motion

Rule 10b5-1 defines when the purchase or sale of a security "constitutes trading 'on the basis of' material nonpublic information in insider trading cases brought under Section 10(b) of the [Exchange] Act and Rule 10b-5 thereunder." Preliminary Note to 17 C.F.R. § 240.10b5-1. The rule also creates an affirmative defense to charges of insider trading when, under certain enumerated circumstances, the person making the purchase or sale had previously adopted "a written plan for trading securities." 17 C.F.R. § 240.10b5-1(c)(1)(i)(A)(3). Asserting the existence of such plans, defendants argue that most of their insider sales were pre-planned, before defendants acquired the inside information Lead Plaintiff alleges, and therefore do not evince an intent to deceive, manipulate, or defraud. Because, however, the Rule 10b5-1 plans defendants allege lie beyond the four corners

---

shares, realizing over $28,000. And on June 10, 2002, C. Daren McCormick, VitalWorks' Vice President and Chief Operations Officer, sold approximately 30,000 shares, realizing more than $257,000. ¶ 110.

[19]Upper management also sold shares in August 2002. On August 1, 2002, McCormick sold approximately 15,000 shares, realizing more than $107,000. On August 20, 2002, Silk sold approximately 10,000 shares, realizing more than $79,500. The next day, August 21, 2002, Hicks sold approximately 33,512 shares, realizing more than $276,000. ¶ 110.

28

of the Complaint, and in any event raise a host of factual questions that cannot be resolved before discovery, they are not properly considered on a motion to dismiss.

In evaluating a motion to dismiss, a court's consideration "is generally limited to the facts as presented within the four corners of the complaint, to documents attached to the complaint, or to documents incorporated within the complaint by reference." Taylor v. Vermont Dep't of Educ., 313 F.3d 768, 776 (2d Cir. 2002) (citation omitted). In a securities case, a court may also consider "public disclosure documents required by law to be, and that have been, filed with the SEC." Rothman v. Gregor, 220 F.3d 81, 88 (2d Cir. 2000) (emphasis added). Lead Plaintiff's Complaint neither refers to, attaches, nor incorporates by reference the 10b5-1 plans defendants assert. Nor are the alleged plans either filed with, or required to be filed with, the SEC. Thus, under the clear holdings of Taylor and Rothman, the Court may not properly consider those alleged plans on a motion to dismiss. The existence of a mere reference to alleged 10b5-1 plans in VitalWork's Form 10-Q for the quarter ended March 31, 2002 is not, under Taylor and Rothman, sufficient to justify consideration of such plans.[20]

Even if the Court could properly consider them, however, the Rule 10b5-1 plans defendants allege could not justify the dismissal of Lead Plaintiff's Complaint. Rule 10b5-1 affords an insider safe harbor only upon proof that a series of conditions have been met. To enjoy the protection of the rule, an insider must establish:

- that the plan was adopted, in writing, before the insider became "aware of the information." 17 C.F.R. § 240.10b5-1(c)(1)(i)(A) and 17 C.F.R. § 240.10b5-1(c)(1)(i)(A)(3); and

- that the plan specifies "the amount of securities to be purchased or sold and the price at which and the date on which the securities were to be purchased or sold" (17 C.F.R. § 240.10b5-1(c)(1)(i)(B)(1)); or that the plan includes "a written formula or algorithm, or computer program, for determining the amount of securities to be purchased or sold and the price at which and the date on which the securities were to be purchased or sold" (17 C.F.R.

---

[20]Def. Mem. at 34; Gallagher Aff. Exh. 3 at 18 ("Item 5. Other Information").

