**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

BERNARD FRAZIER, et al., :          CIVIL ACTION
                        :          3:03cv358 (JBA)
        Plaintiffs,     :
                        :
v.                      :
                        :
VITALWORKS, INC., et al. :
                        :
        Defendants.     :

**RULING ON DEFENDANTS' MOTION TO DISMISS**
**CONSOLIDATED CLASS ACTION COMPLAINT [DOC. #30]**

Plaintiffs bring this securities fraud action against
VitalWorks, Inc. ("VitalWorks") and three individual defendants:
Joseph M. Walsh, Chief Executive Officer and President of
VitalWorks; Michael A. Manto, Chief Financial Officer and
Executive Vice President; and Stephen N. Kahane, Chief Strategy
Officer and Vice Chairman. Consolidated Class Action Complaint
(Compl.) [Doc. #23] ¶¶ 22-24. Plaintiffs allege that between
January 24, 2002, and October 23, 2002 ("class period"),
VitalWorks violated Section 10(b) of the Securities and Exchange
Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5,
promulgated thereunder, by making false and misleading statements
about certain software products and contracts, as well as
VitalWorks' financial future. The complaint further alleges that
the individual defendants are liable for these statements as
controlling persons under Section 20(a) of the Securities and
Exchange Act, 15 U.S.C. § 78t(a). Defendants move to dismiss the

complaint under Fed. R. Civ. P. 12(b)(6) and 9(b), and the
Private Securities Litigation Reform Act of 1995 (PSLRA), 15
U.S.C. § 78u-4(b), on the grounds that: (1) the complaint does
not allege fraud with sufficient particularity; (2) the complaint
does not allege scienter with sufficient particularity; (3) the
allegedly fraudulent statements are protected by the statutory
safe harbor for forward-looking statements, 15 U.S.C. § 78u-
5(c)(1); and (4) the complaint does not sufficiently allege
controlling-person liability.  Def. Memo. of Law in Support of
Motion to Dismiss [Doc. #30] at 2-3.  For the reasons that
follow, defendants' motion is GRANTED.


I.    **FACTUAL BACKGROUND**

The Consolidated Class Action Complaint alleges the
following facts, which the Court accepts as true for purposes of
a motion to dismiss.  Scheuer v. Rhodes, 416 U.S. 232, 236
(1974), Acito v. Imcera Group, Inc., 47 F.3d 47, 57 (1995).

VitalWorks sells information management software and
services to healthcare organizations. Compl. [Doc. #23] ¶ 38.
VitalWorks' programs "are designed to automate the
administrative, financial, and clinical information management
functions of office-based physician practices, hospital-based
physician practices, and large healthcare enterprises, clinics,
and organizations."  Id.  During the class period, VitalWorks
marketed two types of practice management software, "core"

products and "classic" products.  Core products were those that VitalWorks was actively developing for the latest generation of computer hardware and operating systems, including a radiology program called RadConnect RIS.  <u>Id.</u> at ¶¶ 39-40.  The company also continued to service and support its older classic products for previous purchasers.  <u>Id.</u> at ¶ 55.

Plaintiffs allege that defendants misrepresented three aspects[1] of their business during the relevant time.  First, with respect to core products, they allege that defendants knew or recklessly disregarded the fact that RadConnect RIS[2] had technical glitches and did not perform properly, but nonetheless "touted" the software.  <u>Id.</u> at ¶ 40-53.  Second, plaintiffs allege that the company misrepresented the amount of revenue to be gained from upgrading their classic products for current customers to comply with the Health Insurance Portability and Accountability Act of 1996 (HIPAA), Pub. L. No. 104-191, 110 Stat 1936.  <u>Id.</u> at ¶ 71-76.  Third, plaintiffs allege that the company issued misleading revenue projections based on RadConnect's marketability and the effect of HIPAA on expected

---

[1]Plaintiffs have abandoned their claims regarding the contract between VitalWorks and FUJIFILM.  <u>see</u> Compl. [Doc. #16] ¶¶ 66-70;  Lead Plaintiff's Memorandum in Opposition to Defendant's Motion to Dismiss the Consolidated Class Action Complaint [Doc. #33] at 2 n. 3.

[2]Plaintiffs also include information regarding other core products, including programs called Chart Station and Prism.  <u>See</u> Compl. [Doc. #23] ¶¶ 52-53, 60-62.  The Court does not see the relevance of this information.

revenue.  Id. at ¶ 77-98.  The specific statements alleged to be misleading are as follows.

**A.    RadConnect RIS**

Regarding RadConnect RIS, plaintiffs allege VitalWorks made nine false or misleading statements regarding the technological viability, marketability, and profitability of the software.

- On March 29, 2002, VitalWorks filed a Form 10-K report with the Securities and Exchange Commission (SEC).  The form was signed by defendants Walsh, Manto and Kahane. The report stated: "VitalWorks believes that there is a significant opportunity to provide system upgrades to those clients using classic and other non-core products by providing a migration path to VitalWorks' core products... .  The Company is actively promoting the migration of these clients to newer products and intends to retire these products at the earliest possible opportunity."  Compl. [Doc. #23] ¶ 81.

- On April 11, 2002, VitalWorks issued a press release on PR Newswire announcing the commercial release of RadConnect RIS.  The release stated, in part, that "RadConnect RIS is one of the most significant product offerings in recent years, not just for VitalWorks but for the specialty as a whole, redefining the standards of speed, productivity, and workflow."  Id. at ¶ 83.

- In the same press release, VitalWorks claimed that it "is presently the leading provider of RIS systems in the country.  RadConnect RIS underlines our commitment to radiology and our role as the industry leader, and helps secure our leadership for the years to come." Id.

- On May 6, 2002, defendant Walsh sent a letter to shareholders, attaching a copy of the Company's 2001 Annual Report.  In this letter, Walsh stated, "Today, I am pleased to report that we have commercially released two next-generation radiology products... RadConnect RIS and RadConnect Results [the web-based sister program to RadConnect RIS]... .  We believe that these products will be very attractive to our considerable

4

radiology customer base as well as to the entire ambulatory radiology market... ." Id. at ¶ 88.

- In the same letter, defendant Walsh wrote, "I believe that 2002 will be another very exciting year for VitalWorks; we're already off to a good start." Id.

- On July 23, 2002, VitalWorks issued a press release over PR Newswire announcing its second quarter earnings.  The press release stated, in part, "We continue to win in the markets we serve by bringing great software and service solutions to both new and existing clients.  The remainder of the year looks promising for us... ." Id. at ¶ 91.

- On the same date, defendant Walsh conducted a conference call with stock analysts and investors. Discussing the second quarter earnings report, he stated, "And I also, I think, said that on the other hand, our software licenses we were seeing greater sales than we anticipated and because of that, as you know, we raised guidance in the last quarter, mainly because when you mix in more software sales on recurring side, the margins on the software are much higher.  So that would, hopefully, explain those numbers." Id. at ¶ 93.

- In the same conference call, defendant Walsh stated, "again, radiology, I think we got pretty good visibility over the upgrades and the business that we're doing." Id. at ¶ 94.