§ 240.10b5-1(c)(1)(i)(B)(2)); or that the plan does not permit "the person to exercise any subsequent influence over how, when, or whether to effect purchases or sales; provided, in addition, that any other person who, pursuant to the . . . plan, did exercise such influence must not have been aware of the material nonpublic information when doing so" (17 C.F.R. § 240.10b5-1(c)(1)(i)(B)(3)); and

- that the purchase or sale was "pursuant to" the plan, such that there was no deviation from the plan (whether by changing the amount, price, or timing of the purchase of sale), and no entering into or altering of a corresponding or hedging transaction or position with respect to the securities at issue (17 C.F.R. § 240.10b5-1(c)(1)(i)(C); and

- that the "plan to purchase or sell securities was given or entered into in good faith and not as part of a plan or scheme to evade the prohibitions of this section." 17 C.F.R. § 240.10b5-1(c)(1)(ii).

See also Newby v. Enron Corp., 258 F. Supp. 2d 576, 592 (S.D. Tex. 2003) (a Rule 10b5-1 plan must "meet specific requirements that [do] not allow the defendant to exercise any subsequent control over or alteration of that . . . plan with respect to the purchases or sales of the securities").

Because Rule 10b5-1 requires an insider to "demonstrate" each of the requirements set forth above before the affirmative defense will apply (17 C.F.R. § 240.10b5-1(c)(1)(i)), defendants cannot possibly claim entitlement to its protection as a matter of law on a motion to dismiss.

### B. Defendant Walsh, Not His Spouse, Filed a Form 4 with the SEC for the Sale of 58,736 shares on May 31, 2002

Lead Plaintiff alleges numerous insider trades, including the sale of 58,736 shares by defendant Walsh on May 31, 2002. Defendants dismiss this sale by arguing, in a footnote, that Lead Plaintiff is "mistaken" about this sale – that the 58,736 shares were sold not by Walsh, but by his spouse, Sarah M. Walsh (a Vice President of VitalWorks), and that, as a result, the sale is irrelevant to defendants' scienter. Def. Mem. at 35 n.8. In fact, defendants are the ones who are mistaken. It was not Mrs. Walsh who filed a Form 4 with the SEC reporting this sale (and acknowledging a

30

change in beneficial ownership of VitalWorks shares); it was Mr. Walsh. Thus, the sale is indisputably relevant to scienter.

Section 16(a) of the Exchange Act requires the officers and directors of the issuer of a security (and other statutory insiders) to file a statement with the SEC reflecting any change in their beneficial ownership of the issuer's securities. 15 U.S.C. § 78p(a). This statement is called a Form 4, "Statement of Changes in Beneficial Ownership." Under SEC Rule 16a-1(a)(2), a person is a beneficial owner of securities if he or she "has or shares a direct or indirect pecuniary interest in the equity securities . . . ." 17 C.F.R. § 240.16a-1(a)(2). An "indirect pecuniary interest" exists if the securities are "held by members of a person's immediate family sharing the same household,"[21] including that person's spouse. 17 C.F.R. § 240.16a-1(e). Hence, even if the 58,736 shares sold on May 31 were held directly by Mrs. Walsh, as defendants claim, Mr. Walsh, as a statutory insider, nonetheless had a beneficial ownership interest in them and was required to report the sale.

Mr. Walsh admitted that interest on June 6, 2002, when he filed his Form 4 acknowledging the May 31 sale.[22] His Form 4, signed by "John M. Weaver for Joseph M. Walsh," lists three sales on May 31, 2002 – one for 5,926 shares, one for 47,625 shares, and one for 5,185 shares, totaling 58,736 shares. Although the form states that the shares are "owned directly by Sarah M. Walsh," it explicitly acknowledges that Mr. Walsh had an indirect beneficial ownership interest in the shares.

Mr. Walsh's filing of a Form 4 disclosing the May 31 sale is particularly significant because, as far as Lead Plaintiff can determine, Mrs. Walsh did not file a Form 4 (despite being required to do so by SEC Rule 16a-1(a)(3)).[23] Moreover, Mr. Walsh's Form 4 in no way disclaims his beneficial

---

[21] 17 C.F.R. § 240.16a-1(a)(2)(ii)(A).

[22] Mr. Walsh's Form 4 is attached as Exhibit B to the Klingman Declaration.