- On September 16, an analyst named A. Draper from Sun Trust Robinson Humphrey issued a report concerning VitalWorks.  Prior to the report, the analyst had met with VitalWorks' management.  The analyst wrote, "In our conversations with the company, management stated that their latest product, RadConnect RIS, has been very well received." Id. at ¶ 97.

Plaintiffs allege that all of these statements were misleading because VitalWorks' management "knew and/or recklessly disregarded" that RadConnect contained bugs and was not well received by customers.  Id. at ¶ 48.  Plaintiffs base these allegations upon statements by a former Senior Software

Specialist at VitalWorks, who said that before it was released on April 11, 2002, RadConnect RIS was not performing properly, was not gaining customer acceptance, and was not ready for commercial release.  Id.  The software specialist further stated that the code for the program was not "solid," and that VitalWorks had been relying for development on a third party who was not delivering a usable product in a timely manner.  Id.  The complaint does not allege how or when VitalWorks' management may have become aware of these problems; it does not allege that the software specialist--or anyone else--discussed these issues with the individual defendants.

B.    **HIPAA Compliance**

The second set of allegations concerns representations about the effect of HIPAA on VitalWorks' revenue.  The statute, in relevant part, sets standards governing the electronic data transfer of health care information.  See 42 U.S.C. § 1320d et seq.  Covered health care entities were originally required to comply with certain portions of HIPAA by October 16, 2002, shortly before the end of the class period in this case, although the deadline was later extended by a year.  Compl. [Doc. #23] ¶ 76. Plaintiffs allege that defendants represented to investors that VitalWorks would increase its revenues because current customers would have to pay for upgrades or modifications to

existing software in order to comply with HIPAA.  However,
plaintiffs allege, these revenues never materialized.

Specifically, plaintiffs allege that the following
statements were false or misleading:

- On April 23, 2002, VitalWorks issued a press release
  (reissued April 24) announcing its first quarter
  earnings.  The press release stated, among other
  things, "We are continuing to achieve growth in our
  software license sales across every division of the
  company, a result of both core product upgrades
  revolving around HIPAA compliance as well as an
  increased rate of competitive wins." Compl. [Doc. #23]
  ¶ 85.

- On July 23, 2002, VitalWorks announced its second
  quarter earnings and conducted a conference call.
  During that call, defendant Walsh stated to an analyst
  from Wells Fargo Security, "Bud, I think we spoke
  earlier that we expect to continue to invest in the
  Company and especially in the marketing and sales arena
  related around pushing our DDI (ph) with HIPAA.  So we
  have cost built into our internal models related to
  those, including building our EDI [electronic data
  interchange] gateway, which is underway, and some costs
  associated to that.  So, at this point, I think our
  guidance–we feel comfortable with our guidance for the
  third quarter, where it is right now."  Id. at ¶ 94.

- The analyst asked a follow-up question at the
  conference call asking defendant Walsh to compare HIPAA
  revenues expected in the third quarter with those seen
  during the first quarter.  Walsh replied, "I think that
  we'll see expanding revenues related to upgrades,
  getting people the current versions.  But I also
  believe that that process, we'll be seeing revenues
  from that, certainly through the second quarter, but I
  also think it will probably go into the third, fourth
  quarter."  Id.

- In response to a third question from the same analyst,
  asking whether there would be a "break-out quarter" for
  HIPAA revenues, Walsh replied, in part, "...we're
  seeing some of those impacts at HIPAA now in our
  license revenue, I certainly can see where we've built,
  over the past several quarters, people moving to

7

standardized versions of the software that's HIPAA
compliant.  I would expect, you know, again, you see
our models, you see our revenues that we expected over
the next several quarters will continue to grow at the
rate we projected in our revenue guidance." Id.

Plaintiffs allege that defendants knew during the class
period that few customers would be paying for HIPAA-related
software upgrades, and therefore the statements above were false
and misleading.  Plaintiffs point to defendant Walsh's statement
in a conference call on October 23, 2002, that fewer than 200,000
out of two million health care entities required to comply with
HIPAA had filed for an extension before the October 16, 2002,
deadline.  Compl. [Doc. #23] ¶ 76.  From this admission,
plaintiffs infer that the majority of covered entities had
already complied before the deadline.  Plaintiffs also assert
that entities were waiting until the new deadline to comply, and
therefore revenues should not have been expected in fall 2002.
Id. at ¶ 75.  Additionally, plaintiffs allege VitalWorks'
customer service was so poor that clients refused to hire
VitalWorks to complete upgrades.  Id. at ¶ 74.

C.  **Financial Projections**

Plaintiffs also allege separately that VitalWorks' financial
projections for the fourth quarter of 2001 through the third
quarter of 2002, as well as their projections of 2002 and 2003
total revenue, were false and misleading because they were based
upon false information about the profitability of RadConnect RIS

8

and HIPAA.  Plaintiffs specify the following seven financial statements as false and misleading:

- On January 24, 2002, the first day of the class period, VitalWorks announced in a press release over <u>PR Newswire</u> that for "the year 2002, the company estimates revenues of approximately $120 million and net income of approximately $12 million, or $0.24 per diluted share."  Compl. [Doc. #23] ¶ 77.

- On April 23, 2003 and April 24, 2002, the company issued a press release stating, "Looking forward, VitalWorks expects to have second quarter revenues of approximately $29 million... .  For the year 2002, the company estimates revenues of approximately $120 million, and has raised its guidance for net income to $18.5 million to $19.5 million... and EBITDA [earnings before interest, taxes, depreciation, and amortization] as adjusted, to $21 million to $22 million.  For 2003, VitalWorks estimates revenues of $132 million to $138 million.  <u>Id.</u> at ¶ 85].

- On May 15, 2002, Vital Works filed its first quarter report on Form 10-Q.  The form repeated the revenue estimates above, announced April 23-24.  It further stated that "management believes that these forward-looking statements are reasonable and that the projections contained in this report are based on reasonable assumptions and forecasts... . " <u>Id.</u> at ¶ 89.

- On July 23, 2002, VitalWorks issued a press release over <u>PR Newswire</u> stating, in part, "Looking forward, VitalWorks expects to have third quarter revenues of approximately $30 million... .  For the year 2002, the company estimates revenues of approximately $120 million, and has raised its guidance for net income to $23 million to $24.5 million... .  For 2003, VitalWorks estimates revenues of $132 million to $138 million and net income of $20 million to $24 million, or $0.37 to $0.45 per share."  <u>Id.</u> at ¶ 91.

- Plaintiffs also re-allege as misleading defendant Walsh's comments during the July 23, 2002, conference call:  "Bud, I think we spoke earlier that we expect to continue to invest in the Company and especially in the marketing and sales arena related around pushing our DDI (ph) with HIPAA.  So we have cost built into our

internal models related to those, including building our EDI [electronic data interchange] gateway, which is underway, and some costs associated to that. So, at this point, I think our guidance—we feel comfortable with our guidance for the third quarter, where it is right now." <u>Id.</u> at ¶ 94.

## II.  DISCUSSION

### A.  Standard

When deciding a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept all well-pleaded facts as true and draw all reasonable inferences in favor of the plaintiff. <u>Scheuer v. Rhodes</u>, 416 U.S. 232, 236 (1974), <u>Kalnit v. Eichler</u>, 264 F.3d 131, 138 (2d Cir. 2001). Under Fed. R. Civ. P. 9(b), plaintiffs who allege fraud must state the "circumstances constituting fraud... with particularity."