[23] Rule 16a-1(a)(3) states, in relevant part: "Where more than one person subject to section 16 of the Act is deemed to be a beneficial owner of the same equity securities, all such persons must report as beneficial owners of the securities, either separately or jointly . . . ." To report jointly, the Form 4 "must be signed by each beneficial owner, or on behalf of such owner

ownership in the securities at issue, even though Rule 16a-1(a)(4) would have permitted him to do so: "Any person filing a statement pursuant to section 16(a) of the Act may state that the filing shall not be deemed an admission that such person is, for purposes of section 16 of the Act or otherwise, the beneficial owner of any equity securities covered by the statement." 17 C.F.R. § 240.16a-1(a)(4).

To suggest, therefore, that the Complaint "mistakenly" alleges the sale of securities by Mr. Walsh on May 31, 2002, as defendants do, is flatly incorrect. Mr. Walsh reported the May 31, 2002 sale of 58,736 shares of VitalWorks stock in which he had a beneficial interest; his spouse did not. Despite the opportunity to do so, he reported that sale without disclaiming his beneficial ownership of the shares in question. There is no reason, therefore, for the Court to disregard this sale, which defendants do not and cannot attribute to Mr. Walsh's alleged Rule 10b5-1 plan, in considering Lead Plaintiff's scienter allegations.[24]

### C.    The Alleged Insider Sales Were Suspicious

As noted above, the Court of Appeals has held that unusual insider trades will satisfy the scienter requirement in an action brought under section 10(b) and Rule 10b-5: "'Unusual' insider sales at the time of the alleged withholding of negative corporate news may permit an inference of bad faith and scienter." In re Scholastic Corp. Sec. Litig., 252 F.3d 63, 74 (2d Cir.), cert. denied, 534 U.S. 1071 (2001). "Factors considered in determining whether insider trading activity is unusual include the amount of profit from the sales, the portion of stockholdings sold, the change in volume

---

by an authorized person." 17 C.F.R. § 240.16a-3(j). Neither Mr. Weaver nor anyone else signed on behalf of Mrs. Walsh, even though she was a Vice President of the Company, and Mr. Walsh's Form 4 specifically indicates that it is an individual, as oppose to group, filing (see Klingman Decl. Exh. B at box 7). Significantly, defendants did not submit a Form 4 for Mrs. Walsh with their motion to dismiss.

[24]The May 31 trades could not have been made pursuant to defendant Walsh's alleged Rule 10b5-1 plan because, according to VitalWork's Form 10-Q for the first quarter of 2002 (ended March 31, 2002), that plan was to begin "following the Company's announcement of its operating results for the June 2002 quarter" – after May 31, 2002. Gallagher Aff. Exh. 3 at 18 ("Item 5. Other Information").

32

of insider sales, and the number of insiders selling." Id. at 74-75; see also Rothman, 220 F.3d at 94. The timing of the sales (how close to the class period's high price and to the disclosure of negative news) is obviously also critical. See, e.g., Enron, 258 F. Supp. 2d at 593-94; Simon v. American Power Conversion Corp., 945 F. Supp. 416, 435 (D.R.I. 1996).

These factors clearly point to unusual trading by the Individual Defendants. This is not a case in which only a single defendant engaged in insider selling. See, e.g., Acito, 47 F.3d at 54; San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos., 75 F.3d 801, 814 (2d Cir. 1996). Together, the three Individual Defendants sold 738,926 shares during the Class Period – almost all after the Company announced the commercial release of RadConnect in April 2002: Kahane sold 390,190 shares (¶ 109);[25] Manto sold 200,000 shares (¶ 108); and Walsh sold 148,736 shares. ¶ 107. Because none of the Individual Defendants sold any VitalWorks shares before the Class Period, and have sold none since, the very fact of these sales was unusual. ¶ 111.