The Private Securities Litigation Reform Act (PSLRA) refines that standard. "To state a cause of action for securities fraud under section 10(b), 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5(b), a plaintiff must plead that in connection with the purchase or sale of securities, the defendant, acting with scienter, made a false material representation or omitted to disclose material information and that plaintiff's reliance on defendant's action caused plaintiff injury." <u>Rothman v. Gregor</u>, 220 F.3d 81, 89 (2d Cir. 2000) (internal quotation and citation omitted). A plaintiff who alleges that the defendant made a material false statement or omission must "specify each statement

10

alleged to have been misleading, the reason or reasons why the
statement is misleading, and, if an allegation regarding the
statement or omission is made on information and belief, the
complaint shall state with particularity all facts on which that
belief is formed." 15 U.S.C. § 78u-4(b)(2). The Second Circuit
has held that, to survive a motion to dismiss under the PSLRA, a
complaint must "(1) specify the statements that the plaintiff
contends were fraudulent, (2) identify the speaker, (3) state
where and when the statements were made, and (4) explain why the
statements were fraudulent." Novak v. Kasaks, 216 F.3d 300, 306
(2d Cir. 2000), cert. denied, 531 U.S. 1012 (2000).

**B.    Sufficiency of Fraud Allegations**

With one exception, plaintiffs adequately identify the
allegedly fraudulent statements, including the date, the speaker,
and the substance. They point to the following documents: PR
Newswire press release (Jan. 24, 2002); Form 10-K (March 29,
2002); PR Newswire press release (April 11, 2002); PR Newswire
press release (April 23-24, 2002); Letter to shareholders
attached to annual report (May 6, 2002); Form 10-Q (May 15,
2002); PR Newswire press release (July 23, 2002), Transcript of
conference call (July 23, 2002). All of these documents identify
the date, the speaker, and the contents of the statement.

**1.    Sun Trust Robinson Humphrey Report**

With respect to the Sun Trust Robinson Humphrey report

11

(Sept. 16, 2002), the complaint does not include that information. "Plaintiffs may state a claim against corporate officials for false and misleading information disseminated through analysts' reports by alleging that the officials either (1) 'intentionally foster[ed] a mistaken belief concerning a material fact' that was incorporated into reports; or (2) adopted or placed their 'imprimatur' on the reports." Novak, 216 F.3d at 314, quoting Elkind v. Liggett & Myers, Inc., 635 F.2d 156, 163-34 (2d Cir. 1980). The Second Circuit does not "sanction[] the pleading of fraud through completely unattributed statements, even when the plaintiff alleges on information and belief that the unattributed statement was made by an agent of the defendant." In re Time Warner Inc. Sec. Litig., 9 F.3d 259, 265 (2d Cir. 1993). Plaintiffs in Time Warner alleged that various analysts' reports and newspaper stories, which relied on unnamed corporate sources, were fraudulent. The Second Circuit agreed with the district court that "Rule 9(b) [requires], at a minimum, that the plaintiff identify the speaker of the allegedly fraudulent statements." Id.

The Sun Trust report at issue relies on "conversations with the company," and says that "management stated that... RadConnect RIS has been very well received." Compl. [Doc. #23] ¶ 97. The complaint does not identify "the circumstances of the statements--including dates and participants." Novak, 216 F.3d at 314.

Plaintiffs do not allege which member or members of VitalWorks'
management spoke with the Sun Trust analyst.  Completely
unattributed statements do not meet the standards of Rule 9(b).

### 2.  VitalWorks' Statements Concerning RadConnect RIS

The greater deficiency in the First Amended Complaint is
that it "alleges only in a most sketchy fashion circumstances
which would give rise to an inference of fraud." Ross v. A.H.
Robbins Co., Inc., 607 F.2d 545, 558 (2d Cir. 1979).  Plaintiffs
do not point to any material VitalWorks statements that would
have misled reasonable investors.  A statement is material only
if there is "a substantial likelihood that the disclosure of the
omitted fact would have been viewed by the reasonable investor as
having significantly altered the total mix of information made
available." Basic, Inc., v. Levinson, 485 U.S. 224, 231-32
(1988) (internal quotation and citation omitted).  All of the
alleged statements are too vague to meet that test.

First, plaintiffs flag a statement in Form 10-K, dated March
29, 2002, that "VitalWorks believes that there is significant
opportunity to provide system upgrades... [and] is actively
promoting the migration of... clients to newer products." Compl.
[Doc. #23] ¶ 81.  A statement that the company "believes" its
business may go in a particular direction, or that it is
"promoting" a particular business plan, would not be interpreted
by a reasonable investor as a promise that the plan will be

successful.  See San Leandro Emerg. Medical Group v. Philip
Morris Co., 75 F.3d 801, 811 (2d Cir. 1996) (statement of current
marketing plan does not amount to a promise to maintain a policy
in the future); In re Burlington Coat Factory Sec. Litig., 114
F.3d 1410, 1427 (3d Cir. 1997) (statement that company
"believed[d] [it could] continue to grow net earnings at a faster
rate than sales" was not actionable because it was only a "vague
expression of hope by corporate managers.").

     The Second Circuit has held that where a company previously
announced a particular business strategy, it may have a duty to
disclose a new strategy "whenever secret information renders
prior public statements materially misleading... ." Time Warner,
9 F.3d 259, 268 (2d Cir. 1993).  In Time Warner, the company,
which was $10 billion in debt, "embarked on a highly publicized
campaign to find international 'strategic partners' who would
infuse billions of dollars of capital into the company... ." Id.
at 262.  Time Warner was unable to find enough strategic partners
to cover its debts, and began considering a new stock offering,
which would have diluted severely the rights of current
shareholders, as an alternative method for raising funds.  Id.
On a motion to dismiss the complaint, the Second Circuit held
that, "[h]aving publicly hyped strategic alliances, Time Warner
may have come under a duty to disclose facts that would place the
statements concerning strategic alliances in a materially
different light." Id. at 268.  Emphasizing the narrowness of its

14

holding, the Second Circuit continued that its decision only applied "when a corporation is pursuing a specific business goal and announces that goal as well as an intended approach for reaching it," but then actively and seriously considers another approach."[3]

The Second Circuit arguably narrowed <u>Time Warner</u> in <u>San Leandro</u>, 75 F.3d at 811. In that case, plaintiffs alleged that the Philip Morris Company was under a duty to disclose the fact that it had tested an alternative marketing strategy for its Marlboro brand cigarettes, and this strategy might lead to increased market share but lower profits, contrary to the company's previously-announced plan of sustaining profits even at the cost of market share. <u>Id.</u> at 809. While the Second Circuit held that marketing plans could, in some instances, be material, it declined to so hold in that case because it found that Philip Morris's description of its previous marketing plan to the press was not actually a commitment to that plan. <u>Id.</u> at 110. The Court further held that "general announcements by Philip Morris that it was 'optimistic' about its earnings and 'expected' Marlboro to perform well" did not require the company to disclose "the possibility of adoption of an alternative marketing strategy

---

[3] The Second Circuit further held that "whether consideration of the alternate approach constitutes material information, and whether nondisclosure of the alternate approach renders the original disclosure misleading, remain questions for the trier of fact... ." <u>Time Warner</u>, 9 F.3d at 268.

that would hurt short-term earnings." Id. at 811.  These generally optimistic statements, the court held, were "puffery" that could not "have misled a reasonable investor to believe that the company had irrevocably committed itself to one particular strategy, and cannot constitute actionable statements under the securities laws." Id.