Moreover, the sales were highly coordinated. Of the 738,926 shares sold, 558,736, or 76%, were sold during the three-day period between May 29 and May 31, 2002 – the very day VitalWorks' shares hit a Class Period high of $9.00 per share. An unusual concentration and volume of insider sales, especially when the stock price is high, is suspicious and will justify an inference of scienter.[26] See, e.g., Enron, 258 F. Supp. 2d at 593-94 (sales at stock's high point considered suspicious); In re Xerox, 165 F. Supp. 2d at 222 (finding allegations of scienter sufficient when "complaint allege[d] that there was an unusual concentration in terms of the volume of insider sales for any one month

---

[25] Although the Complaint indicates that Kahane sold 355,190 shares during the Class Period, in fact he sold an additional 35,000 shares. See Klingman Decl. Exh. A.

[26] During this same period, upper management sold a substantial number of shares. On May 24, 2002, Stephen L. Hicks, VitalWorks' Vice President and General Counsel, sold approximately 51,529 shares, realizing more than $433,000. On May 29, 2002, Kevin M. Silk, VitalWorks' Vice President of Finance & Business Development, sold approximately 3,500 shares, realizing over $28,000. And on June 10, 2002, C. Daren McCormick, VitalWorks' Vice President and Chief Operations Officer, sold approximately 30,000 shares, realizing more than $257,000. ¶ 110.

33

when compared with such monthly volume for the preceding three years"); Friedberg v. Discreet Logic Inc., 959 F. Supp. 42, 51-52 (D. Mass. 1997) ("It is both the amount and the timing of the sale which, with the other evidence discussed, provide strong circumstantial evidence of conscious misbehavior.").

After May 31, 2002, VitalWorks' shares began trending downward, closing as low as $5.99 on July 12, 2002, before they began to rise again. Thereafter defendant Walsh sold 90,000 shares on August 20, 2002, at $8.0433 per share, and Kahane sold 4,500 shares on September 5, 2002, at $8.55 per share, the highest price VitalWorks' shares have reached between June 11, 2002 and the present. Just over a month after this last Class Period insider trade, VitalWorks' shares plunged upon the Company's announcement of disappointing results for the third quarter of 2002. After closing at $7.18 per share on October 23, 2002, just before the announcement, VitalWorks' shares closed at $3.13 per share the following day, October 24, 2002. See Simon, 945 F. Supp. at 435 (trades made two months before a negative public announcement sufficiently suspicious in timing to raise strong inference of scienter).

Despite these numerous indicia of suspicious trading – no sales of VitalWorks stock by the Individual Defendants either before or after the Class Period; a large volume of sales by multiple defendants during the Class Period; highly coordinated selling during the Class Period, all concentrated at peaks in the stock price; and insider trades shortly before the announcement of disappointing results -- defendants argue that their sales are not unusual. Concerning defendant Kahane's April 26, 2002 sale of 50,690 shares, for example, defendants argue that Kahane acted "appropriately" by selling his shares three days after the Company announced its first quarter earnings – thereby letting the market "absorb" the information the Company had disclosed. Def. Mem. at 35. Lead Plaintiff alleges, however, that the information the Company announced, and the market "absorbed," between April 24 and April 26 was itself materially false and misleading, for the numerous reasons stated in paragraphs 42-76 and 86. Waiting for the market to absorb false and

misleading information – and for the stock price to become artificially inflated – is hardly "appropriate," but rather the <u>modus operandi</u> of the wrongdoing insider.

Defendants also argue that the sales in question cannot be deemed to be suspicious because defendants "Walsh, Manto and Kahane retained, respectively[,] 97%, 84% and 84% of their Company stock, properly taking into account their stock options." Def. Mem. at 37. The Court should reject this argument for a number of reasons.