Here, plaintiffs complain that VitalWorks committed fraud when it stated that it was "actively promoting the migration of... clients to newer products." Compl. [Doc. #23] ¶ 81. However, plaintiffs do not allege that VitalWorks was actually changing its marketing strategy with respect to RadConnect RIS. They do not allege that VitalWorks failed to promote "migration" to new products while publicly announcing that it would do so. They do not allege that VitalWorks was secretly considering another business strategy that it refused to disclose to investors.  Rather, plaintiffs merely allege that RadConnect did not work very well and therefore customers did not want to purchase it.  This allegation does not state a claim for fraud because it does not show that VitalWorks failed to follow through (or was considering not following through) on its announced business plan while representing that it would adhere to the plan.  See San Leandro, 75 F.3d at 811; Cf. Time Warner, 9 F.3d at 268.

Plaintiffs next complain of a series of statements that they describe as "touting" RadConnect RIS. Compl. [Doc. #23] ¶¶ 5,

16

46, 83, 88.  VitalWorks called its software "one of the most significant product offerings in recent years;" said that "we believe [it] will be very attractive to our considerable radiology customer base as well as to the entire ambulatory radiology market;" and "RadConnect RIS underlines our commitment to radiology and our role as the industry leader..."  Id. at ¶¶ 83, 88.  Another press release called its products "great software and service solutions."  Id. at ¶ 91.  VitalWorks also made optimistic statements about its corporate future, predicting that "2002 will be another very exciting year... we're already off to a good start," and "the remainder of the year looks promising for us."  Id. at ¶¶ 88, 91.

Such positive labels and generalized statements of corporate optimism do not amount to materially false and misleading statements.  "People in charge of an enterprise are not required to take a gloomy, fearful or defeatist view of the future; subject to what current data indicates, they can be expected to be confident about their stewardship and the prospects of the business that they manage."  Rothman, 220 F.3d at 90, quoting Shields v. Citytrust Bancorp., Inc., 25 F.3d 1124, 1129 (2d Cir. 1994).

Saying that a product is "significant," "attractive" or "great" is merely "puffery," not actionable securities fraud.  See San Leandro, 75 F.3d at 811.  For instance, Philip Morris's announcement in San Leandro that it "expected" Marlboro

17

cigarettes "to perform well" was inactionable. Id. The Second Circuit held that generally hopeful statements promoting a company's products would not mislead a reasonable investor. Id.

Additionally, there can be no fraud in a generalized statement such as VitalWorks' announcement that it expected to have an "exciting year" or that they were "off to a good start." The Second Circuit has made very clear that generalized, optimistic statements of business performance, short of "definite positive projections," are not actionable. Time Warner, 9 F.3d at 259. For example, in Time Warner, plaintiffs alleged fraud on the basis of the company's statements to analysts and reporters that Time Warner "continues to have serious talks" with potential strategic partners, that it "received and continues to receive many expressions of interest," and that company officers "are excited by the possibilities for growth that will increase shareholder value, especially through strategic partnerships." Id. at 266 n.3. The Court of Appeals held that these statements were not actionable because they "suggest only the hope of any company, embarking on talks with multiple partners, that the talks would go well. No identified defendant stated that he thought deals would be struck by a certain date, or even that it was likely that deals would be struck at all." Id. at 267; see also Faulkner v. Verizon Communs., Inc., 156 F. Supp. 2d 384, 388 (S.D.N.Y. 2001) (announcement that company had reached a

18

"groundbreaking" agreement that would "take [it] a long way" was not actionable).

This case is very similar to Time Warner, 9 F.3d at 259. Statements that VitalWorks expected to have an "exciting year," was "off to a good start," or that "the remainder of the year looks promising for us," Compl. [Doc. #23] ¶¶ 88, 91, are very close to Time Warner's statements about the exciting potential for growth through strategic partnership. VitalWorks' statements therefore lack the sort of definite quality that the Second Circuit also found lacking in Time Warner. They do not contain any specific projections regarding revenues, sales, or any other measure of performance. There is nothing in VitalWorks' vague, optimistic statements that would make them actionable under the securities laws. Id.

Cheerleading only becomes fraud if "defendants had access to contrary facts" and plaintiffs can specifically identify "reports or statements" containing contrary information. Novak, 216 F.3d at 309. For instance, plaintiffs in In re Scholastic, 252 F.3d at 70, alleged that the defendant publishing company failed to acknowledge to investors that its books were being returned unsold at higher rates than in the past; plaintiffs alleged that specific data regarding unsold books was transmitted by named distributors and reviewed on a specified timetable by particular members of corporate management. The Second Circuit held that these allegations were sufficient to survive a motion to dismiss

19

because corporate representations contradicting the known sales data could be fraudulent. Id. at 71-72.

Here, by contrast, plaintiffs include no data about sales of RadConnect RIS. They do not state how many units of the software VitalWorks expected to sell, how many it would need to sell to recoup its research and development costs, or even how many units of its new products VitalWorks usually sells. Moreover, they do not state how much of the allegedly fraudulent financial projections for 2002 were based on expected sales of RadConnect RIS, nor do they point to the existence of internal documents that might contain such information. Plaintiffs do allege that, of twenty-eight units originally sold, only three RadConnect RIS units are still functioning. Compl. [Doc. #23] ¶ 51. Drawing inferences favorable to the plaintiff, this fact could show that the software had problems causing customers to abandon it after only a few years. But it does not necessarily show that customers refused to buy the software initially.[4] Without other sales data for comparison, there is no reason to believe that the existence of some bugs in RadConnect RIS influenced sales of the product, during or after the class period. And without such

---

[4]Customers often buy software with bugs. Indeed, one would be hard pressed to find a software program on the market without at least some technical glitches. As defendants point out, even Microsoft regularly releases patches and service packages designed to correct bugs in its products. See http://www.microsoft.com/downloads/search.aspx?displaylang=en.

20

information, plaintiffs fail to meet their burden of pleading why
any financial projections that included sales estimates for
RadConnect RIS were fraudulent.  See Novak, 216 F.3d at 306.

     The element of timing also is missing.  The complaint
alleges that RadConnect had bugs and did not sell as well as
VitalWorks apparently would have liked, but it fails to allege
how or when defendants learned that product defects existed.  The
complaint cites a "former Senior Software Specialist" who stated
that the "code was not 'solid,'" and that testing during the
winter and spring of 2002 revealed "bugs that prevented the
product from performing as advertised."  Compl. [Doc. #23] ¶¶ 48-
49.  The complaint does not allege that the Senior Software
Specialist ever shared this knowledge with the named defendants
and, if so, whether he/she did so during the class period.  "[I]t
is proper to require the plaintiffs, even at the pleading stage,
to fix more definitively the time at which these crucial events
in the complaint occurred."  Ross, 607 F.2d at 558.