First, defendants' unqualified assertion that it is proper to take into account stock options when considering the percentage of shares retained is incorrect. <u>Id.</u> Numerous courts have held that it is appropriate to take <u>vested</u> stock options into account, but not <u>unvested</u> options. <u>See, e.g.</u>, <u>In re Silicon Graphics Inc. Sec. Litig.</u>, 183 F.3d 970, 986-87 (9th Cir. 1999).[27]

Second, the Individual Defendants state the percentages of stock and options they purportedly retained conclusorily, without either explanation or backup. Using the Form 4's filed by the Individual Defendants and the Proxy Statements filed by the Company, Lead Plaintiff has attempted to determine, unsuccessfully, how defendants calculated the percentages in question. In the case of defendant Kahane, for example, it appears that defendants calculated the percentage of shares he retained using <u>all</u> his options, not just his vested options. According to Kahane's Form 4 dated March 7, 2002 (Klingman Decl. Exh. A), Kahane owned 56,219 shares of VitalWorks stock and 2,079,137 options before he made his first Class Period sale on February 22, 2002. If one includes all 2,079,137 options into the calculation – whether or not they were vested – Kahane sold 18.27% of his Company stock and options (the 390,190 shares sold divided by the sum of 56,219 and 2,079,137, which equals .1827), and retained 81.73%. This number is lower than the 84% retention rate Kahane claims.

More importantly, even the lower 81.73% retention rate is inflated because a significant proportion of Kahane's options did <u>not</u> vest during the Class Period. According to the Company's

---

[27]Some courts have held that even vested options should not be included. <u>See, e.g.</u>, <u>In re Oxford Health Plans, Inc.</u>, 187 F.R.D. 133, 140 (S.D.N.Y. 1999) ("vested options are not shares").

35

Proxy Statement filed on April 30, 2003 (Klingman Decl. Exh. C at 18), only 1,560,566 options had vested by December 31, 2002 (1,205,376 then-exercisable options plus 355,190 options that had already been exercised). Using the figure 1,560,566 as the number of vested options during the Class Period (even though this number is likely to be high because some of the options probably vested between the end of the Class Period, on October 23, 2002, and December 31, 2002), Kahane sold 24.13 % of his Company stock and vested options (the 390,190 shares sold divided by the sum of 56,219 and 1,560,566, which equals .2413), and retained 75.87%. This retention rate is more than eight percentage points lower than the 84% rate asserted, without explanation, by defendants.

Lead Plaintiff provides these calculations not to establish that its numbers are necessarily right; indeed, Lead Plaintiff believes it has insufficient information to do an accurate calculation, and that the 75.87% retention rate it calculated is likely high. Rather, these calculations demonstrate that a question of fact exists as to the percentage of shares and vested options the Individual Defendants actually retained – making defendants' argument an inappropriate basis for a motion to dismiss.

Even if the Court were inclined to consider defendants' retention-rate argument, however, it would not defeat an inference of scienter. First, the number of shares retained by the Individual Defendants is only one of a number of factors bearing upon the unusualness of insider sales. See, e.g., In re Scholastic Corp. Sec. Litig., 252 F.3d at 74-75. The other factors discussed above strongly suggest suspicious and unusual trading by the Individual Defendants.[28] Thus, in Friedberg v. Discreet Logic Inc., 959 F. Supp. 42 (D. Mass. 1997), the plaintiff sufficiently alleged scienter, even though defendants collectively sold only 12% of their total holdings, because "both the amount and the

---

[28]For example, none of the Individual Defendants sold any VitalWorks shares either before or after the Class Period; during the Class Period they sold large quantities in a highly coordinated fashion, coinciding with peaks in the stock price; and substantial insider trades occurred shortly before the announcement of VitalWorks' disappointing results at the end of the Class Period.

36

timing of the sale . . . with the other evidence discussed, provide[d] strong circumstantial evidence of conscious misbehavior." Id. at 51-52 (emphasis added).[29]

Second, the two cases upon which defendants rely are distinguishable. In In re Silicon Graphics Securities Litigation, the Ninth Circuit dismissed the insider trades in question not simply because they were relatively small, but because defendants had "traded in a manner consistent with prior practice." 183 F.3d at 987. Similarly, the District Court in In re Peritus Software Services, Inc., 52 F. Supp. 2d 211, 225 n.5 (D. Mass. 1999) concluded that the insider sales in question "were not out of line with prior trading history." Because none of the Individual Defendants had traded any VitalWorks shares before the Class Period, nor have they since, that is unequivocally untrue here.