     In Ross, plaintiffs brought suit against A.H. Robbins Co.,
the pharmaceutical company responsible for developing the now-
notorious Dalkon Shield interuterine birth control device.  Id.
at 547.  Similar to the allegations in this case, the Ross
plaintiffs alleged that A.H. Robbins artificially inflated the
price of its stock by disseminating false and misleading
information about the safety and effectiveness of the Dalkon
Shield, and failing to reveal that the device was less effective

21

and more dangerous than the company's earlier public statements had indicated.  Id.  Plaintiffs did not allege that the named defendants actually knew of the product defects.  Rather, they alleged that an unpublished report from 1972, two years before A.H. Robbins notified physicians of safety and efficacy problems with the Dalkon Shield, had indicated that the device could be dangerous.  Id. at 558.  Plaintiffs did not allege any relationship between the author of the report and the defendants, nor whether there was "any reason to believe that the defendants were even aware of the report's existence."  Id.  Plaintiffs also failed to allege the point in time when the defendants became aware of the IUD's safety problems.  The Second Circuit affirmed the district court's dismissal of the case under Fed. R. Civ. P. 9(b), holding that "it is reasonable to require that the plaintiffs specifically plead those events which they assert give rise to a strong inference that the defendants had knowledge... . And, of course, plaintiffs must fix the time when these particular events occurred."  Id.[5]

It is critical that plaintiffs in the present case allege that defendants knew of the problems with RadConnect RIS, and knew of them before the end of the class period.  If the "Senior Software Specialist" never informed defendants of the problems

---

[5] In Rothman, 220 F.3d at 90, a post-PSLRA case, the Second Circuit reaffirmed its reasoning in Ross.  See infra at § II.B.3, p. 25-26, for further discussion of Rothman.

with RadConnect RIS, then defendants could not have known of the nature, magnitude, or implications of the defects, and could not have intentionally misled investors regarding the prospects for the product. Even if defendants knew, there can be no fraud unless defendants failed to act upon the information when they received it. Ross, 607 F.2d at 558; see also Mills v. Polar Molecular Corp., 12 F.3d 1170, 1176 (2d Cir. 1993) ("It does not constitute fraud unless, when [a statement] was made, the defendant secretly intended not to perform or knew that he could not perform."). Thus plaintiffs' failure to allege when defendants became aware of the problems with RadConnect RIS is fatal to the complaint in this case.

Moreover, defendants do not allege any facts concerning the type of bugs RadConnect RIS experienced. Despite having interviewed a Senior Software Specialist involved with developing the product, plaintiffs do not allege anything tending to show that the bugs in the program were fatal (or even seriously detrimental) to the program's commercial success. The plaintiffs do not, for example, allege that the bugs prevented customers from accessing data, caused errors in data that would be medically dangerous to patients, caused computers to crash, infected other programs or machines, etc. They merely allege that the code was not "solid" or "ready for commercial release." Compl. [Doc. #23] ¶ 48. This stands in stark contrast to other cases in which plaintiffs at least alleged some information

23

tending to show the magnitude of the alleged fraud perpetrated by defendants.  See Rothman, 220 F.3d at 91, Novak v. Kasaks, 216 F.3d 300 (2d Cir. 2000), infra at § II.B.3.

Essentially, plaintiffs complain that RadConnect RIS was not a good or successful product, despite defendants' hopes, intentions, and projections that it would be.  The securities laws are not intended to compensate investors when a product fails in a competitive marketplace; only if plaintiffs can adequately allege that defendants were aware of substantial problems with RadConnect RIS that would significantly impact revenues, and deliberately concealed those product defects, would the complaint state a claim for fraud.  See Rothman, 220 F.3d at 90 ("The fact that management's optimism about a prosperous future turned out to be unwarranted is not circumstantial evidence of conscious fraudulent behavior or recklessness.").  Plaintiffs do not plead whether or when defendants became aware of any problems with RadConnect RIS.  Therefore plaintiffs' claims concerning that software fail under the standards of Rule 9(b) and the PSLRA because plaintiffs do not explain with particularity why the "puffery" statements about RadConnect RIS were fraudulent.

### 3.    VitalWorks' Statements Concerning HIPAA

The second category of fraud allegations concerns anticipated revenue from current VitalWorks clients who needed to

update their software to comply with HIPAA.  On April 23-24, VitalWorks issued a press release announcing that it was "continuing to achieve growth ... revolving around HIPAA compliance as well as an increased rate of competitive wins." Compl. [Doc. #23] ¶ 85.  In July, defendant Walsh projected that "we'll see expanding revenues related to [HIPAA] upgrades," and said he "believe[d]" that those revenues would arrive in the second, third and fourth quarters.  Id. at ¶ 94.

As with the statements concerning RadConnect RIS, defendants' statements concerning goals for HIPAA revenue do not amount to materially false or misleading statements of a sufficiently definite character as to be actionable under the securities laws.  See Time Warner, 9 F.3d at 259; see also supra at § II.B.2.  VitalWorks' statements simply indicate that the company continued to be profitable and that part of its profit stemmed from HIPAA compliance.  Compl. [Doc. #23] ¶ 85.  They also projected some "growth" in HIPAA revenues.  Defendants in Time Warner made similar statements, including that they were "excited by the possibilities for growth" resulting from strategic partnerships.  Time Warner, 9 F.3d at 259.  The Second Circuit held that this type of generalized, optimistic statement would not mislead a reasonable investor and therefore was not actionable under Section 10(b).  Id. at 267.

Likewise, there is nothing materially misleading about saying that the company was "getting people the current versions"

25

of software, Compl. ¶ 94, unless the company was claiming to have sold software that it did not sell, and there is no such allegation in the complaint.  This case can be contrasted with Rothman, 220 F.3d at 91, where plaintiffs stated a claim for fraud because they alleged that the defendant company did not expense revenues that it knew it would never receive.  In that case, the defendant advanced royalty payments to third-party software developers.  It planned to recoup those royalty payments by selling the software after it was written.  Thus, the company listed the royalty advances as (anticipated) revenues.  Id. at 84-85.  At a certain point, however, the defendants knew, based on their own internal financial analyses, that the products were failing in the marketplace and that the royalty advances would never be recovered.  Id. at 91.  Yet they continued to list the royalty advances as revenues.  Id.  Therefore the Rothman plaintiffs stated a claim for fraud because they alleged that the company misled investors by reporting revenues it knew it would not receive.

The same principle is stated in  Novak v. Kasaks, 216 F.3d 300 (2d Cir. 2000).  There, defendants were directors of Ann Taylor, the clothing manufacturer.  Plaintiffs alleged that defendants made material misrepresentations by stating that their inventory of unsold ("box and hold") clothes was on a par with the past, when in fact the unsold inventory was much larger.  Id.

at 304.  The overvaluation of inventory led to artificially
inflated revenue figures.  In other words, Ann Taylor was
claiming that they had sold, or would sell, clothing that they
knew never would be sold.

There is no such allegation against VitalWorks.  Plaintiffs
do not allege that VitalWorks reported HIPAA revenues that it did
not earn.  They do not allege that VitalWorks reported sales of
software that did not actually occur.