Finally, as the Ninth Circuit has noted, "an insider may not always trade all his shares in the company for which he possesses the inside information; the trader may hold on to a portion of his shares to hedge against the unforeseen or to obscure the insider trading from the SEC." In re Worlds of Wonder Sec. Litig., 35 F.3d 1407, 1427 (9th Cir. 1994).

For all these reasons, Lead Plaintiff has adequately alleged scienter.[30]

## IV. CONTROL PERSON LIABILITY IS ADEQUATELY ALLEGED

The Complaint alleges that the Individual Defendants are control persons of VitalWorks and liable under Section 20(a) of the Exchange Act. To allege a Section 20(a) claim, "a plaintiff must show: (1) a primary violation by the controlled person; (2) control of the primary violator by the defendant; and (3) 'that the controlling person was in some meaningful sense a culpable participant'

---

[29]See also Goldman v. Belden, 754 F.2d 1059,1071 (2d Cir. 1985) (rejecting defendant's argument that insider sales of 26% did not imply scienter); In re Oxford Health Plans Inc., 187 F.R.D. at 139 (percentages ranging from 17% to 67% sufficient to infer scienter); Marksman Partners L.P. v. Chantal Pharm. Corp., 927 F. Supp. 1297, 1313 (C.D. Cal. 1996) (20% of holdings sold for $6.3 million sufficient to infer scienter).

[30]Lead Plaintiff has also alleged sufficient facts establishing scienter under the third independent prong of the Novak test – that defendants "knew facts or had access to information suggesting that their public statements were not accurate." Novak, 216 F.3d at 311. Those allegations are summarized in Section II.C above.

37

in the primary violation." Boguslavsky v. Kaplan, 159 F.3d 715, 720 (2d Cir. 1998) (quoting S.E.C. v. First Jersey Sec., Inc., 101 F.3d 1450, 1472 (2d Cir. 1996)); In re Initial Pub. Offering Sec. Litig., 241 F. Supp. 2d 281, 393 (S.D.N.Y. 2003).[31]

As demonstrated above, the first requirement has been met: Lead Plaintiff has alleged a primary violation of Section 10(b) of the Exchange Act. Additionally, the Complaint demonstrates that each of the Individual Defendants controlled VitalWorks and "engaged in culpable participation in perpetration of the fraud."[32] The Complaint states:

- Walsh[33] served as the Company's Chairman, Chief Executive Officer, President, and as a Director. ¶ 22. In these positions, Walsh controlled the actions of the Company. ¶¶ 26-31 Walsh signed the Company's quarterly reports filed with the SEC on May 15, 2002 and August 13, 2002, and the Company's Form 10-K filed with the SEC on March 29, 2002. ¶¶ 22, 81, 89, 98. Additionally, Walsh made numerous other false and misleading statements during the Class Period. ¶¶ 83, 88, 91, 93, 94.

- Manto served as the Company's Executive Vice President, Chief Financial Officer, and as a Director. ¶ 23. In these positions, Manto controlled the actions of the Company. ¶¶ 26-31. Manto signed the Company's quarterly reports filed with the SEC on May 15, 2002 and August 13, 2002, and the Company's Form 10-K filed with the SEC on March 29, 2002. ¶¶ 23, 81, 89, 98. Manto also participated in conference calls with analysts. ¶ 93.[34]

---

[31]Section 20(a) states, in pertinent part:

Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).

[32]Suez Equity Investors, L.P. v. Toronto-Dominion Bank, 250 F.3d 87, 101 (2d Cir. 2001) (evaluating control and culpable participation together).

[33]Defendants concede that the Complaint alleges statements by Walsh with particularity. See Def. Mem. at 40.

[34]See In re Vivendi, 2003 WL 22489764, at *25 (finding the CFO liable under § 20(a) by virtue of his position and "his responsibility for approving . . . false financial statements").