Plaintiffs give four reasons why the listed statements were
false or misleading.  First, according to a "former Senior Sales
Executive," VitalWorks alienated "many" of its customers because
it "saw HIPAA as an opportunity to make a cash killing," and
overcharged customers for software modifications.  Compl. [Doc.
#23] ¶ 74.  Second, the federal government extended the relevant
HIPAA compliance deadline from October 16, 2002 to the same date
in 2003, and therefore there was no pressure on customers to
upgrade their software during the class period in 2002.  Id. at ¶
75.  Plaintiffs cite defendants' statement (during an October 23,
2002, conference call) that fewer than 200,000 of 2 million
entities subject to HIPAA had actually filed for the extension,
"a fact suggesting that the vast majority had already complied
with the requirement."  Id. at ¶ 76.  Fourth, plaintiffs cite "a
former VitalWorks sales executive and account manager" who worked
at the company until May, 2002 as saying that the market for
HIPAA compliance was fully saturated, and VitalWorks did not have

27

a competitive advantage because it only held a small share of the market for practice management software.  Id. at ¶ 75.

Plaintiffs' explanations for why the statements are fraudulent are not logical.  Plaintiffs allege that VitalWorks alienated some of its customers by charging them a great deal for software modifications, but if VitalWorks were overcharging, its HIPAA-related revenues should have been greater than otherwise expected, not less.  Next, the arguments concerning prior HIPAA compliance are contradictory.  On one hand, plaintiffs allege that most covered entities already had complied with HIPAA.  On the other hand, they allege that defendants knew the deadline was extended and there was no reason for entities to comply before 2003.  Either way, the market for HIPAA-compliant software in October 2002 could be smaller than defendants thought.  But it is plaintiffs' burden to explain why defendants' HIPAA-related statements were fraudulent, Novak, 216 F.3d at 306, and this is not a consistent explanation; either there was more HIPAA-related business available in October 2002 or there was not, but under the PSLRA's heightened standard of pleading plaintiffs cannot have it both ways.  The suggestion that the market for HIPAA compliance was "saturated" also is insufficient.  VitalWorks allegedly was banking on current--not new--customers to bring in HIPAA-related revenues.  The fact that the market for new software may have been saturated, even if true, says nothing about revenue expected from upgrades provided for VitalWorks'

current customers.  As such, none of these reasons can explain why VitalWorks knew or should have known, prior to October 23, 2002, that its projections concerning HIPAA compliance revenue were false or misleading.

The essence of plaintiffs' claim is that defendants made less money in the third quarter from HIPAA than they originally thought they might.  Plaintiffs do not point to anything suggesting defendants knew that their predictions, when made, were false or based on incorrect data.  Cf. Rothman, 220 F.3d at 91, Novak, 216 F.3d at 306.  Corporate officers and directors are required to be attentive and honest, but not omniscient.  Novak, 216 F.3d at 309 ("Corporate officials need not be clairvoyant; they are only responsible for revealing those material facts reasonably available to them.").  Plaintiffs' allegations fall classically into the category of "fraud by hindsight," and as such they fail to state a claim under Rule 9(b) and the PSLRA. See id., citing Stevelman v. Alias Research Inc., 174 F.3d 79, 85 (2d Cir. 1999).

### 4.  VitalWorks' Financial Projections

In addition to alleging that various VitalWorks statements regarding RadConnect RIS and HIPAA were fraudulent, plaintiffs also allege that fiscal year 2002 and 2003 projections issued by the company were fraudulent because they were based upon fraudulent projections concerning RadConnect RIS and HIPAA.  As

29

explained below, since plaintiffs do not adequately allege that the underlying statements concerning growth in sales of VitalWorks' software were fraudulent, they do not state a cognizable claim that financial projections based upon these assumptions are fraudulent.

"[M]ere opinions and predictions of future performance are not actionable under the securities laws unless 'they are worded as guarantees or are supported by specific statements of fact, or if the speaker does not genuinely or reasonably believe them.'" Faulkner v. Verizon Communs., Inc., 156 F. Supp. 2d 384, 398 (S.D.N.Y. 2001), quoting In re International Bus. Machs. Corp. Sec. Litig., 163 F.3d 102, 107 (2d Cir. 1998). Reading the statements plaintiffs allege to be fraudulent, no reasonable investor would understand them to be guarantees. The issue is whether there exist underlying facts that gave defendants reason to know that their projections were false and misleading. Financial projections can be fraudulent if the company bases them upon sales data or other numbers--current or historical material facts--that the company knows to be false or inaccurate. For instance, In re Oxford Health Plans, Inc., Sec. Litig., 187 F.R.D. 133, 140 (S.D.N.Y. 1999), found that plaintiffs stated a claim for fraud where the company's financial projections were based upon accounting figures defendants knew to be incorrect, given the inability of their computer system to accurately track the company's medical insurance claims.

30

However, unless there is an underlying misstatement of current fact, forward-looking financial projections, if accompanied by proper risk disclosures, are protected by the safe harbor provision in 15 U.S.C. § 78u-5(c)(1).[6]  Plaintiffs argue that defendants' financial projections were not made with proper risk disclosures, as required by the statute; defendants dispute this assertion.  The Court need not decide this factual disagreement because even if the risk disclosures were insufficient, there is no ground on which plaintiffs may obtain relief if the underlying statements were not actually false or misleading.  As discussed supra, § II.B.2 - II.B.3, plaintiffs do not adequately plead that defendants' statements with regard to RadConnect RIS and HIPAA were false or misleading.

---

[6] Under the Exchange Act, a written forward-looking statement is protected by the safe harbor provision if:
    (A) the forward-looking statement is–
        (i)  identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement; or
        (ii) immaterial; or
    (B) the plaintiff fails to prove that the forward-looking statement–
        (i) if made by a natural person, was made with actual knowledge by that person that the statement was false or misleading; or
        (ii) if made by a business entity; was–
            (I) made by or with the approval of an executive officer of that entity; and
            (II) made or approved by such officer with actual knowledge by that officer that the statement was false or misleading
15 U.S.C. § 78u-5(c)(1).  Oral statements are protected by similar provisions.  See 15 U.S.C. § 78u-5(c)(2).

31

Not only do plaintiffs fail to allege facts showing that the underlying statements were false, they fail to allege a nexus between any shortcomings in VitalWorks' products and the company's financial results. The fact that RadConnect RIS did not sell as well as hoped (or even failed completely), or that HIPAA revenues were lower than expected, does not mean that the company's subsequent downward revision was due to those factors alone. As plaintiffs themselves assert [Compl. ¶ 52-53], in 2002-2003 VitalWorks sold and supported many other software programs, which also had technical difficulties that may have frustrated customers. Plaintiffs need not show exactly which items caused which losses, but there must be some basis to infer causation. For example, plaintiffs in In re Scholastic, 252 F.3d at 70-71, met their burden when they alleged that the publishing company took a write-off of approximately the same amount as the losses incurred by increased returns of a particular series of children's books. Because their claim centered on concealment of the increasing return rate, and the amount of loss later reported approximately matched the amount of the returns, the Second Circuit found a sufficient nexus for the case to survive a motion to dismiss. Id.