- Kahane served the Company's Vice Chairman, Chief Strategy Officer, and as a Director. ¶ 24. In these positions, Kahane controlled the actions of the Company. ¶¶ 26-31. Kahane signed the Company's Form 10-K filed with the SEC on March 29, 2002. ¶¶ 24, 81. Kahane also participated in the fraud by issuing materially false and misleading statements when in receipt of information communicated directly to him concerning the shortcomings of the Company's core products. ¶ 52.[35]

Defendants contend that a Section 20(a) claim must be pleaded with particularity under Fed. R. Civ. P. Rule 9(b), and that Lead Plaintiff has failed to do so. In support of this contention, defendants rely on Mishkin v. Ageloff, No. 97 Civ. 2690 LAP, 1998 WL 651065, at *23, 26 (S.D.N.Y. Sept. 23, 1998). In fact, however, Mishkin was effectively overruled by the Second Circuit in Suez Equity Investors, L.P. v. Toronto-Dominion Bank, 250 F.3d at 101 (allowing broad allegations of control to be sufficient), and disfavored by recent Southern District Court cases. In In re Initial Public Offering Securities Litigation, for example, the Court held that a Section 20(a) violation need only be pleaded in accordance with Rule 8(a), commonly referred to as notice pleading, not with particularity. 241 F. Supp. 2d at 396-97. The Court stated, "Section 20(a) must therefore be pleaded only in accordance with Rule 8(a). Neither the PSLRA (because scienter is not an essential element), nor Rule 9(b) (because fraud is not an essential element) apply to a Section 20(a) claim." Id.; see also In re Vivendi, 2003 WL 22489764, at *24 (holding that a "§ 20(a) claim needs to be pled only in accordance with Rule 8(a).").[36]

Moreover, as demonstrated above, the Complaint meets the requirements of both Rule 8(a) and Rule 9(b) by pleading sufficient facts to demonstrate the control-person status and culpable

---

[35] Each Individual Defendant is also liable for all alleged false and misleading statements in accordance with the group pleading doctrine. ¶ 27; see In re Oxford Health Plans, Inc., 187 F.R.D. at 142 (doctrine provides that plaintiffs may rely on a presumption that statements in prospectuses, registration statements, annual reports, press releases, or other group-published information are the collective work of those individuals with direct involvement in the everyday business of the company) (citations omitted).

[36] Defendants also cite Boguslavsky, 159 F.3d at 720, which merely sets forth the standards for a Section 20(a) claim and cases from outside the Second Circuit's jurisdiction.

39

participation of the Individual Defendants. Accordingly, the Complaint sufficiently alleges a Section 20(a) claim against each of the Individual Defendants.[37]

## CONCLUSION

For all the foregoing reasons, lead plaintiff Fuller & Thaler Asset Management, Inc. respectfully asks the Court to deny defendants' Motion to Dismiss in its entirety.

Respectfully submitted,

Lead Plaintiff Fuller & Thaler Asset Management, Inc.

_____
Andrew M. Schatz (ct00603)
Patrick A. Klingman (ct17813)
SCHATZ & NOBEL, P.C.
330 Main Street
Hartford, CT 06106
(860) 493-6292

Keith M. Fleischman
Mark T. Millkey
Michael S. Bigin
BERNSTEIN LIEBHARD & LIFSHITZ, LLP
10 East 40th Street
New York, NY 10016
(212) 779-1414

*Attorneys for Lead Plaintiff*

---

[37] Although scienter is not required to plead a § 20(a) claim, the Complaint also alleges with particularity that each Individual Defendant acted with motive and opportunity by selling shares at artificially inflated prices. ¶¶ 105-111.

40

## CERTIFICATE OF SERVICE

I hereby certify that on this 5th day of December, 2003, a copy of the foregoing was sent, via first class mail, postage prepaid, to the following:

Jonathan Hoff
Jasmine Khalili
**Cadwalader, Wickersham & Taft LLP**
100 Maiden Lane
New York, New York  10023

Jonathan B. Tropp
Terence J. Gallagher
**Day Berry & Howard, LLP**
One Canterbury Green
Stamford, Connecticut  06901

_____
Patrick A. Klingman