By contrast, plaintiffs here do not allege how much of VitalWorks' financial projections were based upon expected sales of RadConnect RIS. They do not allege that the revised financial projections announced in October, 2002, were of an amount that

can be correlated to any financial losses attributable to
RadConnect RIS.  Therefore there is no nexus alleged between
VitalWorks' revised financial projections and bugs in the
software.  For the same reason, the allegations of fraud in
financial projections fall short to the extent they are based on
expected HIPAA revenue.  There is no allegation of how much HIPAA
revenue VitalWorks expected, how much was reasonable to expect,
or how those expectations factored into the overall financial
projections that plaintiffs say are fraudulent.  Without any
alleged causal connection, plaintiffs' complaint fails to provide
a sufficient basis from which to infer an intent to defraud.

**D.    Circumstantial Evidence of Scienter**

Plaintiffs argue that, although they do not have any direct
evidence of fraud--anything showing that defendants knew their
statements were false and intended to mislead the investing
public--circumstantial evidence should give rise to an inference
of fraud.  In particular, plaintiffs allege that a series of
sales of VitalWorks stock by the company's directors and officers
shows that they deliberately inflated the stock price and sold
their own shares before the public became aware of VitalWorks'
disappointing estimates in October 2002.

**1.    Standard**

The PSLRA requires a complaint to "state with particularity
facts giving rise to a strong inference that the defendant acted

33

with the required state of mind." 15 U.S.C. § 78u-4(b)(2). The
required state of mind in an action under section 10(b) and Rule
10b-5 is "an intent to deceive, manipulate or defraud." Kalnit
v. Eichler, 264 F.3d 131, 138 (2d Cir. 2001), quoting Ganino v.
Citizens Utilities Co., 228 F.3d 154, 161 (2d Cir. 2000). There
are two methods for pleading such intent. A plaintiff may allege
"facts demonstrating that defendants had both the motive and an
opportunity to commit fraud," or a plaintiff may allege "facts to
show strong circumstantial evidence of defendants' conscious
misbehavior or recklessness." In re Scholastic, 252 F.3d at 74.

     "The motive and opportunity element is generally met when
corporate insiders misrepresent material facts to keep the price
of stock high while selling their own shares at a profit.
'Unusual' insider sales at the time of the alleged withholding of
negative corporate news may permit an inference of bad faith and
scienter." In re Scholastic, 252 F.3d at 74 (internal citations
omitted). To decide whether a trade or series of trades is
"unusual," the court must examine a variety of factors, including
"the amount of profit from the sales, the portion of
stockholdings sold, the change in volume of insider sales, and
the number of insiders selling." Id. at 74-75.

### 2.    Alleged Insider Trading at VitalWorks

     Plaintiffs allege that all three named defendants sold large
numbers of shares during the class period. These sales came in

two waves: one in late April/May 2002, four to six weeks after VitalWorks introduced RadConnect RIS onto the market on April 11; and one in August/September 2002, before VitalWorks announced its downward revisions to financial projections on October 23. The complaint alleges that during the class period defendants collectively sold 703,926 VitalWorks shares.

On May 31, 2002, Defendant Walsh sold 58,736 shares,[7] realizing approximately $510,000. [Compl. ¶ 107]. On May 30, 2002, Defendant Manto sold about 200,000 shares, realizing around $1,600,000 in proceeds. Id. at ¶ 108. On April 26, 2002, Defendant Kahane sold about 50,690 shares, for $380,000, and on May 30, 2002, he sold another 300,000 shares, realizing $2,430,000. Id. at ¶ 109.

On August 20, Defendant Walsh sold 90,000 shares for $723,000. Id. at ¶ 107. Defendant Kahane sold 4,500 shares for $38,000 on September 5. Id. at ¶ 109. The complaint also alleges that other members of VitalWorks' upper management, not defendants in this case, engaged in heavy trading of VitalWorks stock in May/June 2002 and August 2002, during the class period. Id. at ¶ 110. Moreover, plaintiffs allege, defendants did not sell any VitalWorks shares before or after the class period. Id. at ¶ 111(c). Plaintiffs argue that the highly-coordinated

---

[7]Defendants argue that these shares belonged to Sarah Walsh, Mr. Walsh's wife. For purposes of this Motion to Dismiss, the Court assumes plaintiffs' version of the facts to be true.

timing, the large dollar amounts, and the large number of directors involved, together raise suspicion.

The decisions in which courts have considered whether insider trading was suspicious are highly fact-specific. This case does not fit easily within any of them. In <u>In re Scholastic</u>, 252 F.3d at 75, the Second Circuit held that scienter could be inferred from the following facts: there was only one named defendant, who was a director of the Scholastic book publishing company; approximately one month before Scholastic revealed damaging facts concerning its inventory, the defendant sold 80% of his Scholastic stock for a profit of $1.25 million; he had not sold any of the Scholastic stock for about one and a half years prior to the 80% sale.

In <u>San Leandro</u>, 75 F.3d at 813-14, however, the Second Circuit held that a stock sale was not suspicious when a defendant sold $2 million in company shares only days before the company announced reduced profit expectations. The facts that only one out of several defendants sold shares, and that the defendant "retained a large holding in the company, and actually acquired more shares by the conclusion of the transaction than he had sold, [made] clear that the trading was not unusual." <u>Id.</u> at 814 (internal quotation and citation omitted).

<u>Acito</u>, 47 F.3d at 54, involved two stock sales by one outside director just before the company announced downward

36

revisions in its financial projections.[8]  The Second Circuit held
that neither sale was fraudulent because the defendant had
previously announced the first sale in a plan filed with the
Securities and Exchange Commission, and the second sale of 30,000
shares, made 20 days before the negative announcement,
represented less than 11% of his holdings in the company.  Id.
Additionally, no other directors of the company had sold stock
during the class period.  Id.  Taking those factors together, the
Second Circuit held, there was no inference of fraud.  Id.

The main factor distinguishing the present case from those
discussed above is timing.  The cases above all contained
allegations that the defendants sold off large quantities of
stock within a matter of days before they announced disappointing
news about their businesses.  Even if other factors rendered the
sales not suspicious, at least the timing suggested that the
defendants were selling stock on the basis of insider information
shortly before the market received the bad news.  Here, in
contrast, the timing is the opposite.  Defendants sold much more
stock in the spring than the fall.  If defendants really intended
to sell off their stock to avoid the negative reaction to the
October 23, 2002, announcement, one would expect that the fall

---

[8] Imcera Group, the corporate defendant in the case,
manufactured animal medications.  Acito, 47 F.3d at 50.  The Food
and Drug Administration (FDA) on three occasions found production
problems in one of Imcera's factories, so the company was forced
to suspend sales, leading to financial losses.  Id. at 51.

sales would be much larger than the spring sales.  Instead, only two defendants are alleged to have sold anything at all, and those sales were relatively small in comparison to the spring sales:  $723,000 in mid-August and $38,000 in early September. Moreover, these sales occurred nine weeks and seven weeks, respectively, before VitalWorks' October press release and conference call.  This timing is not such as to raise a "strong inference," 15 U.S.C. § 78u-4(b)(2), that defendants were trying to sell off stock on the basis of inside information before the market discovered the bad third quarter news.

Plaintiffs allege that the spring sales were suspicious because defendants were attempting to take advantage of artificially inflated stock prices that were based upon their announcements concerning RadConnect RIS and HIPAA revenues. RadConnect RIS was introduced on April 11, 2002.  VitalWorks' stock price appears not to have reacted to that announcement.[9] On April 23-24, VitalWorks issued a press release announcing first quarter earnings and projections for the year of 2002.  The market did react positively.  VitalWorks' stock jumped from a high of $6.23/share on April 22, to a high of $7.50/share on

_____

[9] The Court takes judicial notice of VitalWorks' published stock prices. See Ganino v. Citizens Utils. Co., 228 F.3d 154, 167 n. 8 (2d Cir. 2000).  On April 1, 2002, VitalWorks stock reached a high price of $6.24/share.  On April 12, it reached a high of $6.04. On April 15, it had declined to $6.01.  Therefore the market seems not to have reacted to the introduction of the software.

April 24 and a high of $8.40/share on April 25.  Then defendant Kahane sold $380,000 worth of shares on April 26, 2002 (that day's high price was $8.20; the closing price was $7.33).

However, the bulk of the spring sales occurred on May 30-31, 2002, over a month after the press release.  VitalWorks' stock did reach historically high prices on those dates (closing at $8.30 and $8.60, respectively).  But plaintiffs do not allege that defendants did anything in May that would have caused these high prices.  Indeed, VitalWorks' average stock price continued to rise throughout the spring and summer, but there is no specific connection alleged between those increases and any statements by management.  The higher stock prices on August 20, 2002 (closing at $8.02) and September 5, 2002 (closing at $8.17), when the fall sales occurred, do not seem to correlate at all with any particular announcements that plaintiffs claim were fraudulent.  Overall, this timing does not suggest a concerted effort to take advantage of artificially inflated stock prices, or to dump the stock just before the investing public discovered a fraud.

Looking at the other elements, it is possible that the fact that all the named defendants sold their stock could be deemed suspicious.  In re Scholastic, 252 F.3d at 75.  Additionally, it could be suspicious that other members of upper management who are not defendants also sold VitalWorks shares at about the same

times, although there are no prior decisions so holding.[10]
However, the timing still does not suggest a concerted effort
among all the defendants to sell stock at once, before bad news
got out.  Defendants Manto and Walsh sold stock on May 30 and 31,
respectively, but those are the only closely-timed sales that are
alleged.  The others are weeks apart, which does not suggest
coordination.

The change in volume of insider sales might be considered
unusual because none of the defendants sold any VitalWorks stock
before or after the class period.  One could argue that this is
evidence that the defendants deliberately deceived the market so
they could sell off their shares while the price was high.  One
could also interpret these circumstances simply as stockholders
selling when VitalWorks stock was at its peak price, which they
did nothing illegal to create.  Again, given that the timing is
not directly linked to the April 23 or October 23, 2002
announcements, the Court cannot conclude that simply because the
defendants sold stock during the class period, that that change
in volume itself raises a "strong inference" of fraudulent
intent.  15 U.S.C. § 78u-4(b)(2).

As for the fourth factor, it is unclear whether the dollar
amount of sales is significant.  Neither party has put the

---

[10] Though plaintiffs allege that all three named defendants
sold shares during the class period, they do not allege how many
officers or directors sold shares, or how many shares were sold.

numbers in context; the Court has no basis for inferring whether the stock sales could be considered large by VitalWorks or American corporate standards.  During April and May 2002, Defendants Walsh, Manto and Kahane engaged in trades of about $0.5 million, $1.6 million and $2.8 million, respectively, for a total of $4.92 million.  The trades in September and October totaled $761,000.  In San Leandro, 75 F.3d at 814, the Second Circuit held that a sale of $2 million of stock was not significant, but the court was also considering the fact that no other named defendants sold their shares during the class period. In Rothman, 220 F.3d at 94-95, the Second Circuit held that even $20 million of stock sales probably was not significant when it represented 9.3% of the defendant's holdings.  However, In re Scholastic, 252 F.3d at 75, held that a stock sale worth $1.25 million was significant when it represented a large portion of the defendant's holdings in the company.

The lesson from these cases is that dollar amounts "cannot be considered in isolation."  In re Scholastic, 252 F.3d at 75. Courts also look to the percentages of stock sold and retained. In this case, plaintiffs and defendants reach different calculations, and the complaint does not allege how much stock each defendant owned initially or retained after selling the listed shares.[11]  Neither party points to anything in the public

---

[11] In their motion to dismiss, defendants assert that Walsh, Manto and Kahane retained 97%, 84% and 84% of their stock

documents that would show the total number of VitalWorks shares
owned by defendants during the class period.  Therefore the Court
finds that the amounts of these stock sales, without any
contextual information, cannot give rise to a "strong inference"
that defendants acted with the intent to defraud.  See 15 U.S.C.
§ 78u-4(b)(2).

     As discussed supra, §§ II.B.2-II.B.3, plaintiffs also fail
to allege any direct evidence that defendants knew about the
alleged shortfalls in revenue from RadConnect RIS or HIPAA before
their October 23, 2002, announcement.  Without sufficient
allegations of scienter, the Section 10(b) claims must be
dismissed under Fed. R. Civ. P. 9(b) and 12(b)(6).  San Leandro,
75 F.3d at 814.

     **E.   Controlling Person Liability**

     A person who either directly or indirectly controls another
who violates the Exchange Act may be held jointly and severally

---

respectively.  Plaintiffs assert in their opposition that the
numbers are lower, and specifically that Kahane retained only
about 75% of his stock.  Plaintiffs also state that they need
discovery to make accurate calculations.  None of this
information is contained within the complaint or any public
documents referenced in the complaint, and therefore the Court
cannot and does not consider it.  Brass v. American Film Techs.,
Inc., 987 F.2d 142, 150 (2d Cir. 1993) ("When determining the
sufficiency of plaintiffs' claim for Rule 12(b)(6) purposes,
consideration is limited to the factual allegations in
plaintiffs' amended complaint, ... to documents attached to the
complaint as an exhibit or incorporated in it by reference, to
matters of which judicial notice may be taken, or to documents
either in plaintiffs' possession or of which plaintiffs had
knowledge and relied on in bringing suit.")

liable for the violation.  <u>See</u> 15 U.S.C. § 78t(a).  To state a claim for controlling person liability, plaintiffs must show: (1) a primary violation of Section 10(b) by the controlled person; (2) control of the primary violator by the defendant; and (3) "that the controlling person was in some meaningful sense a culpable participant."  <u>SEC v. First Jersey Sec., Inc.</u>, 101 F.3d 1450, 1472 (2d Cir. 1996).  Because the Court finds that plaintiffs have not sufficiently alleged a primary violation of Section 10(b), plaintiffs' claim under Section 20(a) must also be dismissed.

## III.  CONCLUSION

Accordingly, defendants' motion to dismiss the consolidated class action complaint is GRANTED, and the complaint is dismissed with prejudice.  The Clerk is directed to close this case.

IT IS SO ORDERED.

_____

_____

_____    Janet Bond Arterton, U.S.D.J.

43

Dated at New Haven, Connecticut:    <u>September    , 2004</u>